## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NORTH END CHAMBER OF COMMERCE, INC., 119 SALEM ST., INC., d/b/a RISTORANTE EUNO, ANTICO FORNO, INC., d/b/a ANTICO FORNO, AQUA PAZZA, INC., d/b/a AQUA PAZZA, ASSAGGIO, INC., d/b/a ASSAGGIO, CASARECCE LLC, d/b/a CASARECCE RESTAURANT, DOLCE, INC., d/b/a DOLCE, FULL COMP, INC., d/b/a MARE OYSTER BAR, IL PANINO EXPRESS, INC., d/b/a QUATTRO RISTORANTE, IL PANINO, INC., d/b/a TRATTORIA IL PANINO [PARMENTER ST.], MARNICO, INC., d/b/a NICO RISTORANTE, MONICA'S TRATTORIA ON PRINCE, INC., d/b/a MONICA'S TRATTORIA, MONICA'S, INC., d/b/a MONICA'S RESTAURANT, and d/b/a VINOTECA DI MONICA, NICOMAR, INC., d/b/a STREGA, SCHIAFFO, INC., d/b/a CARMELINA'S, STREGA PIZZERIA & CAFÉ CORP., d/b/a RINA'S, TERRAMIA, INC., d/b/a TERRAMIA RISTORANTE, TRATTORIA IL PANINO HANOVER, INC., d/b/a TRATTORIA IL PANINO [HANOVER ST.], TRESCA RESTAURANT GROUP, LLC, d/b/a TRESCA,  UMBRIA NORTH END, INC., d/b/a UMBRIA, VADO PAZZO, INC., d/b/a BRICCO RISTORANTE & ENOTECA, and VILLA FRANCESCA'S, INC., d/b/a RISTORANTE VILLA FRANCESCA,

                Plaintiffs,

vs.

CITY OF BOSTON,

                Defendant.

CIVIL ACTION NO._____

### COMPLAINT

### DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This dispute involves the City of Boston's unequal, unfair, and discriminatory treatment of Italian restaurants in Boston's North End in its administration and operation of the City's outdoor dining program in 2022 and 2023.  The plaintiffs are twenty-one (21) Italian restaurants in the North End and the North End Chamber of Commerce.  The defendant is the City of Boston, which treated the North End restaurants differently than all other restaurants across the City, in both its application of the City's outdoor dining program in 2022, and in its refusal to even consider outdoor dining applications from North End restaurants in 2023.

2.     The City's outdoor dining program began in 2020, after Massachusetts declared a state of emergency in response to the COVID-19 pandemic and temporarily closed certain businesses throughout the state, including restaurants.  The closure of Boston's restaurants caused tremendous economic strain on owners and their employees, particularly in the North End.  The North End has the City's highest concentration of restaurants, most of which are Italian restaurants.  Unfortunately, some failed and were forced to close their doors.  Despite those dire times, many North End restaurants supported their community by preparing food for the needy as well as first responders throughout the pandemic.

3.     Boston Mayor Martin J. Walsh initiated a temporary outdoor dining program in May of 2020 and Massachusetts Governor Charles D. Baker issued an executive order authorizing all restaurants to re-open and provide "outdoor table service."  By early June of 2020, approximately 550 Boston restaurants set up outdoor, on-street café zones.  The re-opening of the North End's Italian restaurants through outdoor dining was central to their recovery and the revitalization of economic activity in this struggling neighborhood.  The first two years of the outdoor dining program occurred during the Walsh Administration, though Acting Mayor Kim Janey oversaw the 2021 program after Mayor Walsh resigned to serve as the Secretary of the U.S. Department of Labor in March of 2021.

4.      The events that led to this case began in late 2021, following the election of Boston's current Mayor, Michelle Wu.  In March of 2022, the City singled out the North End restaurants by requiring them to pay steep fees to participate in the outdoor dining program over a shortened season, while permitting every other restaurant in Boston to participate for *free* during a longer season.  The next year, in February of 2023, the City again singled out the North End restaurants, this time by *banning* them from participating in the 2023 outdoor dining program for improper reasons.

5.      The plaintiffs allege that the City's conduct violated their constitutional rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment, and its imposition of harsh participation fees in 2022 was an unlawful tax.  They further claim that the City's actions should be judicially declared invalid and unlawful because they were the result of arbitrary and capricious decision-making and were contrary to law.

6.      The plaintiffs in this case hail from the North End of Boston, the City's oldest neighborhood that has been home to thousands of Italian immigrants and Italian Americans since the late 1800s.  Known worldwide as the Italian section of Boston and "Little Italy," the North End possesses a strong sense of community and tradition.  Numerous small businesses, especially restaurants, cafes, and grocery stores, form the backbone of this vibrant, ethnic community.  For many, owning one of them is the essence of the American Dream.

7.      The North End's Italian restaurants are legendary.  Most are small, family-owned businesses that have been independently operated for generations.  Many current restaurant owners began their early work careers as dishwashers and waiters at other North End restaurants.  Eventually, through hard work, grit, and determination, they saved enough to build their own businesses from the ground up.  Today, generations of family members still cook, wait tables, and work alongside their employees, many of whom are immigrants from all over the world. The restaurants are essential to the heart and soul of Boston.  They are shining lights that keep the City vibrant.

8.      The North End Italian restaurant owners bring this action against their beloved City of Boston—which is their home—with a heavy heart because they are a vital part of the ethnic fabric that makes Boston the remarkable, diverse, multicultural city that it is today.  But the plaintiffs believe that over the past two years, the City has backed them into a corner, leaving them with no choice but to resort to the judicial system to achieve a fair and just resolution of a controversy that impacts their livelihood, their dignity, and their values.

9.      This unfortunate dispute arises out of the City's current administration's misguided and ill-founded decisions to mistreat and discriminate against the North End's Italian restaurants—*knowing it would inflict financial hardship on them*—just as they were beginning to recover from the crisis caused by the pandemic.  During the pandemic, the City's outdoor dining program was essential to the very existence of restaurants citywide.

10.      In its first two years, 2020 and 2021, Boston's outdoor dining program was an outstanding success, enabling restaurants to recoup some of their losses.  The City treated all restaurants participating in the program equally and fairly—*irrespective of the neighborhood in which they were located and regardless of the ethnicity of their owners or the color of their skin.*

11.      When planning for the 2021 outdoor dining program, Mayor Walsh recognized that each neighborhood had its own opportunities and challenges for outdoor dining.  He addressed the specific needs of restaurants and residents by using a collaborative process, taking into account many contributions from residents, restaurants, community groups, and other stakeholders.  The North End's 2021 plan balanced public safety concerns with the need to share the public way.

### The 2022 North End Outdoor Dining Plan

12.      The City's mistreatment of the North End Italian restaurants began within the first three months of Mayor Wu's Administration, which started on November 16, 2021.  It has continued to this date.  From December 2021 to mid-February 2022, the City prepared a special outdoor dining

plan for the North End.  Unlike the Walsh Administration, the Wu Administration's 2022 outdoor dining program targeted the North End restaurants by imposing harsh economic penalties on them as the price to participate in the program. The City required North End restaurants to pay a $7,500 impact fee and monthly fees of $480 for each parking space used by their outdoor patios.  Additionally, the City limited the North End's outdoor dining season to just five months.  By contrast, every other participating restaurant in Boston paid no impact fee, paid no monthly parking fees, and enjoyed an eight-to-nine-month outdoor dining season.

13.     Aware that public revelation of the City's 2022 North End plan would stir citywide controversy, the City deployed a stealth strategy to tightly control the plan preparation process and restrict the dissemination of information about the plan.  In doing so, the City eschewed public collaboration and transparency, leaving essential stakeholders in the dark, including the City's own North End Outdoor Dining Committee.  Since most restaurants in the North End are Italian restaurants, the City was well aware that its draconian measures would adversely impact one ethnic group—Italian Americans.  Having decided the terms of the North End plan by mid-February 2022, the City then delayed the announcement of the plan for a month until two weeks before the outdoor dining season's opening date on April 1, 2022.

14.     Although the North End plan was already etched in stone, in mid-February 2022, the City told the public it was seeking a "community review" of outdoor dining in the North End and welcomed comments.  The City withheld information from the public about the punitive aspects of North End plan.  Members of the public, who actually believed they were contributing to the process, submitted general comments on whether they favored outdoor dining.  Their comments, however, were unrelated to the key features of the North End plan.  The so-called "community review" was merely symbolic, creating a false impression of public participation in a transparent process.

15.     On Friday night, March 18, 2022, two weeks before the start date of the City's outdoor dining season, the City finally disclosed the onerous terms of the North End plan at a mandatory meeting of North End restaurants.  In addition, the City told the restaurants that the stiff impact fees would be used to provide mitigation programs and services for the North End pursuant to recommendations made by a committee of North End community members and local elected officials. The City expected the Italian restaurant owners would be caught off-guard and unprepared to respond.

16.     Not surprisingly, the City's announcement of the North End plan stunned and outraged the North End restaurant owners, who had no idea the City had contemplated discriminating against them.  Several restaurant owners and City residents strenuously protested the City's disparate treatment.  They questioned the fairness of the fees, asking why they should pay for services the City already should be providing, such as street sweeping, sidewalk cleaning, police patrol, and rodent control.  Some restaurant owners openly challenged the legality of the North End plan, going so far as to suggest the filing of a lawsuit against the City.

17.     The City's plan generated immediate backlash from the North End community.  Angry and disappointed residents contacted City officials and opposed the penalties and restrictions.  One resident denounced the City's actions, claiming that, coupled with the possible elimination of Columbus Day, it could be viewed as signaling an unnecessary attack on Italian Americans.

18.     By Sunday, March 20, 2022, just two days after the mandatory meeting, the City plotted how it would defend a lawsuit if the North End restaurants challenged the North End plan in court. In an internal e-mail, the City considered retaliating by imposing a ban of outdoor dining in the North End by stating: "***If they sue, can we just say 'fine, we are shutting down the North End program.'***"

19.     The next day, March 21, 2022, at the annual St. Patrick's Day breakfast, Mayor Wu added fuel to the fire by stating she was ***"getting used to dealing with problems that are***

***expensive, disruptive and white.***" North End restaurant owners, including the plaintiffs, believed the Mayor made disparaging comments that were racially and/or ethnically biased and aimed at them, and did not credit the Mayor's subsequent explanation that her reference to disruptive "white" problems meant "snowflakes" and "snowstorms."

20.    Days later, on March 24, 2022, concerned citizens and a North End Italian restaurant owner started a petition to oppose the City's assessment of expensive fees on the restaurants.  The petition quickly received an overwhelmingly positive response, garnering over 37,500 supporters.  The petition and its outcome were made known to Mayor Wu, other City officials, and elected officials.

21.    The next day, March 25, 2022, Mayor Wu swiftly responded with a public threat to economically crush the restaurants.  She sent a letter to North End restaurant owners, threatening to ban outdoor dining in the North End unless a "critical mass" of them acceded to the City's harsh terms of the North End plan:

> If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of the season.

22.    In the public letter, Mayor Wu attempted to justify the City's disparate treatment of the North End restaurants by citing reasons why the fees were necessary to address "unique impacts of outdoor dining on the quality of residential life."  All the reasons were pretextual.  They either lacked factual support, were erroneous, or did not provide an objectively valid basis for the more stringent requirements.

23.    The Mayor's letter and comments were sharply criticized by the media.  In an effort to quell the swelling public opposition and wave of adverse publicity, Mayor Wu scheduled a press conference at City Hall on March 29, 2022, to address the controversy.  But even that was mishandled and backfired.  Before the press conference even started, the City initiated a heated encounter with some North End restaurant owners by excluding them from attending because they had voiced

opposition to the North End plan.  It thereby prevented public discussion of the controversial issue by those who held a viewpoint contrary to the City's position.

24.    Following this rocky start, Mayor Wu then made a provocative statement to justify the City's differential treatment of the North End restaurants by declaring:  ***"Equity doesn't mean equality all across the board."***  But as far as the North End restaurant owners were concerned, the dispute concerned the City's "unequal" treatment of similarly situated City businesses participating in a City program.  The North End restaurants did not consider the Mayor's vague concept of "equity" as a valid basis or appropriate explanation for overt discrimination.

25.    Next, during the question-and-answer segment, Mayor Wu stated that there are ***"needs all across our City"*** pertaining to rodent control, clean streets, trash pickup, and pedestrian safety, and no one from the City ascribed blame for these problems to the restaurant owners or even to outdoor dining.  Yet, the City had imposed the fees on the North End restaurants to pay for those very problems, which existed long before outdoor dining.  In effect, Mayor Wu admitted that the "quality of life issues" were citywide issues—not just North End issues—and they were not caused by the North End restaurant owners or outdoor dining.

26.    Finally, Mayor Wu repeatedly assured the public that the City intended to use all the funds paid by the North End restaurants to specifically address the "impacts" caused by outdoor dining in the North End.  She guaranteed that "[w]e are putting every dollar that we have to good use," noting "there is a tremendous amount of need in our communities and in our neighborhoods" and the fees were "meant to address the particular impacts of this program."  As it turned out, the City did not live up to that promise.

27.    City records show the City did *not* later allocate funds to provide mitigation programs and services to the North End pursuant to recommendations of a North End community committee. Worse, those records show the City instead used some of the funds to purchase an electric street

sweeper for $552,000 in the summer of 2022 to advance the Mayor's Green New Deal, which called for the electrification of the City's entire fleet of vehicles. The City "expensed" this high-priced vehicle to the 2022 North End outdoor dining program, even though it was purchased for citywide use. The electric street sweeper was unrelated to any requirements of the North End program. The City used proceeds from its controversial North End plan to promote a political climate justice agenda.

28.     The City also provided no process for the North End restaurant owners to appeal or otherwise challenge the terms of the North End plan. Consequently, shortly after the North End's outdoor dining season began, several restaurant owners filed a complaint in federal court against Mayor Wu, alleging that the fees imposed by the City were unconstitutional and violated state law.

### The 2023 Outdoor Dining Ban

29.     Several issues that plagued the City's 2022 flawed North End plan reemerged when the City banned outdoor dining in the North End for the 2023 season. Once again, the City singled out the North End restaurants from all other Boston restaurants. This time, the City employed a highly irregular process to limit the Italian restaurants from meaningfully participating in discussions leading to the ban. Conversely, the City provided favored treatment and extraordinary access to the North End/Waterfront Residents Association ("NEWRA"), a politically powerful community organization that had openly opposed the North End restaurants and pressed for the ban.

30.     The events leading to the ban began shortly after the North End's abbreviated outdoor dining season had ended. At that time, there was a strained relationship between the City and the North End Italian restaurants. The restaurants' federal lawsuit against Mayor Wu was pending. Local and national media had published reports that were highly critical of Mayor Wu and the City. The restaurants had just been forced to pay a season's worth of hefty fees while the rest of Boston's restaurants participated in the program for free. And just one week after the North End's outdoor dining season ended, Mayor Wu announced that a new holiday, Indigenous Peoples' Day, would be

celebrated in Boston on the same day as Columbus Day.  Many plaintiffs viewed Mayor Wu's act as a deliberate ethnic affront meant to overshadow or symbolically replace the only federal Italian holiday, since the Mayor easily could have chosen any one of hundreds of other days of the year to celebrate the new holiday.

31.     Meanwhile, NEWRA, representing a small fraction of North End residents, began lobbying City Hall to ban outdoor dining in the North End.  NEWRA's leadership flooded the City with e-mails demanding access to high-level City officials to discuss putting an end to outdoor dining. The City accommodated NEWRA's requests, sending representatives to its monthly meetings, exchanging e-mails and calls with NEWRA, and hosting private meetings with NEWRA's leadership.

32.     On January 12, 2023, City officials attended a pivotal monthly meeting of NEWRA that was a turning point for the North End's 2023 outdoor dining season.  The purpose of the meeting was for NEWRA members to air their grievances regarding outdoor dining.  By January 12, 2023, the future of outdoor dining in the North End was the main issue on the plate of the City's outdoor dining program.  The North End was the City's largest restaurant district.  Outdoor dining was of critical importance to the Italian restaurants and the North End community, not just NEWRA's members.

33.     The proper forum to discuss this vital issue was a *public* forum, where stakeholders on all sides would have a fair opportunity to express their views and be heard.  Yet, the City abdicated its responsibility to organize and conduct a properly noticed public meeting on this important issue. Instead, it sent a legion of high-level City officials to attend the meeting.  In this manner, the City delegated its responsibility to conduct a public hearing to NEWRA—a private, partisan advocacy group with a known anti-outdoor dining agenda.

34.     A North End resident who closely covers North End events, issues, and news on a local blog attended the meeting and prepared a written account of what transpired.   Based on that account, it was a one-sided meeting attended by a "small group" at dinner time.  The attendees were

non-representative of North End residents as a whole.  The meeting bore little resemblance to an intelligent discussion of the issues surrounding outdoor dining, as its attendees did not allow any debate from those who disagreed with them.  The attendee concluded, "It's unfortunate that the City took what they heard there as a representative voice."

35.      Another meeting attendee—a lifelong North End resident—shared this view.  In an e-mail to the City after the meeting, she explained that much of the North End opposition to outdoor dining was generated by "a small group of residents that will always be against it [outdoor dining] and some for personal reasons against a restaurant owner."  She wrote, "I don't feel that the restaurant owners get a fair amount of respect at these public meetings. They are mocked and disrespected."

36.      In the days following the meeting, City officials held private phone calls with NEWRA members and private meetings with them, all of which occurred outside the public's eye and without the public's knowledge.  On the other hand, the City held a limited meeting with a handful of North End Italian restaurant owners supporting outdoor dining on January 19, 2023.  And as to that meeting, the City did not notify all North End restaurant owners or even those that had participated in past outdoor dining programs.  While the City was in near constant communication with NEWRA officials in this timeframe, it was tight lipped with the North End restaurant owners about a potential ban.

37.      By early February 2023, the City sided with NEWRA and decided to ban outdoor dining in the North End for the 2023 season.  Having already required the North End restaurants to pay large fees to participate in the outdoor dining program, the City surely understood that the economic consequences of a ban would be devastating for North End restaurants.

38.      On February 14, 2023, two days before announcing the ban, the City finally circulated a public notice about an "informational" North End meeting on outdoor dining on February 16, 2023, at Saint Joseph's Hall in the North End.  The notice said the meeting was to "provide an update to the neighborhood" on the outdoor dining program.  It made no mention of the ban.

39.     The meeting was held at St. Joseph's Hall as planned on February 16, 2023, with armed Boston Police officers lining the back of the church hall.  Once again, the North End Italian restaurant owners were caught off-guard and astonished when the City announced the ban.  As a final insult, while the meeting was in progress, the City issued a press release announcing that it would conduct a robust permanent outdoor dining program for every neighborhood in Boston except the North End. As to the North End, the press release stated, "The City will not be permitting on-street dining in the North End this year."

40.     The press release stated various purported reasons for the ban.  As was the case with Mayor Wu's ostensible justifications for the imposition of the harsh fees, all the reasons for the ban were pretextual.  They either lacked factual support, were erroneous, or did not provide an objectively valid basis for the ban.

41.     In this manner, the City fulfilled its prior retaliatory threat to end outdoor dining in the North End.  The City's ban reflected its yearlong bias, hostility, and ill will towards the North End Italian restaurants and the plaintiffs, some of which were parties to a federal lawsuit against the Mayor that was pending at the time of the ban.  The ban was discriminatory because it treated Italian American restaurants differently than similarly situated restaurants in other parts of Boston.  The ban also was facially discriminatory because it targeted a white ethnic group for disparate treatment and was not keyed to a legitimate state interest.

42.     Importantly, the process by which the City made its decision was highly irregular, unfair and the product of political favoritism. The City gave no advance notice to the plaintiffs that it was investigating or even contemplating the ban.  The City did not organize or hold a single public meeting to collect comments or opinions on the ban.  The City afforded no process or opportunity by which the North End restaurant owners could present evidence and advance arguments in support of their position.  And the City provided no process to appeal or challenge the imposition of the ban.

43.     By contrast, the City provided biased and favored treatment to NEWRA, which it knew was antagonistic to the North End restaurants.  It maintained continuous communication with NEWRA's leadership, engaged in back-channel decision making with NEWRA, and even hosted private meetings with NEWRA leaders at City Hall.

44.     By imposing the retaliatory ban, high-level City officials misused governmental power to punish and oppress the North End restaurants, which had publicly disagreed with City Hall's outdoor dining policy, had sought public support for their position, and had exercised their First Amendment rights to seek legal recourse against the City.

45.     The City's alarming decisions to punish and mistreat scores of North End family restaurants over the past two years have caused them to bring this lawsuit.  The North End's Italian restaurants have been victimized by the City's interference with the free market economy of Boston's competitive restaurant industry.  The City has placed them at a competitive disadvantage by requiring them to pay hundreds of thousands of dollars in fees just to participate in Boston's outdoor dining program and then by banning them from the outdoor dining program.  The ban, in turn, led to layoffs of restaurant employees.  This discriminatory conduct has caused the Italian restaurants to incur unwarranted costs and to lose considerable revenue and income.

46.     But the damage does not end with the Italian restaurants.  The restaurants draw a high volume of people to the North End, which has the salutary effect of generating customers for other businesses in the North End, many of which are members of the North End Chamber of Commerce, also a plaintiff.  Now, fewer diners and tourists frequent the North End due to the ban, and other non-restaurant businesses in the North End have lost revenue, too.

47.     The City's policies, which are contrary to law, have tarnished its image, its culture, and its sense of citywide community by discriminating against Italian American citizens who own and

operate most of the North End's restaurants.  The reputational damage to the City is both immense

and ironic, as the City's policies clash with a host of anti-discrimination policies and laws on its books.

## THE PARTIES

48.     Plaintiff the North End Chamber of Commerce, Inc. is a corporation organized under

the laws of the Commonwealth of Massachusetts with its principal place of business located at 256

Hanover Street, Suite 7, Boston, Massachusetts.  The North End Chamber of Commerce, Inc.

members include approximately fifty-nine restaurants, cafés, and other food-related businesses, among

other businesses located in the North End of Boston.  Twenty-one (21) members of the North End

Chamber of Commerce, Inc. are plaintiffs in this action and operate Italian restaurants in the North

End of Boston.  Many other members of the North End Chamber of Commerce, Inc., including

entities operating Italian restaurants in the North End who are not named plaintiffs, have standing to

bring this action in their own right.  The interests the North End Chamber of Commerce, Inc. seeks

to protect are germane to its purpose.

49.     Plaintiff 119 Salem St., Inc., d/b/a Ristorante Euno, is a corporation organized under

the laws of the Commonwealth of Massachusetts with its principal place of business at 119 Salem

Street, Boston, Massachusetts.  119 Salem St., Inc. operates an Italian restaurant known as Ristorante

Euno in the North End of Boston at 119 Salem Street.

50.     Plaintiff Antico Forno, Inc., d/b/a Antico Forno, is a corporation organized under

the laws of the Commonwealth of Massachusetts with its principal place of business at 93 Salem Street,

Boston, Massachusetts.  Antico Forno, Inc. operates an Italian restaurant known as Antico Forno in

the North End of Boston at 93 Salem Street.

51.     Plaintiff Aqua Pazza, Inc., d/b/a Aqua Pazza, is a corporation organized under the

laws of the Commonwealth of Massachusetts with its principal place of business at 135 Richmond

Street, Boston, Massachusetts.  Aqua Pazza, Inc. operates an Italian restaurant known as Aqua Pazza in the North End of Boston at 135 Richmond Street.

52.    Plaintiff Assaggio, Inc., d/b/a Assaggio, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 29 Prince Street, Boston, Massachusetts.  Assaggio, Inc. operates an Italian restaurant known as Assaggio in the North End of Boston at 29 Prince Street.

53.    Plaintiff Casarecce LLC, d/b/a Casarecce Restaurant, is a limited liability company formed under the laws of the Commonwealth of Massachusetts with its principal place of business at 285 Hanover Street, Boston, Massachusetts.  Casarecce LLC operates an Italian restaurant known as Casarecce Restaurant in the North End of Boston at 285 Hanover Street.

54.    Plaintiff Dolce, Inc., d/b/a Dolce, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 272 Hanover Street, Boston, Massachusetts.  Dolce, Inc. operates an Italian restaurant known as Dolce in the North End of Boston at 272 Hanover Street.

55.    Plaintiff Full Comp, Inc., d/b/a Mare Oyster Bar, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 3 Mechanic Street, Boston, Massachusetts.  Full Comp, Inc. operates an Italian restaurant known as Mare Oyster Bar in the North End of Boston at 3 Mechanic Street.

56.    Plaintiff Il Panino Express, Inc., d/b/a Quattro Ristorante, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 264 Hanover Street, Boston, Massachusetts.  Il Panino Express, Inc. operates an Italian restaurant known as Quattro Ristorante in the North End of Boston at 264 Hanover Street.

57.    Plaintiff Il Panino Inc., d/b/a Trattoria Il Panino [Parmenter Street], is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business

15

at 280 Hanover Street, Boston, Massachusetts.  Il Panino Inc. operates an Italian restaurant known as Trattoria Il Panino [Parmenter Street] in the North End of Boston at 280 Hanover Street.

58.     Plaintiff Marnico, Inc., d/b/a Nico Ristorante, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 417 Hanover Street, Boston, Massachusetts.  Marnico, Inc. operates an Italian restaurant known as Nico Ristorante in the North End of Boston at 119 Salem Street.

59.     Plaintiff Monica's Trattoria On Prince, Inc., d/b/a Monica's Trattoria, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 67 Prince Street, Boston, Massachusetts.  Monica's Trattoria On Prince, Inc. operates an Italian restaurant known as Monica's Trattoria in the North End of Boston at 67 Prince Street.

60.     Plaintiff Monica's, Inc., d/b/a Monica's Restaurant, and d/b/a Vinoteca di Monica, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 143 Richmond Street, Boston, Massachusetts.  Monica's, Inc. operates an Italian restaurant known as Vinoteca di Monica in the North End of Boston at 143 Richmond Street.

61.     Plaintiff Nicomar, Inc., d/b/a Strega, is a Massachusetts corporation with its principal place of business at 379 Hanover Street, Boston, Massachusetts.  Nicomar, Inc. operates an Italian restaurant known as Strega in the North End of Boston at 379 Hanover Street.

62.     Plaintiff Schiaffo, Inc., d/b/a Carmelina's, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 307 Hanover Street, Boston, Massachusetts.  Schiaffo, Inc. operates an Italian restaurant known as Carmelina's in the North End of Boston at 307 Hanover Street.

63.     Plaintiff Strega Pizzeria & Café Corp., d/b/a Rina's, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 374 Hanover

Street, Boston, Massachusetts.  Strega Pizzeria & Café Corp. operates an Italian restaurant known as Rina's in the North End of Boston at 374 Hanover Street.

64.     Plaintiff Terramia, Inc., d/b/a Terramia Ristorante, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 98 Salem Street, Boston, Massachusetts.  Terramia, Inc. operates an Italian restaurant known as Terramia Ristorante in the North End of Boston at 98 Salem Street.

65.     Plaintiff Trattoria Il Panino Hanover, Inc., d/b/a Trattoria Il Panino [Hanover Street], is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 280 Hanover Street, Boston, Massachusetts.  Trattoria Il Panino Hanover, Inc. operates an Italian restaurant known as Trattoria Il Panino [Hanover Street] in the North End of Boston at 280 Hanover Street.

66.     Plaintiff Tresca Restaurant Group, LLC, d/b/a Tresca, is a limited liability company formed under the laws of the Commonwealth of Massachusetts with its principal place of business at 233 Hanover Street, Boston, Massachusetts.  Tresca Restaurant Group, LLC operates an Italian restaurant known as Tresca in the North End of Boston at 233 Hanover Street.

67.     Plaintiff Umbria North End, Inc., d/b/a Umbria, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 250 Hanover Street, Boston, Massachusetts.  Umbria North End, Inc. operates an Italian restaurant known as Umbria in the North End of Boston at 250 Hanover Street.

68.     Plaintiff Vado Pazzo, Inc., d/b/a Bricco Ristorante & Enoteca, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 241 Hanover Street, Boston, Massachusetts.  Vado Pazzo, Inc. operates an Italian restaurant known as Bricco Ristorante & Enoteca in the North End of Boston at 241 Hanover Street.

69.     Plaintiff Villa Francesca's, Inc., d/b/a Ristorante Villa Francesca, is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 150 Richmond Street, Boston, Massachusetts.  Francesca's, Inc. operates an Italian restaurant known as Ristorante Villa Francesca in the North End of Boston at 150 Richmond Street.

70.     Defendant The City of Boston (the "City" or "Boston") is a Massachusetts municipality with its principal place of business at 1 City Hall Square, Boston, Massachusetts.

## JURISDICTION AND VENUE

71.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Massachusetts state law.

72.     This Court has subject matter jurisdiction over the federal law claims under 28 U.S.C. §§ 1331and 1343.  This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367.

73.     This Court has personal jurisdiction over defendant The City of Boston under M.G.L. c. 223A, § 3.  The exercise of personal jurisdiction over defendant The City of Boston is consistent with the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

74.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)-(c).

75.     An actual case or controversy has arisen between the parties because the defendant The City of Boston has unlawfully deprived the plaintiffs of their rights under the United States Constitution and the laws of the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### A Brief History of Italians in the North End[1]

76.      The North End is Boston's oldest neighborhood.  It borders Downtown Boston to the south, the West End to the west, and is otherwise surrounded by the Boston Harbor to the north and east, as shown on the map below:



77.      Beginning in the late 1800s, thousands of Italian immigrants traveled to the United States.  Many settled in the North End.  Most were poor, having left their personal belongings behind and spent their savings to travel to the United States with the hope of finding a better life in America. Early Italian immigrants in Boston commonly worked as laborers, living in North End tenements with relatives and others from their home villages. Given their poverty and language barrier, Italian immigrants in Boston frequently faced discrimination.

78.      In the early 1900s, over eighty-five percent of the Italians in Boston lived in the North End.  And by the 1930s, Italian immigrants formed the majority of North End residents.  The

---

[1] *See* Stephen Puleo *The Boston Italians* (2007).

neighborhood, which came to be known as "Little Italy," continued to attract large numbers of Italian immigrants through the 1960s and 1970s.

79.     North End Italians were known for their family values, work ethic, religion, and entrepreneurship.  Over time, North End Italians developed many thriving small businesses in their community, especially restaurants, cafés, and grocery stores.  Some of those small companies grew to national prominence and are now household names.  One such business, the Pastene Company, began in 1848 as a modest pushcart operation and eventually became one of North America's oldest family-run businesses.  Another, the Prince Spaghetti Company, was founded by Italian immigrants from Sicily in 1912 on Prince Street.  Its national rise was due, in part, to its 1969 iconic TV commercial featuring "Anthony" and the phrase "Wednesday is Prince Spaghetti day."

80.     Today, the North End retains much of its original Italian character.  Its population of approximately 11,000 resides in a wide variety of housing, ranging from small apartments in multi-unit, old brick buildings to new luxury condominiums lining Boston's waterfront.  The layout of residences, businesses, and streets that form the heart of the North End today are the direct result of the early settlement and development of the area by Italian immigrants.  Many consider the North End to be the best-preserved Italian neighborhood in the country.

81.     The North End is widely viewed as the Italian section of Boston.  Famous for its small ethnic businesses, including grocery stores, restaurants and cafés, the North End is a cherished destination for locals and tourists to savor colorful Italian feasts, attend processions honoring the saints, and visit historic buildings, including Paul Revere's home, the Old North Church, and the oldest public square in the country.  This neighborhood has a rich, cultural living history like no other.

82.     Among the crown jewels of the North End are its world renowned, legendary Italian restaurants.  The authentic Italian cuisine of the restaurants contributes to the ethnic ambiance that pervades this section of the City. The restaurants are beloved for their intimate settings and

neighborhood charm. People from near and far visit the North End to dine at its Italian restaurants. As one of Boston's premiere tourist attractions, they benefit the economy of the entire City.

83.     For decades, the North End's Italian restaurants and cafés have provided jobs not only for the local population but also for newly arrived immigrants. This practice is in keeping with the North End's long-standing and noble custom of helping immigrants find work and assimilate into the community. It exemplifies the City's view that "[i]mmigrants make great economic contributions to our City" and "Boston's economic success wouldn't be the same without immigrants as business owners, members of the workforce, and consumers."[2]

### The Pandemic and Outdoor Dining in Boston

84.     In late 2019, the novel coronavirus rapidly spread to multiple countries, including the United States, prompting the World Health Organization to announce a global pandemic. By March of 2020, the virus had infected Americans nationwide, causing the deaths of thousands. Through March and early April of 2020, several states, cities, and county governments imposed "stay at home" orders to stem the spread of the virus in the United States. In Massachusetts, Governor Baker declared a state of emergency and issued an executive order restricting non-essential person-to-person contact and movement outside the home. Certain businesses and organizations were temporarily closed, including restaurants.

85.     For several months, restaurants throughout Boston were shuttered, causing tremendous financial strain on owners and their employees. The North End, which has the highest concentration of restaurants in Boston, was particularly hard hit. Faced with no income and mounting expenses, many North End restaurants were pushed to the brink of bankruptcy. At least seven restaurants did not survive.

---

[2] https://www.boston.gov/departments/immigrant-advancement/immigrant-demographics

86.     Though facing bleak times, many North End restaurants supported their community by preparing food and providing necessities to the needy through curbside service and deliveries.  They extended similar service to first responders, including the Boston Police Department, fire houses, and Massachusetts General Hospital.

87.     On May 21, 2020, at the direction of Mayor Walsh, the City initiated a temporary outdoor dining program in response to the ongoing public health emergency.  Shortly thereafter, Governor Baker, recognizing the harsh economic damage incurred by the restaurant industry, issued another executive order authorizing the restaurants to re-open and provide "outdoor table service" on sidewalks, patios, decks, lawns, parking areas, or other outdoor spaces.[3]

## Boston's 2020 Temporary Outdoor Dining Program

88.     Under the Walsh Administration, Boston's temporary outdoor dining program began in late May 2020 and was scheduled to end on October 31, 2020, though that date was later extended. The Boston Licensing Board approved more than 550 requests for outdoor dining licenses.  By early June of 2020, restaurants throughout the City had set up outdoor, on-street café zones.  In the North End, many of the outdoor café zones resembled European-style cafes, equipped with umbrellas and plants.  The re-opening of the Italian restaurants in the North End through outdoor dining was essential to their economic recovery and sparked revitalization of economic activity in the neighborhood.

## Boston's 2021 Outdoor Dining Pilot Program

89.     Boston's 2020 outdoor dining program was an outstanding success, leading Mayor Walsh to issue a press release on December 10, 2020, announcing the City's plan to continue the

---

[3] Order Authorizing the Re-Opening of Phase II Enterprises, COVID-19 Order No. 37, Office of the Governor, Charles D. Baker, June 6, 2020.

program in 2021.  According to Mayor Walsh, the 2021 program would take into consideration the input of restaurants and residents:

> This year we saw the benefits outdoor dining can have on our neighborhoods: vibrant streets, support for local businesses, a safe and enjoyable experience for restaurant goers, and, in many ways, a lifeline for our small businesses during this challenging time.  We have appreciated the feedback from restaurants and residents and look forward to their continued input as we develop an outdoor dining plan for next year that balances public health, our restaurants, and our residents.

A true and accurate copy of the press release dated December 10, 2020, is attached as Exhibit 1.

90.     Based on public feedback, the City included some new features in the 2021 program. The 2021 program provided for consistent regulatory oversight and enforcement of all requirements to ensure that outdoor dining was safe and enjoyable.  It also featured a more streamlined and transparent online platform to facilitate the application process.

91.     In the City's formal announcement of the 2021 Outdoor Dining Pilot Program on March 1, 2021, Mayor Walsh not only praised the success of the City's 2020 program, but also addressed ways in which the 2021 program incorporated new features based on suggestions received from the community:

> The 2021 Outdoor Dining Pilot Program will continue many of the successful initiatives from last year's program, such as streamlined permitting and outdoor patios on roadways that enable restaurants with narrow sidewalks to offer patio seating to patrons, while offering new features based on community feedback.

92.     Restaurants that participated in the 2020 program were invited to re-apply.  The City also accepted applications from restaurants that did not partake in the 2020 program.  Recognizing that each neighborhood had its own opportunities and challenges for outdoor dining, the City worked to address the specific needs of restaurants, residents, and visitors across neighborhoods.

93.     Mayor Walsh approved a late March start date for the City's 2021 Outdoor Dining Pilot Program, though the start date for North End restaurants was slightly delayed to April 1, 2021, to provide the Licensing Board with sufficient time to finalize the plan for the North End.

94.     The preparation of the North End outdoor dining plan, which was completed in late March 2021, was highly collaborative and reflected lessons learned from the 2020 season.  It was the result of months of planning and extensive discussions with residents, businesses, restaurants, community groups, organizations, elected officials, and other stakeholders.  According to the City, the North End's plan specifically *balanced* residents' public safety concerns, such as emergency vehicle access, pedestrian safety, accessibility, and quality of life, with the need to share the public way.

95.     In late March 2021, shortly before the beginning of the outdoor dining program, Mayor Walsh was confirmed to serve as the Secretary of the U.S. Department of Labor and resigned as Boston's Mayor.  Kim Janey, the President of the Boston City Council, was designated to serve as Acting Mayor of the City Boston.  A special election for Mayor of Boston was scheduled for November 2, 2022.

96.     Like the 2020 outdoor dining program, the 2021 program enjoyed great success and was well-received by City residents.

### Citywide Complaints About Outdoor Dining

97.     Although a large percentage of City residents favored outdoor dining based on the success of the 2020 and 2021 programs, that view was not uniformly shared.  Outdoor dining also had its detractors. There were residents from *all* of Boston's neighborhoods who simply disagreed with the *concept of outdoor dining.*  Some fervidly opposed it in their neighborhoods.

98.     In 2020, the City received hundreds of e-mails from residents lodging complaints about the program.  They ranged from alleged improper dimensions of outdoor patios, loss of parking, failure to adhere to social distancing guidelines, excessive noise, trash and sanitation issues, rodents, sidewalk accessibility problems, traffic, to safety issues, and others.

99.     To address citizens' outdoor dining complaints in a more systematic way, the City encouraged residents to use its "311" call system to express their concerns in 2021.  The City's "311"

call system enabled citizens to submit non-emergency complaints to constituent service representatives.

100.    In 2021 alone, there were approximately 274,000 citywide complaints reported by "311" calls.  Of those complaints, only 140 pertained to the City's outdoor dining program.  The City also continued to receive some complaints by e-mail.

101.    As in 2020, there were complaints from residents in every neighborhood where restaurants participated in the program.  The number of complaints by each neighborhood varied but were largely proportional to the number of restaurants in the neighborhood.  The neighborhoods with the largest number of restaurants that participated in the 2021 program were the North End, Downtown Boston, Back Bay, the South End, South Boston, and Beacon Hill.  A brief summary of residents' complaints in various neighborhoods follows.

102.    **Back Bay:**  In the summer of 2021, City officials discussed a restaurant on Newbury Street, noting "the pedestrian experience is pretty tight here and more space is needed for people walking."  Days later, a nearby Newbury Street business owner questioned City officials if they had "heard anything back from the city's outdoor dining team regarding the extreme congestion on the sidewalk" by the restaurant.  In June 2021, a Back Bay neighborhood association reported that a popular social club "had taken the entire public way for seating space," which had "force[d] people to walk in the utility strip at the curb to get around it."  The neighborhood association commented that the area was "certainly not navigable by wheelchair."  A resident also complained about blaring music being played on the outdoor patio of a Newbury Street restaurant in May 2021.

103.    **South Boston:**  A South Boston resident commented that "we need to rethink the dining on the street," explaining there was a restaurant on West Broadway that has "made the street extremely dangerous."  The resident claimed that another restaurant on West Broadway had "created insanity on our street and this is just adding to the chaos."  On July 1, 2021, a resident protested that

a third popular restaurant on West Broadway had rodent and trash issues.  According to the resident, over the summer, the restaurant had "garbage overflowing from their dumpsters" and the "open garbage dumpsters … look like a health hazard."

104.    **Beacon Hill:**  Beacon Hill residents submitted their share of complaints, too.  One resident lodged over fifty complaints during the 2021 season about a restaurant on Chestnut Street, mostly citing excessive noise and COVID-19 infractions.  Traffic and safety concerns were the topic of another resident's complaint about a Beacon Hill restaurant on Bowdoin Street.  The resident questioned whether emergency vehicles, ambulances, and school buses were able to travel past the on-street café.

105.    **Charlestown:**  Several complaints about outdoor dining in Charlestown focused on problems caused by the layout of on-street patios.  In July 2021, a resident reported that an outdoor café on Second Avenue blocked a pedestrian pathway.  In April 2021, another resident complained that a bistro's outdoor patio used more space than was permitted on Monument Street, such that a fire truck had difficulty traveling on the street.

106.    **Dorchester:**  The dimension of outdoor dining patios of restaurants in Dorchester also surfaced as the source of complaints.  In June 2021, a Dorchester resident reported that the outdoor patio of a West Bellmore Street restaurant took up the entire sidewalk.  Another resident complained in June 2021 that an outdoor patio of an Adams Street restaurant was built so far into the street that it was struck by a passing vehicle.

107.    **Roxbury:**  Outdoor dining concerns in Roxbury involved traffic and safety.  A resident complained in July 2021 that a restaurant on the corner of Burrell Street caused a blind spot and was a traffic hazard.  Another reported that a Washington Street restaurant's outdoor patio was a "fire hazard" in June 2021.  And in October 2021, a resident reported the outdoor patio of a Columbus

Avenue restaurant blocked drivers' visibility and impaired their ability to turn from Northampton Street onto Columbus Avenue.

108.   **South End:**  Outdoor dining in the South End also was criticized by local residents. In September 2021, a South End resident protested the granting of an outdoor dining permit to a restaurant on Clarendon Street, noting it would eliminate the area where her children play, create noise on a quiet street, and use three or more resident parking spaces.  In April 2021, a South End resident reported that a Washington Street restaurant's outdoor seating extended too far into the street and created a visibility hazard for drivers exiting a nearby underground garage.

109.   **Downtown Boston:**  In Downtown Boston, residents complained separately in the spring of 2021 about two State Street restaurants, one of which blocked a residential entry way and the other restricted pedestrian use of the sidewalk.  Another complaint was submitted in April 2021, claiming that a Broad Street restaurant's patrons were seated in the middle of the sidewalk and some were not wearing masks.

110.   **East Boston:**  East Boston residents also registered complaints about outdoor dining. In May 2021, a resident claimed that a Maverick Street restaurant had used more space on the street than was allowed, which created a "dangerous public safety situation for bicycles, pedestrians and all other vehicles."  As to the same restaurant, another complaint asserted that "cars have to squeeze by" because the tables extended too far into the road.  In August 2021, a resident also reported that a Sumner Street restaurant had blocked part of the street for outdoor dining.

### NEWRA's Opposition to Outdoor Dining in the North End

### *NEWRA*

111.   There also were complaints about outdoor dining in the North End.  The primary source of those complaints was the North End/Waterfront Residents Association, known as

"NEWRA." Since the inception of the City's outdoor dining program, NEWRA opposed the concept and wanted it banned from the North End.

112.    To become a member of NEWRA, one must live in the North End or a section of the Boston Waterfront that runs along the outskirts of the North End and the Boston Harbor. NEWRA members comprise a small percentage of the North End's population.

113.    NEWRA members are not elected by North End residents. Its membership is voluntary. NEWRA does not represent the North End in any political, legal, or voting capacity. As such, NEWRA is not a voice of the North End and does not speak for its residents.

114.    The two neighborhoods where NEWRA members reside are vastly dissimilar. The North End is a longstanding Italian American neighborhood composed of Italian stores, historic landmarks and Italian restaurants. In contrast, Boston's Waterfront has no particular ethnic identity and is geographically removed from any impact of outdoor dining in the North End.

115.    The street layout, geography, and style and type of residences of the North End vary demonstrably from these features of the Waterfront. The North End's venerable brick sidewalks and streets are narrower than the concrete sidewalks and wide streets that outline the perimeter of the North End along the Waterfront, such as Commercial Street and a short segment Atlantic Avenue. Unlike most streets in the North End, Commercial Street and the section of Atlantic Avenue are multi-lane streets that run along the waterfront, delineating a boundary of the North End. During the 2021 outdoor dining season, there were only 4 North End restaurants located on the Commercial Street/Atlantic Avenue border that participated in the program.

116.    The North End's residences are modest in comparison to those on the Waterfront. For decades, the North End's close residential quarters cemented tight-knit bonds between generations of neighbors. On the other hand, the Waterfront is lined with luxury waterfront condominiums offering spectacular views of Boston Harbor. Aside from their expansive ocean views,

most of these multi-million-dollar condominiums boast 5-star amenities, including concierge services, doormen, fitness centers, and underground parking. Although the North End and the Boston Waterfront sections of Boston vary dramatically, NEWRA refers to them as a single neighborhood—the "North End/Waterfront."

117.    While styled as a "residents association" in name, NEWRA has functioned principally as a lobbying group over its 20-plus year history. During that time, it has monitored legislation, public health and safety issues, construction, and renovation projects. According to NEWRA's website, its "meeting topics" have included "a range of proposed or planned changes that would impact our neighborhood, including new government policies, traffic and public safety matters, construction and renovation projects, and uses of public parks and open spaces." NEWRA follows these topics and seeks to influence outcomes through lobbying efforts. It has historically opposed many developments and proposed projects in the North End.

118.    As part of NEWRA's lobbying efforts, it maintains extensive contact with public officials at the state and local level, including "local elected officials," and "representatives of city agencies." NEWRA's Zoning, Licensing & Construction Committee also has relationships with local agencies involved in planning, development and licensing. It has regularly invited state and local authorities to speak at its meetings, including then-mayoral candidates Michelle Wu and Annissa Essaibi George, Boston City Councilors, City and state transportation officials, and many others.

119.    Numerous NEWRA members, including members of its leadership, are not Italian Americans. Some reside in waterfront luxury condominiums along Commercial Street. Although several influential NEWRA members have been largely unaffected by the City's outdoor dining program, they have steadfastly opposed the concept of outdoor dining in the North End.

*Formation of the North End Outdoor Dining Committee*

120.    To further its objective of opposing permanent outdoor dining in the North End, in the fall of 2021, NEWRA members called for a meeting with City officials.  In response, the City held a public meeting in mid-September 2021 as a forum for residents to express their views.   At the meeting, NEWRA members aired complaints about public safety, health, loud noise, sidewalk access and household doorways, trash on sidewalks and streets, cleanup, and rodents.  This was not the first time that NEWRA made complaints about "quality of life" conditions in the North End, which have been a common NEWRA theme for many years.  Most of NEWRA's complaints applied to the concept of outdoor dining.  They were not specific to outdoor dining in the North End.

121.    Acting Mayor Janey, a candidate for Mayor of Boston, responded to NEWRA's complaints by directing the formation of the North End Outdoor Dining Committee.   The Committee's purpose was to gather community feedback and propose recommendations for the future program.  It was comprised of representatives from NEWRA, additional residents, and restaurant owners, and was chaired by the City's North End Liaison, John Romano.

122.    The North End Outdoor Dining Committee held meetings in late September 2021, and late October 2021.  Following the September meeting, NEWRA's President sent a private e-mail to Romano, stating she did not realize the meeting was going to be a televised public meeting involving residents and City officials.  She suggested that they conduct a future meeting "and not record it."

123.    At the two Committee meetings, members discussed possible differences between the current program, which served as a response to the pandemic, and a permanent program, which would replace it when pandemic-related restrictions were lifted.  The Committee further addressed free parking for North End residents and ways to make the program safe and more convenient for residents while continuing to help the business community.  The meetings were not held to advocate the termination of outdoor dining in the North End.

124.    As a result of the meetings, the City agreed that North End restaurants would end outdoor dining service on November 1, 2021, to facilitate planned construction, parking, and traffic. Other City neighborhoods continued to provide outdoor dining until December 2021.

### The Election of Michelle Wu as Mayor of the City of Boston

125.    On November 2, 2021, Boston City Council Member Michelle Wu won the election for Mayor of the City of Boston.  She was sworn in as Mayor of Boston on November 16, 2021.

126.    Mayor Wu ran for office on a political platform that promoted racial, economic, and climate justice.  She described that platform on her campaign website, michelleforboston.com, as follows:

> Our policy platform is more than a vision.  It is a promise to Boston residents—a commitment to take on our hardest challenges, and to center our efforts on the pursuit of racial, economic, and climate justice.

127.    Mayor Wu immediately embarked on an ambitious plan to implement her political platform.  Three days after her swearing-in ceremony, Mayor Wu changed the name of Boston's Department of Economic Development to the Office of Economic Opportunity and Inclusion ("OEOI"), and appointed Segun Idowu as the Chief of OEOI.   Shortly thereafter, the Mayor tasked Idowu and OEOI to head the operation and oversight of the City's 2022 outdoor dining program and extended the 2021 program to December 31, 2021.

### Boston's 2022 Outdoor Dining Pilot Program

### *A Separate Plan for the North End*

128.    The City's outdoor dining program was an early agenda item for Mayor Wu.  Before the 2021 program even ended, the Wu Administration began preparing the 2022 Outdoor Dining Pilot Program.   Romano, who was promoted to Deputy Director of the City's Office of Neighborhood Services ("ONS"), played a key role in developing a separate North End plan.  From December 2021 to mid-February 2022, the City, spearheaded by Romano, prepared a separate, far

more stringent, outdoor dining plan *only* for the North End.  Mayor Wu and senior City officials heavily weighed in on the development of the plan.

129.    While preparing the North End plan, newly appointed, high-level City officials deployed a stealth strategy, largely drafting the plan behind closed doors at City Hall.  Unlike the Walsh Administration, the Wu Administration shirked public collaboration and transparency when preparing the 2022 North End plan.

130.    For the most part, the City excluded essential stakeholders from the process, leaving residents, businesses, restaurants, community groups, and organizations on the sidelines and out of the loop.  The City made decisions regarding the key features of the North End plan with little to no external input, including from its own North End Outdoor Dining Committee.  Instead, the City employed insular decision-making to create a highly controversial, punitive plan, which it later sprung on the North End restaurants shortly before the start of the 2022 outdoor dining season.

131.    Romano initiated the furtive project in early December 2021, circulating a confidential document titled "North End Outdoor Dining" to a select group, including Mayor Wu's Senior Advisor and other high-level advisors of the Mayor's Office and Cabinet.  By early January 2022, Mayor Wu and Massachusetts State Representative Aaron Michlewitz, whose district includes the North End, also collaborated to "finalize a North End plan."

132.    In mid-January 2022, Romano teamed with a Policy Analyst in the Mayor's Office after receiving an internal call "about outdoor dining and the urgency of moving on the North End plan."  The Policy Analyst assisted Romano in revising a memorandum on the plan for Mayor Wu. They continued to add comments to the memorandum, including a requirement that the North End would have a shorter outdoor dining season than all other Boston neighborhoods.  Romano and the Policy Analyst planned to deliver the memorandum to Mayor Wu after Romano had conferred with the City's Cabinet Chiefs about funding allocations.

133.    In formulating the special North End plan, the City deployed transportation engineers to ensure the plan would improve the safety of the North End outdoor dining program and increase the "livability of the program for the residents." Romano also joined forces with other high-level Wu Administration officials to iron out details, including the City's Chief Financial Officer, Mayor Wu's Senior Advisor for Infrastructure, the Chief of Staff of Streets, and the Interim Commissioner of the Transportation Department.

134.    This group discussed requiring the North End restaurants to pay monthly parking fees for each parking space they used for their outdoor dining cafes, with the payments to be made directly to nearby off-street parking garages and lots. The parking spaces would be free for North End residents. They also considered requesting the restaurants to pay for personnel to maintain parking and code enforcement on weekend nights and Sundays at the start of the outdoor dining season and at its height. Finally, they contemplated using a portion of the sales or meals taxes collected from the restaurants to support community efforts in the North End. These requirements were to be applied *only* to the North End restaurants and not to any other restaurants in the City.

135.    In late January 2022, Romano advised the City's Chief of Staff of Intergovernmental Relations, the Director of Intergovernmental Relations, and Mayor Wu's Senior Advisor and Civic Engagement Director that he needed the Mayor's approval to (1) announce a capital improvement project to build a bathroom at the Puopolo/Langone Field in the North End; (2) provide funding to North End non-profit and neighborhood groups to show immediate investment in the neighborhood based on the North End Outdoor Dining Program; and (3) convert a segment of Hanover Street in the North End to a one-way street.

136.    In early February 2022, Romano and other City officials discussed the City's decision to assess a hefty "impact" fee on North End restaurants as a condition for their participation in the program. This was reflected in an "Outdoor Dining" slide deck presentation prepared for an

upcoming meeting.  The presentation also included a slide with the heading "New Impact Fee" followed by the statement: "Restaurants will be charged a fee to address the impact of the program on the North End neighborhood."  During a review of the presentation, one City official commented, "If you are willing to delete the word 'impact' from just the heading here that would be useful, you can leave it in the description.  If we are challenged we likely will not defend it as an impact fee."

137.    In a later e-mail, the City re-named the "Impact Fee," this time calling it a "permit fee."  The funds from the fees purportedly were to be used to (1) fund enhanced city services to improve the outdoor dining program, and (2) create a North End Community Benefit Fund to improve the quality of life for residents during the outdoor dining program.  Seven members of the North End community were supposed to provide input on how the funds would be used.

138.    The City prepared a list of additional services that it would provide to North End residents with the fees paid by the restaurant owners, such as (1) increased enforcement of outdoor café compliance and parking, (2) Boston Transportation Department enforcement overtime, (3) Boston Police Department presence overtime, (4) initial licensing and ongoing site enforcement, (5) full-time and seasonal hokeys (employees who clean streets and sidewalks), (6) rat baiting, (7) power washing of sidewalks, (8) painting of streetlight poles, (9) placement of banners on streetlight poles; and (10) painting of street lane lines.

139.    The slide presentation also made clear the City would reinvest the impact fees in the North End.  One page, titled "Mitigation Plan," stated:

> The City will collect fees from the North End Restaurants that choose to participate in the outdoor dining program to provide several mitigation programs and services for the North End community.

> Money spent will be focused on services and items to help mitigate the problems that outdoor dining may bring to resident and our town.  A committee composed of community members and local elected official from the North End will advise how those funds are allocated and spent for the community.

Another page, titled "Outdoor Dining in 2022," stated that North End "[r]estaurants will be charged a fee to address impacts. Funds will be reinvested into the North End neighborhood." At a later date, the City compiled suggested options for use of the funds, including aquarium access, holiday and festival lights, athletic equipment, Spirit of Boston cruises for Seniors, lessons for children at the North End Music and Performing Arts Center, and an arts and crafts program.

140.    Mayor Wu was an active participant in the development of the North End plan. She was the proponent of converting a segment of the Hanover Street to a one-way street and planned a Feburary walkthrough of the North End with elected officials representing the North End. Mayor Wu also made tentative plans to attend an upcoming meeting of the North End Outdoor Dining Committee on February 15, 2022, and possibly a public meeting for North End residents on February 17, 2022, at which the City planned to inform residents of the separate North End plan.

141.    High-level City officials, however, tightly controlled the dissemination of information about the separate North End plan. The public was conspicuously absent from the process. There simply was no public transparency between the City, its residents, as well as other key stakeholders.

142.    A terse e-mail exchange between Romano and a member of the North End Outdoor Dining Committee clearly made this point. On February 7, 2022, Romano notified members of the North End Outdoor Dining Committee of an upcoming meeting on February 15, 2022, at which the City would present its North End plan. Romano informed Committee members that the City had been "hard at work to address issues from the past years" and wanted their insight before presenting the plan to the public.

143.    Within minutes, one Committee member—who also was the President of NEWRA— sent a curt reply to Romano, chastising the City for excluding the Committee from the process. The Committee member wrote that she was "very disappointed that the committee was not part of the process in putting the plan together." She also demanded the names of those who had developed the

plan.  Romano attempted to mollify the angry Committee member with a vague explanation, responding that Boston had a citywide plan based on input for past meetings but was holding a meeting to elicit the Committee's input "to make sure we have a north end specific plan."

144.   Before the meeting with the North End Outdoor Dining Committee, Romano sent an e-mail to the Mayor's Director of Scheduling and Advance, recommending that Mayor Wu prepare remarks, particularly on the "reasoning for the program returning this year."  Romano commented, "This is extremely controversial and how it's presented to the neighborhood on Tuesday and Thursday will be critical."  Romano's comments again showed that North End residents had no information about the separate North End plan and had not participated in the process.

145.   Romano additionally sent talking points for Mayor Wu in anticipation that there would be opposition from an organized group of North End residents at the meeting on February 17, 2022.  The talking points included reference to strides the City had made in 2022 to "ensure the safety of the program" and a need for Boston Police to work overtime in the North End to assist with program enforcement.

146.   On February 17, 2022, the City and the North End Outdoor Dining Committee hosted a virtual community meeting to inform North End residents of the City's plans for the 2022 outdoor dining season in the North End.  City officials provided some details of the North End plan such as the closure of a section of Hanover Street during the outdoor dining season.  However, the City purposefully did not inform the public of its decision to levy hefty impact fees and monthly parking fees on the North End restaurants.

### Announcement of the 2022 Outdoor Dining Plan
### and the Symbolic "Community Review" of the North End

147.   On February 24, 2022, the City issued a press release formally announcing Boston's 2022 Outdoor Dining Pilot Program.  In the press release, Mayor Wu trumpeted the significance of outdoor dining and its positive impact on small businesses and Boston's residents and neighborhoods:

For the past two years we've seen how outdoor dining activates public spaces, helps small businesses, and creates connected communities for everyone. I'm excited to bring outdoor dining back this spring to support our small businesses and continue to make public spaces more accessible and enjoyable for residents, business owners, and visitors across our neighborhoods.

148.    According to the City, the 2022 Outdoor Dining Pilot Program season would begin on April 1, 2022, in every Boston neighborhood *except* the North End. As to the North End, the City explained, it was "currently undergoing a community review of the outdoor dining program as special considerations are needed due to the density of the restaurants in the neighborhood." Yet, behind the scenes, the City already had decided the outdoor dining program in the North End would not begin until May 1, 2022, one month after all other neighborhoods in Boston. Nonetheless, the City again withheld this information from the public as well as its decision to impose onerous fees on the North End's restaurants.

149.    The City's announcement about conducting a "community review" of only the North End did not go unnoticed by residents of Beacon Hill. The next day, on February 25, 2022, the Chair of the Beacon Hill Civic Association contacted the City, asking why the Beacon Hill neighborhood was not afforded a similar opportunity to undergo a "community review" before the outdoor dining program became active. While commenting that the organization was generally supportive of the program, the Chair asserted that "it will have an impact on our residents as well that needs to be taken into account."

### Community Support for the North End's Italian Restaurants

150.    The public was unaware of the penal nature of the North End plan or any of its important features. As a result, the community had nothing to review. Members of the public were relegated to submitting comments mainly about whether they favored outdoor dining.

151.    Nevertheless, in the ensuing days, numerous North End residents wrote to City Hall, declaring their full support for outdoor dining. One resident marveled how outdoor dining gave the

North End a "distinctively European feel," noting there was "overwhelming" support for outdoor dining in the neighborhood and just a "vocal sliver" of residents opposing it:

> I would like to express my total support for continuing to allow outdoor dining in the North End in perpetuity. In addition to saving dozens of restaurants from closing, outdoor dining gives the North End a distinctively European feel that helps make the North End the special place that it is to residents of the neighborhood and to the city as a whole. Support for outdoor dining is overwhelming within the neighborhood; it is heartbreaking that a vocal sliver of the residential population is threatening something that adds so much to the community and the city. While the program does remove a small number of parking spaces, the benefit to the thousands of residents of the North End and Boston as a whole and to the businesses in the North End vastly outweigh the concerns of a handful of residents (that must merely park a little further away).

152.    Another North End resident lauded the popularity of outdoor dining in the North End, noting its value to other local businesses as well as the health and safety of the neighborhood:

> I'm a resident of the North End . . . and was unable to attend the meeting last night w.r.t. outdoor dining in the North End, and I just wanted to voice my support for the program. Outdoor dining has been quite popular in the last several years it has been implemented and has been good not only for local businesses but residents as well. It has resulted in less cars driving/parking on our streets, which leads to a safer and healthier neighborhood for all of us. The North End is fortunate to be very walkable and transit-friendly, a result of its existing for hundreds of years before car ownership was common. The idea that parking is more important and better for residents versus a vibrant streetscape with residents and tourists alike able to walk, dine, and enjoy the neighborhood at the time of year that is best for just being outside, is something I find just ridiculous.

153.    A third Boston resident similarly supported continued outdoor dining in the North End, pointing out its many improvements to life in the neighborhood:

> I recently learned that the city is considering ending outdoor dining in the North End. I was disappointed to hear this because I have greatly enjoyed the experience of outdoor dining in the North End, along Hanover Street in particular. By prioritizing room for cars, it not only lessens the available positive experiences of pedestrians, shoppers and diners, but also puts them at greater risk due to increased traffic in crosswalks, etc. (Not to mention the added noise and air pollution from idling engines!) Additionally, the local restaurants that have already been so impacted by the Covid-19 pandemic would now have significantly lowered capacity to serve guests and keep their businesses afloat.
>
> I appreciate the efforts of city personnel in trying to plan for the future amid so much uncertainty. I just wanted to reach out and voice my support for the outdoor dining

in the North End.  To me, it gives the neighborhood so much more character and charm, and I would hate to see it end.

154.    Other residents echoed these views.  One wrote, "I am so excited that outdoor dining is returning to our city—it had been a vibrant and exciting change," but added she was "disappointed to learn that the North End has no current start date" and "would like to see outdoor dining return as soon as possible."  Another stated that she wanted to express her support for maintaining outdoor dining, calling it "critically important" for "both customers and businesses."

155.    While many North End residents fully supported outdoor dining, vocal leaders of NEWRA attempted to persuade the City to ban it.  One longtime NEWRA leader generally opposed the concept of permanent outdoor dining on public property, arguing that a few businesses should not be permitted to continue to grow at the neighborhood's expense.

156.    Another resident, however, suggested a less drastic approach, urging the City to consider a compromise that would reduce the size of the outdoor dining program.  This, he claimed, would "go a long way to reducing community impacts" and would demonstrate the City was listening to both the business and residential community.

157.    Although several members of the community shared their views on outdoor dining in the North End, the so-called "community review" was not a true review at all.  The City had intentionally withheld critical information about the North End plan, which already had been finalized, thereby precluding the public from commenting on the plan.

### The Meeting on March 18, 2022

158.    Following the three-week period for the symbolic "community review," the City scheduled three sequential meetings in mid-March of 2022 to address the North End plan.

159.    The first meeting was held on March 15, 2022.  Members of the North End Dining Committee were requested to "provide a last round of recommendations and feedback." The day before the meeting, NEWRA's President privately communicated with Romano.  She expressed

disdain, demanding Romano to "share what this is about" and commenting that "I thought things were in place." Romano replied that the City had made changes to the program based on feedback from the neighborhood and the Committee, and it would announce "the amount we'll collect for the mitigation funds from the restaurant." Romano's comment indicates that he already had told NEWRA's President about the "mitigation funds."

160. The second meeting held on March 17, 2022, was an informational meeting for North End residents. The City still did not disclose the details of the North End plan to residents at the meeting, as it planned to do so at the third meeting on March 18, 2022.

161. On the night of March 17, 2022, Romano provided the City's Press Secretary with the following list of "major bullet points for outdoor dining in the North End" to be used when responding to inevitable media inquiries that would follow the meeting:

- Start date of May 1, 2022;

- End date of September 5, "unless they have been good actors and complied with the program," in which case the end date would be September 30, 2022;

- Under the 3-strike enforcement policy, a licensee's end date will be September 5 if it has one or two strikes; the end date would be September 30 if it has no strikes;

- Each restaurant will pay between $400-$500 per month for each parking spot used by its outdoor café; the payment will be directly to the parking garage facility, where North End residents will park at no cost;

- Each restaurant will pay an additional $7,500; a North End mitigation committee comprised of North End constituents will use the funds as determined by elected officials and community groups; and

- A section of Hanover Street will remain designated as one-way.

162. Press inquiries began that night and continued into the early morning of March 18. Word had leaked that the City was treating the North End restaurants differently, and members of the media began asking Romano to confirm whether North End restaurants were being charged a $7,500 fee and would have a shorter outdoor dining season.

163.    Shortly before the third meeting on March 18, 2022, the City informed the North End restaurants about the mandatory meeting by sending a notice to them titled "NOTICE OF MANDATORY INFORMATION HEARING REGARDING TEMPORARY OUTDOOR DINING FOR NORTH END LICENSEES." The City defined "North End Licensees" as "all establishments located in the North End planning to participate in the 2022 Outdoor Dining program" (emphasis in original).

164.    As to the purpose of the meeting, the notice stated: "The Mandatory Emergency Informational Hearing is being held to discuss outdoor dining in the North End, requirements and expectations, and enforcement efforts and potential disciplinary actions for failure to adhere to outdoor dining and COVID-19 requirements." The notice made no mention of the penal terms of the North End plan. A true and accurate copy of the notice is attached as Exhibit 2.

165.    The third meeting was held on March 18, 2022, for North End restaurant owners who planned to participate in the program. City officials knew the restaurant owners would be blindsided when they heard the terms of the plan and would have minimal time to respond before the beginning of the outdoor dining season.

166.    At the meeting, the City explained the central features of the North End plan, using a slide presentation to highlight important points. The City finally informed the North End restaurants owners that they would have to pay a fee of $7,500 to participate in its outdoor dining program, as well as pay for alternate parking for parking spaces used in on-street dining. In addition, the City announced they would have a shorter outdoor dining season than restaurants in all other sections of Boston. The City further revealed that the fees and a shorter outdoor dining season applied *only* to the North End restaurants

167.    These requirements appeared on a presentation slide titled "Outdoor Dining in 2022," which summarized differences in how the City intended to treat the North End restaurants from other Boston restaurants. Under the slide heading "What's Different in the North End," the City identified

four stringent requirements on the North End restaurants. They included (1) a shorter outdoor dining season; (2) payment of monthly fees for parking spaces; (3) payment of a fee to address impacts; and (4) increased enforcement.  A true and accurate copy of the presentation slide is attached as <u>Exhibit 3</u>.

168.    The City also used a second slide titled "Mitigation Plan."  In bold type, the slide stated, ***"The City will collect fees from the North End Restaurants that choose to participate in the outdoor dining program to provide several mitigation programs and services for the North End"*** (emphasis in original).  On the slide, the City further explained the "money spent will be focused on services and items to help mitigate the problems that outdoor dining might bring to residents and our town."  Additionally, the slide represented that "[a] committee composed of community members and local elected officials from the North End" was to "advise how those funds" were to be "allocated and spent for the community."  A true and accurate copy of the second presentation slide is also included on <u>Exhibit 3</u>.

169.    The City's announcement stunned the North End restaurant owners, who felt as though they had just been ambushed.  The North End restaurant owners, including the plaintiffs, had no idea the City was planning to treat them in a such a drastic, discriminatory manner.  They were particularly taken aback because they had participated in the outdoor dining program on equal terms with all other restaurants in Boston for the past two years.

170.    Though feeling astonished, outraged, and betrayed, the restaurant owners did not hesitate to express their views.  Several vigorously opposed the plan.  They questioned the fairness of the $7,500 payment.  One owner asked why he should pay the same fee as a restaurant with double the amount of space.  Another pointed out that if 80 restaurants paid $7,500 each, it would total $630,000.  He then asked whether the North End outdoor dining program had cost the City $630,000

in prior years.  A third inquired why North End restaurants should pay for services the City should already be providing, such as street sweeping, sidewalk cleaning, police patrol, and rodent control.

171.    Several others outright challenged the legality of the City singling out the North End restaurants by requiring them to pay $7,500 while not charging a similar amount to all other restaurants.   And some irate restaurant owners protested the City's discriminatory and unfair treatment, suggesting the North End restaurants should file a lawsuit against the City.  Yet, they openly acknowledged that some restaurants would shy away from a legal challenge out of fear the City would retaliate against them.

172.    After the meeting, a North End restaurant owner contacted the City to express her concerns in writing.  She wrote that her "biggest concern" was paying $7,500 fee and monthly parking fee because her restaurant was small and just beginning to recover from drastic losses caused by the pandemic.  The troubled owner explained that she had spent thousands of dollars to construct the restaurant's outdoor space in 2021, but it would no longer meet the new 2022 guidelines.  She lamented that the new plan would require her to spend an additional $20,000 for fees, parking, insurance, and new construction.  This program, she exclaimed, "is not fair" because the City has "singled out" the North End from all other Boston neighborhoods and "placed all of the financial burden for outdoor dining on the North End restaurant owners."

173.    Following the contentious meeting, more North End restaurant owners sent e-mails to the City declaring that the new fees were not sustainable for small restaurants.  They explained how the City's allocation of outdoor dining space had a direct correlation to a restaurant's profit or loss.  In their view, the flawed process resulted in unequal treatment and a lack of transparency.  Restaurant owners asked the City to change its position on the $7,500 fee and to impose a fair fee structure.

174.    Even one NEWRA leader agreed.  In an e-mail to Romano, he questioned the logic behind the $7,500 flat fee payable by all restaurants, noting the fee was not based on the size of the

restaurant or its number of seats.  As a matter of "fundamental fairness," he wrote, small restaurants should be treated differently than larger ones due to the reduced impact their activities have on the quality of residential life.

175.     More outraged and disappointed North End residents contacted Mayor Wu and other City officials.  One resident denounced the City's actions as more stringent in the North End than in other neighborhoods, noting they signaled an unnecessary attack on Italian Americans:

> The North End is not just a local dining destination but a national one.  It doesn't appear that other neighborhoods are being treated as stringently as the North End.  **Coupled with the possible elimination of Columbus Day as a holiday signals a perceived and unnecessary attack on Italian Americans.**
>
> Kindly reconsider this issue.  There is enough polarization on the country.  We shouldn't be adding food to the mix (emphasis supplied).

176.     Another North End resident urged the City to quell the "brewing" outdoor dining war.  The resident sharply disagreed with the $7,500 fee, commenting that the increased meal taxes derived from outdoor dining would provide the City with more revenue.   And in direct contradiction to one of NEWRA's prior complaints, the resident emphasized that the restaurants clean their areas and Hanover Street has "never been cleaner when outdoor dining is in session."

**The City's Internal Discussions on Banning Outdoor Dining to Quell Opposition**

177.     By Sunday, March 20, 2022, the City became concerned about the "pushback" it had received from North End restaurants and braced for a possible legal challenge.  It immediately began to strategize how it could defend its disparate treatment of the North End restaurants.  In an internal e-mail, the City contemplated what action it would take if the restaurants elected to file suit, including imposing an outright ban of outdoor dining in the North End:  *"If they sue, can we just say 'fine, we are shutting down the North End program.'"*

178.     But City officials were not all on the same page.  One City licensing expert questioned the legal basis for the $7,500 fee, observing that the City had waived the fees in 2020-2021.  In addition,

he explained, sidewalk café fees were calculated by the Public Works Department for sidewalk occupancy without including lost parking meter revenues.

179.     The very next day, March 21, 2022, Mayor Wu escalated the controversy.  At the St. Patrick's Day breakfast, Mayor Wu stated that she is ***"getting used to dealing with problems that are expensive, disruptive and white."***  When the audience's response indicated that the comment was not well received, Mayor Wu then quickly attempted to clarify her words, stating she was referring to "snowflakes" and "snowstorms."  But North End restaurant owners, including the plaintiffs, believed that the Mayor made disparaging comments that were racially and/or ethnically biased and directly aimed at them.  They did not credit her explanation that disruptive "white" problems meant "snowflakes" and "snowstorms."

180.     While the City was evaluating a ban of outdoor dining as a possible retaliatory response, North End residents and other Boston business constituents continued to urge the City to eliminate the $7,500 fee.  One resident wrote that she disagreed with the requirement that only North End restaurants had to pay a $7,500 fee and fees for parking spaces, whereas restaurants in all other neighborhoods pay no fees.  She observed that the restaurants had trouble surviving the pandemic, and outdoor dining "only helps all of us."

181.     The owner of Boston CityWalks, a company that provides walking tours of Boston, echoed this sentiment and expressed grave concern that the City's imposition of large fees on the North End restaurants could harm tourism.  He commented: "The North End is really special and one of the big draws are the Italian Restaurants.  They are wonderful for the North End and the city and are a huge asset in the tourist domain."  Yet, he warned that the new $7,500 fee was "terrible for the restaurants and their owners."  Emphasizing it was a "miracle that so many have survived the pandemic, he was now "afraid this will be the death knell of many more."

### The Public Petition Opposing the City's
### Disparate Treatment of North End Restaurants

182.    On March 24, 2022, concerned citizens and a North End restaurant owner started a petition on change.org to oppose the City's imposition of the $7,500 outdoor dining fee and the monthly parking space fees.  The petition called the $7,500 fee "an unreasonable fee that unfairly targets Boston's North End restaurants."  It made several points about the fee, including the following:

- The $7,500 fee does not mitigate the effects of the pandemic for restaurants in the North End; it amplifies them;

- The North End restaurants have to pay a $7,500 excessive participation fee just to have outdoor dining, plus a $500 monthly fee per parking space;

- The fees apply only to North End restaurants and no other restaurants in Boston;

- The City claimed the fee is necessary because North End residents deserve to have clean streets, yet North End restaurants pay private companies to pick up their trash nightly and do not use public trash pick-up services;

- The unfair and excessive $7,500 fee on top of the $500 monthly charge per parking space make it impossible for the North End restaurants to compete with Boston's other restaurants; and

- Small, mom-and-pop restaurants in the North End cannot endure these fees.

183.    The petition asked people to sign it if they believed the fees were excessive, unfair, and should be eliminated.  It received an overwhelming positive response, garnering 37,523 supporters to eliminate the fee.  The petition and its results were sent to Mayor Wu, Segun Idowu, Chief of OEOI, Ciara D'Amico, Boston's North End Neighborhood Liaison, Massachusetts Senator Lydia Edwards, Massachusetts Representative Aaron Michlewitz, and members of the Boston City Council.

### The City's Threat to Ban Outdoor Dining in the North End

184.    Despite fielding countless pleas from North End residents and restaurant owners to eliminate the fees, Mayor Wu defiantly refused to reconsider her position.  Instead, she doubled down.

On March 25, 2022, Mayor Wu sent a letter to the North End restaurant owners, issuing the following threat:

> If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of the season.

The Mayor's dire warning was clear—if the Italian restaurants continued to oppose the North End's outdoor dining plan, the City would ban outdoor dining in the North End. The threat was meaningful and coercive, leaving restaurant owners with little choice as the 2022 outdoor dining season was about to commence. A true and accurate copy of the Mayor's letter dated March 25, 2022, is attached as Exhibit 4.

185.    Mayor Wu's letter earned a harsh rebuke from *The Boston Globe*, which instantly responded by publishing an article disapproving the unfairness of the fees and criticizing Mayor Wu's judgment.[4] *The Boston Globe* accused Mayor Wu of "holding on to a misguided plan to impose a hefty fee only on the North End restaurants" and "threatening to impose a greater hardship on the North End by rescinding outdoor dining":

> There's also an element of unfairness to the fee she plans to impose on North End restaurants that want to set up outdoor seating. In a letter to restaurant owners, she said that North End is different from other neighborhoods 'because of the unique impacts of outdoor dining on the quality of residential life.' According to the mayor's office, there are three times the number of on-street restaurant patios in the North End, more lost parking spots, and more constituent complaints about noise, congestion and rodents. Yet it's also true that any Boston restaurant that's using public space for outdoor seating is taking that space away from the general public. In the interests of fairness, that cost should be assessed as well, and a fee imposed.

> Yet, rather than leveling the playing field, Wu is threatening to impose a great hardship on the North End by rescinding outdoor dining in that neighborhood if a majority of restaurant owners believe the proposed program is 'unworkable.'

> Yikes. What every successful gambler knows—and what every politician should know—is 'that the secret to survivin' / Is knowin' what to throw away / And knowin' what to keep.

---

[4] J. Vennochi, "From vaccines to North End restaurants, Mayor Michelle Wu creates her own equity problems," *The Boston Globe*, March 28, 2022.

### *Pretextual Reasons for the North End's Plan*

186.     In her letter to the North End restaurants on March 25, 2022, Mayor Wu attempted to justify the City's disparate treatment, citing three reasons why the fees were necessary to address "unique impacts of outdoor dining on the quality of residential life":

- The North End had more than three times the number of on-street restaurants than the next highest neighborhood;

- It had the greatest loss of parking spots; and

- The North End had more 311 and constituent service complaints related to noise, congestion, rodents, and street cleanliness from outdoor dining than anywhere else.

All three reasons were pretextual, as they either lacked factual support, were erroneous, or did not provide an objectively valid basis for the more stringent requirements.

### TOO MANY NORTH END RESTAURANTS

187.     The Mayor's first reason was the North End had too many restaurants that participated in the City's on-street outdoor dining program—"three times the number of on-street restaurants than the next highest neighborhood."  But records provided by the City in response to Public Records Law requests indicate the statement was inaccurate. City records show that in 2021, the top four neighborhoods with restaurants that participated in on-street outdoor dining were the North End with 70, followed closely by Downtown Boston with 62, Back Bay with 37, South Boston with 30, and the South End with 24.

188.     But aside from this significant factual inaccuracy, this first reason wrongly suggested that North End restaurants were somehow to blame because a large number of them participated in the City's outdoor program.  The City invited all Boston restaurants to participate in the program. The City decided whether to approve or deny a restaurant's application.  The City itself—not the restaurants or the neighborhoods—made the call on how many restaurants would participate. And

this is precisely what happened in 2021 and 2022.  In 2022, under the Wu Administration, 350 restaurants applied for outdoor dining, yet the City approved just 280 of them, turning away 20% of the applicants.  In addition, the City reviewed and approved the size of the on-street patio for each restaurant.  To the extent that the sheer number of North End restaurants somehow adversely impacted the quality of life in the North End, this was of the City's own making.

189.    The City's reliance on this reason was pretextual:  the reason was erroneous and the City controlled the number of restaurants and the sizes of their on-street patios.

LOSS OF PARKING SPACES

190.    Mayor Wu's second reason was the North End had "the greatest loss of parking spots" due to outdoor dining.  However, this too was not a valid basis to impose parking fees *only* on the North End's Italian restaurants.  The issue of alleged harm caused by the "loss of parking spots" existed in every City neighborhood, not just the North End.

191.    Almost all restaurants that engaged in on-street outdoor dining used parking spots, irrespective whether the restaurants were in the North End, Back Bay, the South End, or any other neighborhood.  The loss of a parking space had the same impact in any neighborhood—there was one less parking space available for residents.  As pointed out by *The Boston Globe*, if the City believed that a restaurant should pay a monthly parking fee for each parking spot that it used, then it should have *"level[ed] the playing field"* and applied its rule equally across the board to *all* restaurants in *all* neighborhoods.

192.    Requiring *only* the North End's Italian restaurants to pay for parking spots was unfair and discriminatory.  Even NEWRA's President acknowledged this point in an e-mail to Romano on March 17, 2022, in which she wrote:

> I appreciate that the north end restaurants should pay to accommodate parking for residents displaced but [sic] compelled to reiterate that their [sic] needs to be equity across the city.  *Every restaurant that is using public space – the street, parks, sidewalks, etc. to*

49

*serve meals – should be paying a usage fee to the city based on the space.  It's only fair* (emphasis supplied).

193.    The City's reliance on the loss of parking spots in the North End also was a pretextual basis for the imposition of the monthly parking fees.

"311" CALLS

194.    Mayor Wu's final reason was there were more "311" calls and constituent service complaints in the North End about noise, congestion, rodents, and street cleanliness from outdoor dining.  This also was not a legitimate basis for the City's disparate treatment.  The hard evidence, the "311 calls," simply do not support the claim.  In addition, residents from other neighborhoods made similar complaints about outdoor dining.  This was not a North End phenomenon.

195.    Analysis of the "311" complaints concerning outdoor dining in the North End shows they provided no justification for the assessment of any monetary penalties on North End restaurants.  Based on City records, there were only one-hundred forty (140) total "311" complaints pertaining to the City's outdoor dining program in 2021.   Of the relatively small number of outdoor dining complaints, just 41 concerned the North End, which had 70 restaurants with on-street outdoor dining.  And South Boston fell right on the heels of the North End with 39 complaints, even though it had approximately *40 less restaurants* with on-street outdoor dining.

196.    The City classified the 41 complaints as follows:  layout or dimensions of outdoor patios (12); COVID-19 rules (5); noise (4); North End (4); parking (3); fire safety (2); multiple set-ups (2); ADA (Americans with Disabilities Act) accessibility (1); animals on premise (1); barriers (1); capacity (1); general complaints (1); hours of operation (1); loose items (1); noise/trash (1); and electricity (1).  One complaint pertained to a restaurant located in a different neighborhood.

197.    Mayor Wu's second reason specifically focused on 311 complaints pertaining to four issues:  noise, congestion, rodents, and street cleanliness.  But there were *no* 311 complaints about congestion, rodents, and street cleanliness.  As to the remaining issue, noise, there were 4 general

complaints about "noise" and 1 complaint about "noise/trash."  The paltry number of complaints about noise from music, loud voices, and car horns—just 4 or 5 in 5 months—was well below the number of noise complaints that could occur on a single weekend night in any Boston neighborhood. The one complaint about "trash/noise" over a 5-month period is insignificant.  The noise complaints were so minor that they cannot even plausibly be described as issue in the North End.

198.    Analysis of the remaining categories of 311 complaints—which were not even cited by Mayor Wu as a basis for the assessment of fees—also shows that they too were minor, at best.  The category with the most complaints, twelve (12), involved allegations about improper dimensions of outdoor patios, such as the placement of chairs outside the outdoor café's boundaries, umbrellas that were too close to vehicles, or intrusion of an outdoor café into a fire lane.  The number of complaints about layout or dimension issues was remarkably low given that 70 restaurants participated in the program for 5 months or approximately 150 days.  Moreover, all 12 alleged technical violations could easily have been addressed by the City's Inspectional Services, which is responsible for ensuring that restaurants comply with the program's requirements.  If a restaurant actually committed a technical violation (such as placing an umbrella too close to the street), the City could have required the restaurant to correct the infraction, issued a violation notice, or even revoked the restaurant's outdoor dining rights if the restaurant failed to remedy the issue.  The miniscule number of alleged technical issue complaints over 5 months provided no basis for the assessment of a hefty program participation fee.[5]

199.    The same holds true for the small handful of complaints about alleged COVID guideline violations, which concerned allegations pertaining to social distancing, people not wearing masks, and distance between tables.  Again, there were a mere 5 complaints over 5 months, which

---

[5] Since there were only 12 complaints, assuming they were alleged to have been committed by different restaurants, that would mean there were no alleged technical violations reported for 58 of the 70 restaurants with on-street dining over a 5-month period.

borders on being insignificant.  As to the 3 parking complaints, the City addressed that issue by paying for alternative parking for every space utilized by outdoor dining.  Even the 1 ADA accessibility complaint about sidewalks was far too low to sound any alarm about the impact of outdoor dining in the North End.  And all other categories of "311" complaints were one-offs that were marginally relevant, if at all, to the issue at hand.

200.     The mere 41 "311" complaints about North End outdoor dining over a five-month period in 2021 shows the North End restaurants operated highly disciplined outdoor dining practices. Moreover, the "311" complaints were mere *allegations*.  Just because a person filed a complaint did not mean that it was true.  And since so few complaints were even lodged, the City's reliance on this reason as a basis to penalize the North End restaurants was purely a pretext.

201.     Further, as alleged in Paragraphs 97 to 110, residents from *every* other neighborhood in Boston—all with fewer restaurants than the North End—submitted complaints to the City about outdoor dining in those neighborhoods.  Yet, the City took no punitive actions as to any of them, including South Boston, which had essentially an identical number of complaints in a neighborhood with far fewer restaurants engaged in the outdoor dining program.

### The Press Conference at City Hall on May 29, 2022

202.     A few days later, on March 29, 2022, Mayor Wu scheduled a press conference at City Hall to address the outdoor dining controversy.  The City invited a small number of North End Italian restaurant owners to the press conference and included their names on a list of invitees.  News of the press conference spread, and several other North End restaurant owners decided to attend, including several plaintiffs who had vocally opposed the plan.  However, shortly before the scheduled press conference was to start, the City suddenly changed the location to a smaller room.

203.     When the North End restaurant owners whose names were not on the list arrived, City officials would not permit them to attend, claiming their names were not on the list and citing

possible overcapacity and fire code concerns.  A tense argument ensued, as the restaurant owners who had been turned away wanted to voice their position on this divisive issue as it directly impacted their livelihoods.

204.    At the outset of the press conference, Mayor Wu defended the City's disparate treatment of the North End's restaurants by stating: **"Equity doesn't mean equality all across the board."**

205.    North End restaurant owners, including the plaintiffs, viewed this comment as further proof of the City's discriminatory intent.  As far as they were concerned, the dispute *did* mean equality all across the board."  From the restaurants' perspective, the City was treating them unequally when compared to how it was treating similarly situated restaurants outside the North End participating in the same City program.  In their view, they were entitled to have equal access and benefit from all city programs and to be treated fairly and equally under Boston's own laws, which prohibit unequal treatment of Boston residents based on their ethnicity, race or skin color.[6]  The Mayor's reference to "equity," from their standpoint, had nothing to do with the dispute and was not a valid or appropriate explanation for overt discrimination.

206.    In fact, the Policy of Boston's Human Rights ordinance in effect at that time stated: "It is the policy of the City of Boston to assure that every resident shall have equal access to and benefit from all public services."[7]  The Policy further declared that "behavior which denies equal treatment to any of our citizens as a result of their … race, color …national origin …deprives persons of the benefits of a free and open society."  Finally, the Policy asserted that "it is the intention of this ordinance that all persons be treated fairly and equally and it is the expressed intent of this ordinance [sic] guarantee to all of our citizens fair and equal treatment under law."

---

[6]  City of Boston Municipal Code §§ 12-9 (Human Rights).

[7] City of Boston Municipal Code §§ 12-9 (Human Rights).

207.    Next, during the question-and-answer segment, an attendee asked Mayor Wu whether tax funds should be used to remedy citywide problems that existed *before* outdoor dining, including rodents, and the lack of trash pickup, instead of punishing the restaurants with fees.  Mayor Wu responded that the current outdoor dining situation had "highlighted" that there are "needs all across our City," whether related to outdoor dining or not, pertaining to rodent control, clean streets, trash pickup, and pedestrian safety. She acknowledged that these problems existed citywide in many neighborhoods in Boston, and no one from the City blamed these problems on the restaurant owners or even on outdoor dining:

> For all of the attention, and media, and coverage of this event, what I'm grateful for, is that it has highlighted that **there are needs all across our City**, all across our City whether it's related to outdoor dining or not.  **We need to do better when it comes to rodent control, and clean streets, and trash pickup, and pedestrian safety**. And so, the lessons we're taking from this neighborhood where that is all so concentrated and so intense, we're going to make sure that we apply that all across the City as well.  Had some conversations with some of my colleagues about what our rodent plans need to be in many neighborhoods across Boston.  **So surely this has never been a situation where anyone from the City of Boston was trying to assign blame to our restaurant owners or to a particular neighborhood or even to outdoor dining specifically for some of the challenges that we face.**

208.    On several occasions, Mayor Wu also confirmed to the public that the City would use the fees that would be paid by the North End restaurants to specifically address the "impacts" caused by outdoor dining in the North End: "To make this [outdoor dining] work in this neighborhood, we need to have a specially tailored program for our North End residents.  That means we need the resources to be able to address some of the impacts that will help contribute to an even greater quality of life."  She later reiterated this point, stating, "We need the resources [fees] to be able to address some of the impacts that will help contribute to an even greater quality of life."  Finally, Mayor Wu guaranteed that "[w]e are putting every dollar that we have to good use," noting "there is a tremendous amount of need in our communities and in our neighborhoods" and the fees were "meant to address the particular impacts of this program."

209.    The North End restaurant owners who had been barred from the press conference returned to the North End.  While the City had prohibited them from expressing their views at the press conference, they held their own press conference in their neighborhood.  There, they exercised their First Amendment right to petition government, to offer a different viewpoint on a controversial public issue, and to protest the City's unfair and unequal treatment of them.

210.    On April 1, 2022, the 2022 outdoor dining program commenced in every neighborhood of Boston except the North End.  The short deadline for the North End restaurants to notify the City whether they planned to participate in the program was April 10, 2022.

211.    One month later, on May 1, 2022, the City's outdoor dining program began in the North End.  Over the course of the program, most of the 62 North End restaurants paid $7,500 to the City and monthly parking fees of $480 for each parking space utilized by their on-street cafes.  Some qualified for hardship waivers, which enabled them to pay reduced fees, whereas others paid prorated fees because they did not participate for the entire season.  On the other hand, the City did not require any other similarly situated restaurants located outside the North End to pay impact fees or monthly parking fees.

### The Federal Lawsuit and Adverse Publicity

212.    Shortly after the delayed start of the outdoor dining in the North End, four owners of North End restaurants filed a complaint against Mayor Wu in the U.S. District Court for the District of Massachusetts, alleging that the fees imposed by the City on them to participate in the City's outdoor dining program were unconstitutional and violated Massachusetts law.  The case was titled *Jorge Mendoza, et al. v. Michelle Wu*, Case No. 1:22-cv-10710-IT.

213.    The North End restaurants' vocal opposition to the North End plan, the federal discrimination lawsuit, and the prodigious response to the poll supporting the restaurants generated

significant local and national media coverage averse to the City and Mayor Wu.   One local publication

was particularly critical of Mayor Wu and her policies:

> Boston Mayor Michelle Wu was the first woman of color to be elected in city history. Her election was a symbol of a more equitable future, and that Boston's long days of discrimination are passing.
>
> Except that many of the Mayor's policies have been anything but free of discrimination.  And anything but equitable.
>
> The Mayor's latest controversy hits home in one of Boston's oldest neighborhoods, the North End.  Wu has decided to lay heavy outdoor dining fines and regulations on restaurants in the area, including a $7,500 program entry fee, in addition to hundreds of dollars monthly in order to pay for occupied parking spaces.  They have also been allotted three fewer months for outdoor dining than restaurants in the rest of the city.
>
> This comes with warmer weather approaching and the subsequent wave of tourists. Especially with the recent elimination of the Mayor's vaccine mandate, which negatively impacted restaurants, the lifting of COVID-19 restrictions overall is priming one of the country's most destined neighborhoods for a successful summer.
>
> So why has the Mayor decided to punish some of the most profitable tax sources in the city?  She has cited a disproportionate number of noise, rodent and traffic complaints in the neighborhood.  Streets in the area are additionally much smaller and congested than other areas, so restaurants take up more parking spaces.  Hanover Street, one of the North End's main streets, will turn into a one-way for the duration of outdoor dining, and the North End's centuries-old layout does not make it easy to divert traffic.
>
> But to anyone that has ever stepped into Boston, traffic is horrendous everywhere. The entire city's layout is poorly designed for the 21st century.  Congestion is atrocious everywhere.  In the summer, sidewalks are packed with tourists where the heat is only exacerbated by the hot sun reflecting off the roads.  And restaurants around the city use public space for their outdoor dining and are set to pay far fewer fees than the North End.
>
> So again, why?
>
> Perhaps it's because the Mayor thinks she can.  She admitted herself at the St. Patrick's Day breakfast that she is 'getting used to dealing with problems that are expensive, disruptive and white.'  She quickly clarified that she was talking about 'snowflakes' and 'snowstorms' when her joke didn't sit well with the crowd.[8]

---

[8] JD Conte, "Mayor Wu's outdoor dining policy is a blatant issue," *The Suffolk Journal*, April 5, 2022.

214.   The *Boston Business Journal* commented that Mayor Wu needed to refocus by working with the small business community rather than adopting measures that hampered their ability to recover from the hardship caused by the pandemic:

> Wu made it clear she gives preference to residents over the small businesses that have been in those same neighborhoods for generations, employing so many of those same constituents.  Rather than imposing costs that make it even more difficult for smaller restaurants to claw their way back after two years of hardship, the Wu administration should be working more closely with the business community and should use existing tax revenue to support residents in city neighborhoods for a few short warm-weather months during a pilot program.[9]

215.   And on a national level, the prominent publication *Reason* issued an article questioning whether Mayor Wu hated the City's restaurants:

> Struggling new Boston Mayor Michelle Wu (D) seems hellbent on making things difficult or impossible for city restaurants, many of which are still struggling in the wake of Covid-19 pandemic.  Wu is facing growing criticism from restauranteurs, columnists, and others in the city for her administration's unfair and outrageous outdoor-dining polices.
>
> .  .  .
>
> Last week, North End restauranteurs, rightly outraged by the sudden onset of expensive fees, sent a letter of protest to Mayor Wu, blasting the city for treating them unequally and threatening to sue the city over the exorbitant and unfair fees.
>
> Wu responded to her constituents in the perhaps worst way possible.  'If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of this season,' Wu wrote.
>
> .  .  .
>
> Fair and equal treatment.  Responsive government.  Clear and timely rules.  That's all most Boston restauranteurs want.  Mayor Wu is serving up a heaping pile of my-way-or-the-highway policymaking.  And for what?[10]

---

[9] G. Higgins, "North End fee is too big a burden on business," *Boston Business Journal*, March 30, 2022.

[10] B. Linnekin, "Does Boston's Mayor Hate the City's Restaurants?," *Reason*, April 2, 2022.

**The City's Purchase of an Electric Street Sweeper for
$552,000 Using Revenue from Fees Paid by North End Restaurants**

216.    By April 10, 2022, when the North End restaurants had committed to participate in

the 2022 outdoor dining program, the City calculated that it would collect approximately $450,000 in

fees from the North End.  Having a new source of several hundred thousand dollars in revenue, City

records show that it decided to use some of the impact fee revenue to purchase an electric street

sweeper as part of the Mayor's Green New Deal Plan for Boston.

217.    The North End had no need for a new electric street sweeper for its outdoor dining

plan for several reasons.  First, the City already had a fleet of street sweepers that worked perfectly

well for many years in the North End.  Second, as part of the special North End Plan, the City hired

several full-time Department of Public Works employees known as "hokeys" to be stationed in the

North End throughout the duration of the outdoor dining season.  The hokeys sole job was to clean

the sidewalks, the streets, and the gutters.   Third, the restaurant owners themselves were responsible

for power washing the sidewalks in front of their establishments and maintaining clean outdoor patio

areas.

218.    The chronology of key events leading to the purchase of the electric street sweeper

shows the City bought the vehicle to further its goal of electrification of the City's fleet of vehicles

under the Green New Deal Plan.  It did not buy the expensive vehicle for outdoor dining in the North

End.

219.    ***Late November/Early December 2021:***  Mayor Wu ran for office on a political

platform that included climate justice.  During her first week on the job, Mayor Wu immediately began

to execute her Green New Deal Plan that she crafted in 2020 while serving as a City Councilor.[11]  She

_____

[11] *Planning for a Boston Green New Deal & Just Recovery*, Office of Boston City Councilor Michelle Wu, Aug. 2020
at 7-8.

signed an ordinance to divest City investment in companies that derived more than 15 percent of their revenue from fossil fuels.  Within three weeks, Mayor Wu announced several new steps to reduce vehicle emissions, including the adoption of a new Fleet Utilization Policy.  A central objective of the Fleet Utilization Policy was the electrification of the City's entire fleet of vehicles.

220.   ***January/February 2022:***  In January and February of 2022, when City officials formulated the special plan for the North End outdoor dining, they decided to assess a $7,500 "impact fee" on North End restaurants to participate in the program.  All funds from the fees were to be used to improve the outdoor dining program and create a North End Community Benefit Fund to improve the quality of life for residents.  The City committed to reinvest the impact fees in the North End neighborhood.  The City never mentioned to North End residents or the restaurant owners that some of the fees would be used to purchase an electric street sweeper.

221.   ***March 25, 2022:***  On March 25, 2022, Mayor Wu sent a letter to the North End restaurant owners in which she represented that the North End outdoor dining program needed their "resources"—a reference to the $7,500 fee and monthly payments for parking spaces—"to mitigate the impacts on parking, trash, rodents, and public safety."  She made no mention that their "resources" would be used to purchase an electric street sweeper.  *See* Exhibit 4.

222.   ***March 29, 2022:***  At the press conference on March 29, 2022, Mayor Wu confirmed on several occasions that the City would use the fees to specifically address the "impacts" caused by outdoor dining in the North End.  Again, Mayor Wu made no mention that the City had planned to use the fees to purchase an electric street sweeper.

223.   ***April 6, 2022:***  One week later, on April 6, 2022, the City issued a press release titled, "Progress Made Toward Electrifying City of Boston Vehicle Fleet" as part of a "Green New Deal for Boston."  In the press release, Mayor Wu announced that Boston Public Schools would be launching an electric school bus pilot program deploying 20 buses during the 2022-2023 school year.  She further

noted that the electrification of the school buses built on the City's efforts outlined in the Fleet Utilization Policy.

224. ***April 10, 2022:***  By April 10, 2022, the City calculated that the revenue from the "impact fees" would total approximately $450,000.

225. ***May 2, 2022:***  And just three weeks later, on May 2, 2022, the City solicited bids for its purchase of an "Electric Street Sweeper."  The Invitation to Bid indicated that the bid period would open on May 2, 2022, and close on May 18, 2022.  The City's Procurement Department also issued specifications for the Electric Street Sweeper.  The Invitation for Bid did not disclose that the electric street sweeper was being purchased to service North End outdoor dining.  The City did not inform the North End restaurant owners or residents that some of the restaurants' fees would be used to pay for an electric street sweeper.  The City did not award a contract to purchase the electric street sweeper pursuant to its initial Invitation for Bid.

226. ***July 25, 2022:***  The City issued a second Invitation for Bid for a "Full Electric Street Sweeper" on July 25, 2022.  The Invitation for Bid stated the bid period would open on July 25, 2022, and close on August 10, 2022, at noon.  Once again, the Invitation for Bid did not disclose that the electric street sweeper was being purchased to service North End outdoor dining.  During this time period, the City awarded the bid and purchased a RAVO electric street sweeper for a cost of $552,000, according to City records.  After the purchase, the City did not inform the North End restaurant owners or residents that some of the restaurants' fees would be used to pay for an electric street sweeper.  At that time, there was only 5-6 weeks left in the North End's shortened outdoor dining season, which was scheduled to end on September 5, 2022.

227. ***June to September 23, 2022 (Office of Budget Management Costs):***  The City's costs related to its purchase of the electric street sweeper were set forth in a City of Boston Office of Budget Management Excel spreadsheet that the City produced in response to a Public Records Law

request.   The document indicates that it was prepared for the North End Outdoor Dining program and is titled "2282 – 23 North End Outdoor Dining Proposal – OBM Costs."   The document is an Excel spreadsheet with three sections that appear to have been prepared at different times.   The first section is labelled "Projected Cost as of June 2022."   The second section is titled "[Costs] Expensed to date July 2022."   And the third section is named "[C]osts Expensed to date 92322 [Sept. 23, 2022]."   Copies of the three sections of the spreadsheets are attached as Exhibits 5, 6, and 7, respectively.

"PROJECTED COST AS OF JUNE 2022"

228.    The title of the first section suggests the City prepared it at some point before or during the month of June 2022.   It projected that 60 restaurants would participate in the outdoor dining program and pay a fee of $7,500 each for total fees of $450,000.   The projected costs of the program were divided into two categories: (1) Increased Enforcement (for outdoor café and parking compliance); and (2) Increased Cleaning (for litter and rodents).   *See* Exhibit 5.

229.    For 2022, the City's projected cost for Increased Enforcement was $42,400 and a jaw dropping $548,436 for Increased Cleaning.   As for the Increased Cleaning sum, the City specifically allocated $6,000 to have a "hokey" stationed full-time in the North End for a 20-week period to clean sidewalks, gutters, and public areas.   The City further allocated another $4,000 for additional street sweeping on weekends for 22 weeks.   The bloated Increased Cleaning sum, however, included $520,000 that the City had allocated for a new Department of Public Works electric street sweeper manufactured by RAVO.   Without the electric street sweeper, the *actual* projected cost for Increased Cleaning was just $28,436.   *See* Exhibit 5.

230.    While the City reported that its Total Projected Investment of the North End outdoor dining program as of June 2022 was $590,836, its *actual* projected cost for outdoor dining in the North End through June of 2022 was just $70,836.   *See* Exhibit 5.

| Menu Item | FY22 | FY23 | Total | Notes |
|---|---|---|---|---|
| **Increase Enforcement (for Outdoor Cafe Compliance & Parking)** | | | | |
| BTD Parking Enforcement (OT) | $14,400 | $21,600 | $36,000 | Overtime for 2 PEOs for 20 weeks for 5 nights a week |
| Initial BPD Police Presence (OT) | $28,000 | $42,000 | $70,000 | Estimate for OT costs of 5 officers for 4 weeks (5 officers x 7 OT Hours x $65 Rate x 14 days) |
| Initial Licensing/ISD/BTD Enforcement (OT) | $0 | $0 | $0 | No additional initial enforcement beyond standard work |
| Ongoing site enforcement | $0 | $0 | $0 | Jacob Wessell and John Romano - no cost |
| | | | | |
| **Increase Cleaning (for Litter & Rodents)** | | | | |
| Seasonal PWD Hokey | $6,000 | $9,000 | $15,000 | There are 6 full-time hokeys budgeted and 2 vacant. 19 seasonal hokeys budgeted (mostly vacant). 1 hokey stationed at North End x $600 weekly x 20 weeks = $12k round to $15k for extra work |
| Additional PWD street sweeping (OT) | $4,000 | $6,000 | $10,000 | OT for Saturday and Sunday sweeper operator for the 22 weeks (May thru Sept) |
| New PWD Street Sweeping Equipment (RAVO) | $520,000 | $0 | $520,000 | Fully electric sweeper, purchased in FY22 |
| Rat Baiting Program (ISD) | | | | ISD equipment and staff time (John R spoke with ISD, need to confirm details) |
| Powerwash Sidewalks (PWD) | $10,000 | $10,000 | $20,000 | PWD equipment and staff time (need help to confirm details) |
| Paint streetlight poles (PWD) | $4,375 | $4,375 | $8,750 | PWD equipment and staff time (need help to confirm details) |
| Banners on SL poles on hanover/salem st (PWD) | $1,750 | $1,750 | $3,500 | https://www.boston.gov/departments/public-works/city-boston-banner-program |
| Parks - | | | | No anticipated costs, per SB email on 4/7/22 |
| BTD - Lane lines; Flex posts, etc. | $2,311 | $5,000 | $7,311 | $1.3 per foot to remove, $.40 to put down; about $1,600 linear feet. Numbers are rounded, BTD would do this on regular time. Flex posts are another roughly $8k; numbers rounded. |
| **Total Proj Investments** | $590,836 | $99,725 | $690,561 | |

| | Estimate | Notes | | |
|---|---|---|---|---|
| Total projected 2022 licenses | 60 | 80 licenses for North End in 2021 when program was free, assuming 25% (60 licenses) less for | | |
| Est proj cost per permit | $7,500 | $7500 is target number | | |
| Proj cost per restaurant for parking | $4,800 | Just an FYI, not City revenue as it will be paid directly by restaurants to garages $960 per month | | |

| | | |
|---|---|---|
| **Total Proj New Revenue** | $450,000 | |
| **Total Proj New Spending** | $690,561 | |
| Remaining Revenue Avail | -$240,561 | -- should be 0 |

"[COSTS] EXPENSED TO DATE JULY 2022"

231. The second spreadsheet described the City's costs that were "expensed" to the North End outdoor dining program for the four-month period of April to July 2022. The City's "expensed" cost for four months of Increased Enforcement was $37,793 and $675,529 for Increased Cleaning. Of the Increased Cleaning sum, the City allocated $552,000 for the new RAVO electric street sweeper. The total "expensed" cost of the North End outdoor dining program as of June 2022 was $714,322. The *actual* cost, "minus the sweeper," was just $162,322. The City also determined that the cost of

the electric street sweeper represented a staggering 77.28 percent of the cost of the North End's outdoor dining program.

| Cost Item | Expenses April 2022 - July 2022 | Percentage of Expenses | Comments |
|---|---|---|---|
| **Increase Enforcement (for Outdoor Cafe Compliance & Parking)** | | | |
| BTD Parking Enforcement (OT) | | 0.00% | |
| Initial BPD Police Presence (OT) | $ 38,793 | 5.43% | 607 hours of OT since May related to traffic safety |
| Initial Licensing/ISD/BTD Enforcement (OT) | | 0.00% | |
| Ongoing site enforcement | | 0.00% | |
| **Increase Cleaning (for Litter & Rodents)** | | | |
| Seasonal PWD Hokey | $ 28,189 | 3.95% | 2 dedicated hokeys for the North End |
| Additional PWD street sweeping (OT) + Clean Up | $ 19,267 | 2.70% | |
| New PWD Street Sweeping Equipment (RAVO) | $ 552,000 | 77.28% | New sweeper purchased for North End outdoor dining. Specifications for north end streets navigation. |
| Rat Baiting Program (ISD) | | 0.00% | |
| Powerwash Sidewalks (PWD) | $ 3,466 | 0.49% | Regularly occurring |
| Paint streetlight poles (PWD) | $ 9,008 | 1.26% | Maintenance as needed |
| Trash Code Enforcement | $ 11,840 | 1.66% | Increased workload due to trash increase from outdoor dining |
| Banners on SL poles on hanover/salem st (PWD) | | 0.00% | |
| Parks - | | 0.00% | |
| BTD - Lane lines; Flex posts, etc. | | 0.00% | |
| BTD - Engineering Personnel | $ 35,598 | 4.98% | Based on 6 engineers, both regular and OT cost, estimates from Amy Coording, calculation in commented link |
| BTD - Sign Shop OT | $ 4,500 | 0.63% | Estimated by Mike Devine |
| BTD - Sign Shop materials | $ 7,000 | 0.98% | Material costs, estimated by Mike Devine |
| BTD - Sign Shop regular time | $ 3,000 | 0.42% | Estimated by Mike Devine |
| BTD - Policy & Planning (Jacob Wessel) | $ 1,661 | 0.23% | Estimated around 40 hours between July 2021 and Feb 2022 |
| **Total Expenses** | $ 714,322 | 100.00% | |
| | $ 162,322 | | Minus the sweeper |

| Department and Services | Percent of North End Services |
|---|---|
| Public Safety/Enforcement | 5.43% |
| Public Works: Sweeping, hokeys, powerwashing, maintenance | 87.32% |
| Transportation Dept | 7.25% |
| Inspectional Services | 0.00% |
| Total City Services | 100.00% |

Based on the April to mid July expenses for this work. Projecting out the rest of outdoor

C]OSTS EXPENSED TO DATE 92322 [SEPT. 23, 2022]."

232. The third spreadsheet described the City's costs that were "expensed" to the North End outdoor dining program for the six-month period of April to September 23, 2022. The City's "expensed" cost for six-months of Increased Enforcement was $58,593 and $735,763 for Increased Cleaning. Of the Increased Cleaning sum, the City allocated $552,000 for the new RAVO electric

street sweeper.  The total "expensed" cost of the North End outdoor dining program as of June 2022 was $794,356.  The *actual* cost, "minus the sweeper," was just $242,356.  The City also determined that the cost of the electric street sweeper was nearly 70 percent of the cost of the North End's outdoor dining program.  *See* Exhibit 7.

| Cost Item | Expenses April 2022 - End of Sept 2023 | Percentage of Expenses | Comments |
|---|---|---|---|
| **Increase Enforcement (for Outdoor Cafe Compliance & Parking)** | | | |
| BTD Parking Enforcement (OT) | $        19,800.00 | 2.49% | Based on past estimates, trimmed for 1/4 of FY23 |
| Initial BPD Police Presence (OT) | $        38,793 | 4.88% | May 1 - May 21<br>607 Hours hours of OT in May related to traffic safety |
| Initial Licensing/ISD/BTD Enforcement (OT) | | 0.00% | |
| Ongoing site enforcement | | 0.00% | |
| **Increase Cleaning (for Litter & Rodents)** | | | |
| Seasonal PWD Hokey | $        51,713 | 6.51% | 2 dedicated hokeys for the North End |
| Additional PWD street sweeping (OT) + Clean up | $        36,321 | 4.57% | |
| New PWD Street Sweeping Equipment (RAVO) | $        552,000 | 69.49% | New sweeper purchased for North End outdoor dining. Specifications for north end streets navigation. |
| Rat Baiting Program (ISD) | | 0.00% | |
| Powerwash Sidewalks (PWD) | $        4,701 | 0.59% | Regularly occurring |
| Paint streetlight poles (PWD) | $        28,203 | 3.55% | Maintenance as needed |
| Trash Code Enforcement | $        14,916 | 1.88% | Increased workload due to trash increase from outdoor dining |
| Banners on SL poles on hanover/salem st (PWD) | | 0.00% | |
| Parks - | | 0.00% | |
| BTD - Lane lines; Flex posts, etc. | | 0.00% | |
| BTD - Engineering Personnel | $        35,598 | 4.48% | Based on 6 engineers, both regular and OT cost, estimates from Amy Coording, calculation in commented link |
| BTD - Sign Shop OT | $        2,311 | 0.29% | Originally estimated by Mike Devine, updated 9/30 for coded OT expenses |
| BTD - Sign Shop materials | $        7,000 | 0.88% | Material costs, estimated by Mike Devine |
| BTD - Sign Shop regular time | $        3,000 | 0.38% | Estimated by Mike Devine |
| BTD - Policy & Planning (Jacob Wessel) | | 0.00% | Original value here from was July 2021 and Feb 2022, with no subsequent work, so removing |
| **Total Expenses** | $        794,356 | 100.00% | |
| | $        242,356 | | Minus the sweeper |

| Department and Services | Percent of North End Services |
|---|---|
| Public Safety/Enforcement | 7.38% |
| Public Works: Sweeping, hokeys, powerwashing, maintenance | 86.59% |
| Transportation Dept | 6.03% |
| Inspectional Services | 0.00% |
| Total City Services | 100.00% |

Based on the April to mid July expenses for this work. Projecting out the rest of

233.    The City's own documents show (1) it allocated sufficient funds to hire employees to maintain the cleanliness of the North End's streets during the 2022 outdoor dining season; (2) the City's actual expenses for  the North End's 2022 outdoor dining season from April through September 2020 were $242,356, which was significantly lower than the projected revenue of $450,000 from the

impact fees; (3) the City "expensed" the entire cost of the electric street sweeper, $552,000, to the 2022 North End outdoor dining program; (4) the City did not amortize the cost of the electronic street sweeper over a period of years; and (5) the City did not even receive the electric street sweeper until the end of July, with just 5-6 weeks left in the North End's 2022 scheduled outdoor dining season.

234.    Once it acquired the electric street sweeper, the City painted or laminated it with scenery from the North End.  The left side of the vehicle displays a scene of St. Stephen's Church on Hanover Street.  The right side includes a scene of the Old North Church and the statue of Paul Revere.  And the back of the vehicle shows a picture of the lamppost on the corner of Hanover and Parmenter Streets adorned with signs of cities and provinces in Italy, including "Roma," "Milano," "Calabria," "Venezia," and "Torino," as shown in the photograph below:



235.    The electric street sweeper, however, was not used as a dedicated piece of equipment for the North End despite its elaborate North End décor. The City already had a sufficient and satisfactory fleet of street sweepers that had effectively cleaned the North End's streets for years.  In fact, the City has used and continues to use the electric street sweeper in all neighborhoods in Boston. For example, a post by the Boston Public Works Department's ("PWD") on its public X account (formerly Twitter) shows a photograph of the electric street sweeper "cleaning Causeway St. in the

#WestEnd." A second PWD post displays a photograph of the electric street sweeper cleaning streets in the South End. And a third PWD post shows a photograph of the electric street sweeper at work near Alcorn Street in Allston. True and accurate copies of the three PWD posts are attached as Exhibits 8, 9, and 10, respectively. The electric street sweeper was unnecessary and unrelated to any requirements of the North End's 2022 outdoor dining program.

236.    ***February 6, 2023:*** Finally, in early 2023, in a press release titled "Mayor Michelle Wu, Superintendent Mary Skipper and Green New Deal Director Oliver Sellers-Garcia Celebrate Fleet Electrification," the City took that opportunity to boast about its continued electrification of its fleet of vehicles by stating it had added "its first all-electric street sweeper last year." The City did not attribute the purchase of the electric street sweeper to the 2022 North End outdoor dining program. Nor did it inform the public that it has imposed onerous fees on the North End's restaurant owners to pay, in part, for the vehicle. Rather, the City pitched the purchase of the electric street sweeper as part of the City's Green New Deal.

### North End Restaurants' Compliance with the City's 2022 Outdoor Dining Program's Requirements

237.    The City set September 5, 2022, as the early end date for outdoor dining in the North End unless restaurants complied with all program requirements. Under the City's "three strike" enforcement policy, a licensee's end date would be September 5 if it had one or two strikes against it. A restaurant was allocated a "strike" for each violation of outdoor dining program requirements and guidelines. If a licensee had no strikes, then its end date would be September 30, 2022.

238.    All North End restaurants that participated in outdoor dining complied with program's requirements. In late August, the City sent written notices to them stating the program's end date was September 30, 2022. Outdoor dining for all other Boston restaurants continued to December 15, 2022.

**Unanswered Questions about the Cost of the North End's**
**2022 Outdoor Dining Program and the City's Use of the Impact Fees**

239.    As the North End's 2022 outdoor dining period drew to a close in September, interested parties questioned the City about the cost of the program and the City's use of the impact fees extracted from the restaurants.  The media pressed for disclosure about the City's costs, namely, what it had paid to administer the North End's program.

240.    NEWRA, on the other hand, wanted to know how the City had used the fees to benefit North End residents.  From NEWRA's perspective, North End residents should have benefitted from the fees, including an additional day of trash collection or enhancement of public areas such as playgrounds or parks.  Like the media, NEWRA complained about the lack of information.

241.    Some residents also asked about whether the City had actually spent the funds to provide the so-called enhanced services to the North End.  For example, in the summer of 2022, one resident asked how the City was using the funds because there was no Boston Police detail present on Hanover Street:

> Constituent states that they were told that … the money from Outdoor Dining in the North End would go towards a police detail on Hanover St but there is no police detail today.  Constituent states they are concerned with where the money is going if it is not going towards a police detail.

Another resident pointedly asked whether the funds were "just going to the government":

> Can the residents of the north end see an outline how the money the restaurants paid have been used?  We have Graffiti, traffic, no trash bins, no parking spots, loud noise.  Is the money just going to the government or to the neighborhood?

Others similarly questioned the City's failure to provide hokeys to clean the streets and the lack of street sweeping.  As indicated by the charts of expenses described in Paragraphs 228 to 232 and Exhibits 5, 6, and 7, the City claimed to have allocated considerable funds to provide these services.

242.    This was an opportunity for the City to come clean about the actual cost of administering the North End program, which was quite low, and its use of impact fees to buy an electric street sweeper for $552,000 to promote its Green New Deal Plan.

243.    The City's response to inquiries finally was posted on the Outdoor Dining section of the City's website, which contains the chart below captioned "North End Outdoor Dining Spending":

## NORTH END OUTDOOR DINING SPENDING

For the 2022 outdoor dining season, participating North End restaurants agreed to pay a fee to help offset the City's expenses due to the unique impacts outdoor dining has on the neighborhood.

The City created an outdoor dining committee made up of both residents and local business owners to advise on how funds collected from the fee should be spent. To date, the City has collected about $300,000 from businesses participating in the program. All money collected from restaurant owners has been spent on the North End neighborhood.

The costs as of late September 2022 (when the 2022 outdoor dining season ended in the North End) are below.

| CITY DEPARTMENT | AMOUNT SPENT |
|---|---|
| Public Safety (traffic detail and enforcement) | $58,593 |
| Public Works (sweeping, hokeys, powerwashing, maintenance, equipment) | $687,854 |
| Boston Transportation Department (signage and personnel) | $47,909 |

Spending total: $794,356

| CITY DEPARTMENT | PERCENTAGE OF AMOUNT SPENT |
|---|---|
| Public Safety (traffic detail and enforcement) | 7.38% |
| Public Works (sweeping, hokeys, powerwashing, maintenance, equipment) | 86.59% |
| Boston Transportation Department (signage) | 6.03% |

244.    To the left of the chart, the City provided the public with the following explanatory note about the impact fees and revenues it had collected from the North End restaurants:

> For the 2022 outdoor dining season, participating North End restaurants agreed to pay a fee to help offset the City's expenses due to the unique impacts outdoor dining has on the neighborhood.

The City created an outdoor dining committee made up of both residents and local business owners to advise on how funds collected from the fee should be spent. To date, the City has collected about $300,000 from businesses participating in the program. **All money collected from restaurant owners has been spent on the North End neighborhood** (emphasis supplied).

245.    At best, the City responded by posting erroneous numbers on its website. At worst, it misinformed the public by omitting key information about its purchase of the electric street sweeper.

246.    First, the City incorrectly stated that the total spending for the North End's 2022 outdoor dining season was $794,356. It was not. Based on the City's own spreadsheet of expensed costs for the program, the *actual* cost was $242,356—a mere 30 percent of the stated amount. The sum provided by the City included $552,000 that the City paid for the electric street sweeper as part of its Green New Deal initiative.

247.    Second, the City represented that cost of "Public Works (sweeping, hokeys, power-washing, maintenance equipment)" was $637,354, which was 86.59 percent of the cost. This also was inaccurate. The actual cost for "Public Works" was much lower at just $183,763, which was only 28 percent of the amount reported. The City inflated the total cost of the program by including the $552,000 that it had paid for the electric street sweeper.

248.    Third, the City *never informed the public* that it had spent $552,000 for an electric street sweeper that was bought for citywide use as part of the Green New Deal.

249.    Fourth, the City attempted to create the impression that the North End Outdoor Dining Committee had advised the City on how the funds from the restaurant owners should be spent. But based on records produced by the City, there does not appear to be any evidence that the North End Outdoor Dining Committee knew that the City had allocated $552,000 for the purchase of the electric street sweeper. And City records further provide no evidence that the City allocated any funds to be used by the North End community fund for mitigation problems and services in the North End.

250.    Finally, the City misinformed the public that all money collected from restaurant owners "had been spent on the North End neighborhood." Again, the City did not disclose that the purchase of the electric street sweeper for *citywide* use was nearly 70 percent of the alleged cost of the North End's outdoor dining program.

251.    To this date, the City has continued to misinform the public about the costs of the 2022 North End outdoor dining season as the above chart remains on its website.

**The Mayor's Announcement of a New
Holiday to Be Celebrated on Columbus Day**

252.    Columbus Day was officially recognized as a Federal holiday in the United States in 1971. For over 50 years, it has been observed on the second Monday in October, as commemorated by annual Presidential proclamation noting Columbus' achievements. Many Italian Americans observe Columbus Day as a celebration of their heritage, including Italian Americans in the North End.

253.    As a tribute to Columbus, a park on the waterfront of the North End was named the Christopher Columbus Waterfront Park. In October 1979, a marble statue of Christopher Columbus acquired by The Friends of the Christopher Columbus Committee was installed in the park with the support of several Italian-American interest groups. The statue sat on a granite pedestal that honors Italian-American families in the North End. In recent years, including 2020, vandals have damaged the Christopher Columbus statue, resulting in its removal. The repeated desecration of the Christopher Columbus statue in the North End is widely viewed by the plaintiffs and other Italian Americans in Boston and elsewhere as discriminatory acts against Italians and their heritage.

254.    Columbus Day was celebrated as a Federal holiday on Monday, October 10, 2022, across the country and by scores of Italian Americans throughout Massachusetts, including North End's Italian restaurant owners.

255.     On October 6, 2022, days before Columbus Day, Mayor Wu issued a Proclamation that October 10, 2022—Columbus Day—would now be celebrated in Boston as Indigenous Peoples' Day.  While the celebration of a new City holiday to recognize an ethnic group is commendable, the Mayor decided the City's new holiday would be celebrated in Boston on the same day as the only longstanding federal Italian holiday.  The Mayor easily could have chosen one of hundreds of other days of the year on which Bostonians could celebrate Indigenous Peoples' Day but intentionally chose Columbus Day and made her announcement four days before Columbus Day.  Many North End Italian Americans, including the plaintiffs, considered the Mayor's act as a deliberate ethnic affront meant to overshadow or symbolically replace the only federal Italian holiday.

256.     At that time, Mayor Wu was a defendant in a pending civil action in federal court in a case in which several owners of North End Italian restaurants had alleged that she had discriminated against them and violated their federal constitutional and state law rights.  In addition, just months earlier when Mayor Wu imposed harsh participation fees on North End restaurants, a North End resident sent an e-mail to Mayor Wu urging that she "kindly reconsider this issue" and observing that the City's disparate treatment of the North End Italian restaurants **"coupled with the possible elimination of Columbus Day as a holiday signals a perceived and unnecessary attack on Italian Americans."**

### NEWRA's Campaign to Ban Outdoor Dining in the North End

257.     Once the North End's outdoor dining season ended, NEWRA began to pressure City Hall to ban outdoor dining in the North End.  In November 2022, NEWRA's President sent e-mails to Romano and Shelley insisting that NEWRA be involved in the City's plan for outdoor dining in 2023.  She claimed that "residents want to be part of the process."

258.     NEWRA's President requested City officials to attend every monthly meeting of NEWRA from November 2022 through February 2023 to discuss outdoor dining in the North End.

The City knew that NEWRA was antagonistic to the North End Italian restaurants.  During that 4-month period, NEWRA's leaders were in constant communication with City officials concerning their interest in banning outdoor dining in the North End.  Simultaneously, however, the City had limited interaction with the North End restaurants and those who supported outdoor dining.

259.     In November 2022, NEWRA also met with City to discuss the repair of crosswalks and sidewalks, as well as the relocation of traffic lights on North Washington Street in the North End. NEWRA informed City officials that the North End's sidewalks and crosswalks were in "poor condition" and labeled them a "serious public safety concern."

260.     Privately, in an internal City e-mail, City officials acknowledged the condition of the North End's sidewalks were a "priority due to the court ordered agreement."[12] They considered providing a host of excuses for existing conditions, such as low staff capacity and lack of hiring.  They even discussed blaming outdoor dining for the delay in performing street and sidewalk repairs.  But one City official nixed that thought, commenting that outdoor dining did not stop the City from performing work just blocks from Hanover Street. The North End residents had longstanding safety concerns about the condition of the neighborhood's sidewalks and crosswalks as well as the traffic malady.  Those concerns were not caused by outdoor dining.

261.     Shortly before NEWRA's monthly meeting in December, NEWRA's President urged Ciara D'Amico, the City's North End Liaison, and Kristen Shelley, the City's Outdoor Dining Manager, to attend.  D'Amico agreed to attend, but also informed NEWRA's President and its Board that the City was conducting two community listening sessions on December 5 and 6, 2022, regarding the upcoming outdoor dining program.  D'Amico explained that the sessions would focus on "hearing

---

[12] The City's reference to the "court ordered agreement" likely is to the Consent Decree issued in *Michael Muehe, et al. v. City of Boston*, Case No. 1:21-cv-11080-RGS, discussed in Paragraphs 338 to 339.

from residents and businesses on the goals of a permanent outdoor dining program as well as sharing updates from our team on the program."

262.    The City prepared a slide presentation for the meetings titled, "Outdoor Dining Proposal, December 2022."  The presentation explained that over 350 businesses had applied for the 2022 Temporary Outdoor Dining Program, and 280 of them were approved to be on public property. The top five neighborhoods in terms of number of restaurants participating in the program were the North End with 62, followed closely by Back Bay with 49, South Boston with 36, Downtown Boston with 35, and the South End with 30.

263.    In a slide devoted to "Ongoing feedback and Engagement Process," the City wrote it had "collected feedback from community members and businesses" since the start of the temporary program, and the feedback and input had informed program updates in 2021, 2022, and was "crucial for a permanent program."

264.    An important section of the presentation on the "Objectives of the Permanent Outdoor Dining Program" stated that a central aim of the program was to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."  Nothing in the presentation suggested the City had decided to ban outdoor on-street dining in the North End or had even considered doing so.  The same held true for the City's oral presentations at the meetings.

265.    On December 5, 2022, the City held the first community listening session.  After the meeting, a NEWRA leader contacted Romano, urging the City to participate in a meeting to address the particular needs of the North End before making a final decision on a North End outdoor dining program.

266.    The City's second community listening session took place on December 6, 2022. Following the meeting, a City official in attendance sent Shelley a summary of attendees' comments.

Most the 21 comments pertained to citywide outdoor dining. Just one focused solely on the North End. The attendee suggested there should be specific regulations for the North End. Two other comments mentioned the North End along with other neighborhoods. One noted the increased number of people using outdoor dining after the pandemic, which the attendee deemed to be too much for South Boston, Beacon Hill, and the North End. The other supported "pedestrianizing" outdoor dining on Newbury Street in the Back Bay and Hanover Street in the North End.

267.    NEWRA held its monthly meeting on December 8, 2022. D'Amico, who attended, summarized the members' comments as follows:

- Residents wanted to be heard in-person about their concerns and felt betrayed by the City, believing it already had decided to continue outdoor dining in the North End;

- Residents wanted an answer as to whether there would be outdoor dining in the North End;

- Assuming there would be outdoor dining, they asked about parking, fees, and streets, particularly Hanover Street;

- Residents believed if North End restaurants had to pay to participate in outdoor dining, then restaurants citywide should, too;

- Restaurant owners wanted to know if they should keep their barriers, as many were paying storage fees for them;

- Residents believed that North Square, a city park, was being misused for outdoor dining; and

- Many were shocked that certain areas had been ADA approved.

268.    As reported by D'Amico, none of the members' comments even remotely suggested that outdoor dining in the North End had caused serious quality of life issues for residents. Two comments were critical of the City's oversight of the program, such as permitting the use of North Square for outdoor dining and approving the accessibility of other areas under the ADA. Other comments were essentially questions about the program, such as (1) whether the program would

occur, (2) whether the program would require restaurants' payment of parking fees, and (3) whether restaurant owners should keep their barriers. Another comment supported the view that all City restaurants should pay a participation fee if the North End's restaurants were required to do so. Finally, one comment criticized the City for excluding residents from the discussion on the program's future. None of the NEWRA members' comments justified a ban.

269. Meanwhile, NEWRA's President continued to insist that high-level City officials attend NEWRA's monthly meeting on January 12, 2023, to again listen to its members' concerns about outdoor dining. When D'Amico asked if NEWRA had invited the North End restaurant owners to the meeting, NEWRA's President responded: "I haven't gotten that far. Happy to discuss. The meeting will be respectful and allow everyone to provide their thoughts."

270. Idowu supported attending NEWRA's meeting on January 12, but opposed the City's hosting of a separate meeting for the North End, stating the City already had incorporated the neighborhood's feedback in the design of the permanent outdoor dining program:

> I think it will be valuable to have representation at the NEWRA meeting, but it will not be reasonable to host a separate North End-specific meeting. **In addition to our having no new information to share at the moment, I don't believe we will hear any opinions or concerns not already expressed in the past or even at our most recent virtual meetings. That feedback has already been used to design the permanent program**, and additional sessions will only provide a platform for residents and business owners to engage in unhelpful ways (emphasis supplied).

He suggested the group reconvene to determine the next steps and provide Mayor Wu with a recommendation.

271. On December 20, 2022, Shelley, Romano, and other City officials nonetheless held a private meeting with NEWRA's President to discuss "issues, concerns, and feedback" regarding outdoor dining in the North End in 2022 and prior years.

272. A few days before NEWRA's meeting on January 12, 2023, Boston City Councilor Gabriela Coletta, who planned to attend the meeting, requested the City to provide her with an update

on the status of the 2023 outdoor dining program, including a "full accounting of the revenue collected" from the 2022 outdoor dining program.  As of January 11, 2023, the day before the meeting, the City still did not have "final numbers" on revenue it had collected from North End restaurants, even though the media and NEWRA had also asked for the same information back in late September of 2022.

273.     During the same timeframe, the City's legal team was actively engaged in litigation with the North End Italian restaurants that filed the lawsuit against Mayor Wu.   Just days before the meeting on January 12, the City's legal team filed a motion to dismiss the amended complaint.

**NEWRA's Meeting on January 12, 2023**

274.     NEWRA held its monthly meeting on January 12, 2023, with several City officials and elected officials attending.  A North End resident who covers North End events, issues, and news on a local blog known as NorthEnd.page attended the meeting.  He provided a detailed written account of what transpired on NorthEnd.page.  The North End resident wrote that a "small group" attended the meeting, which was scheduled at dinner time.  "It was filled with the same people who have the luxury of attending most of the in-person only North End meetings.  Mostly over 50.  Mostly car owners.  And completely non-representative."  The North End resident included a photograph of NEWRA's alleged grievances about outdoor dining that were posted on the wall.  He labeled them, "NEWRA's 11 Outdoor Dining Theses." The list was as follows:

- Pandemic emergency is over; indoor dining is back 100%;

- Not all restaurants want to participate; they feel pressure to be part of it;

- Need for sidewalk and street repairs; City promised to pave and repair;

- Limited sidewalk access and passage; increased congestion by visitors and restaurant servers;

- Encroachment into public spaces, parks and sidewalks;

76

- Increased vehicle traffic increases public safety risk;

- Double parked delivery trucks and vehicles;

- More trash = more rats;

- Increased noise; motorcycles revving engines, loud music, and voices;

- Loss of parking and access to public parks and open spaces; and

- Loss of historic character and community; North End now feels like a circus, not a neighborhood.

275.    According to the North End resident, the meeting bore little resemblance to an intelligent discussion of issues surrounding outdoor dining, as its attendees did not allow any debate from those who disagreed with them:

> While it was organized by neighborhood groups, there was no vote.  There wasn't any debate.  It was more of an airing of grievances.  No resident who didn't agree with the posted message (there was a bulleted list of positions hung behind the speakers) would have felt comfortable speaking up (I spoke with two after the meeting).  One of the three restaurant owners who did attend tried to debate but was shut down.  It's unfortunate that the City took what they heard there as a representative voice.

276.    Based on the North End resident's account of the meeting, there was no opportunity for anyone to challenge or even address "NEWRA's 11 Outdoor Dining Theses."  However, almost every grievance on the list had nothing to do with outdoor dining in the North End specifically.  Most were general gripes about the concept of outdoor dining.  Some of the remaining complaints had nothing to do with outdoor dining but reflected criticisms of the City's conduct.  The City easily could have addressed and summarily disposed of every NEWRA complaint as follows:

- The end of the pandemic and return of indoor dining was true for restaurants in every City neighborhood, not just the North End.

- Whether a restaurant decided to participate in outdoor dining was purely a voluntary choice for each restaurant throughout the City.  In fact, about third of the North End's restaurants did not participate in the outdoor dining program in 2020, 2021, and 2022.

- As to the loss of parking spaces, restaurants participating in on-street outdoor dining throughout City used parking spaces, not just those in the North End. Moreover, the North End restaurants effectively eliminated this issue by paying large sums in 2022 to provide residents with predictable, free parking in parking facilities for every parking space they used. This actually benefitted North End residents, who frequently had to circle the block to find parking spaces before the outdoor dining program even existed.

- The encroachment of outdoor dining cafés on sidewalks was a common feature of all on-street outdoor dining for restaurants throughout the City.

- To the extent a restaurant used a public park or public space for outdoor dining anywhere in the City, it did so only with the City's specific permission. This was not a feature of most of the North End restaurants as only 3 used public parks.

- Any alleged increased noise by patrons dining outdoors existed wherever there was outdoor dining, not just in the North End.

- Outdoor dining in *any* Boston neighborhood could possibly result in increased trash and rodents. Trash collection and rodent control have been historic issues throughout Boston long before outdoor dining. These issues were not unique to the North End. Moreover, North End restaurants pay for *daily* private trash pickup.

- Double parking of delivery trucks and traffic existed in all City neighborhoods and was not causally linked to outdoor dining in the North End. Traffic control, double parking and safety issues are generic enforcement issues that exist throughout Boston.

- NEWRA's characterization of the North End as a "circus" due to outdoor dining was purely a subjective matter of opinion and was disputed by many. In contrast, another North End resident informed the City that outdoor dining "gives the North End a distinctively European feel that helps make the North End the special place that it is to residents of the neighborhood and to the city as a whole."

277.    Individually and collectively, "NEWRA's 11 Outdoor Dining Theses" listed generic grievances about outdoor dining and provided no factual basis or justification for the City to ban outdoor dining in the North End. Rather, the list merely showed that a vocal minority of residents opposed the concept of outdoor dining.

### Aftermath of NEWRA's Meeting on January 12, 2023

278.    In the days following the meeting, NEWRA barraged the City with more e-mails, most of which were sent to Idowu.  The anti-outdoor dining e-mail campaign largely rehashed complaints that NEWRA had made during the meeting and recycled familiar issues that NEWRA members had raised over the years, such as crowded sidewalks, rowdy patrons, trash management, and traffic.  Yet, the City had previously considered these complaints and already had addressed them in its preparation of the 2021 and 2022 outdoor dining programs.

279.    Notably, one meeting attendee—a lifelong resident of the North End—sharply disagreed with NEWRA members and offered a widely different perspective in an e-mail to Idowu. The resident explained that much of the North End opposition was generated by ***"a small group of residents that will always be against it [outdoor dining] and some for personal reasons against a restaurant owner."***  She wrote, "I don't feel that the restaurant owners get a fair amount of respect at these public meetings. They are mocked and disrespected." She offered support for her neighbors and her friends that own restaurants, noting her willingness to assist in resolving this conflict.

280.    Consistent with the lifelong resident's view that a "small group" of North End residents "will always be against" outdoor dining, NEWRA's President continued to pressure the City to ban outdoor dining in the North End.  On January 15, 2023, she sent an e-mail to Idowu offering to continue the discussion with him and noting "there are strong sentiments here about continuing the outdoor dining program."  She attached a PDF copy of the written list of NEWRA's complaints used at the meeting on January 12, and volunteered to continue as a member of the City's North End Outdoor Dining Committee.

281.    NEWRA's incessant and persistent hammering away at City officials worked, as City officials held private phone calls with NEWRA members and even hosted private meetings with them at City Hall, all of which occurred outside the public's eye and without the public's knowledge.  On

the other hand, the City held limited meetings with North End restaurant owners and residents supporting outdoor dining.  And even when it met with North End restaurant owners, the City did not send public notices or otherwise notify all North End restaurants of the meetings.

282.   City officials planned an internal meeting to discuss outdoor dining in the North End to take place in late January 2023.  Shortly before the meeting, on January 25, NEWRA's President sent an e-mail to Idowu, Shelley, Romano, and D'Amico again requesting City officials to meet with NEWRA's Executive Committee and other North End residents who wanted to end outdoor dining.

283.   This time, NEWRA's President attempted to bolster her demand by raising questions about the applicability of legal and regulatory requirements related to alcohol, fire safety, and misuse of public property if the City permitted outdoor dining to continue in the North End.  She again attached the PDF copy of NEWRA's list of generic complaints about outdoor dining, questioning how the City would "mitigate the numerous impacts raised by the community."  In addition, NEWRA's President questioned how the City planned to correct the "*inequity*" caused by the North End restaurants' success.  She wrote:

> How will the City mitigate the *inequity* created by greatly increasing visitor presence, dining capacity, alcohol service, and associated revenue for North End businesses to the detriment of the business communities in other neighborhoods?

284.   City officials already knew that NEWRA's President was an ardent supporter of banning outdoor dining in the North End.  The so-called "*inequity*" that NEWRA's President wanted to "mitigate" or eradicate was the fruits of the labor of North End restaurant owners that had been earned through hard work and fair competition in Boston's highly competitive restaurant market.

285.   While NEWRA's behind-the-scenes, anti-outdoor dining campaign with City Hall was in full swing, restaurant owners began to reach out to the City.  In early February 2023, several restaurant owners contacted Shelley and Idowu, asking for updates on the status of the outdoor dining program so they could complete the application process and prepare for the upcoming season.

286.     On February 7, 2023, Shelley responded to the owner of Café Dello Sport on Hanover Street as follows: "At this time there is no new information regarding the outdoor dining program." Yet, Shelley attached the City's December 2022 presentation to her e-mail.  She endorsed the presentation, claiming it contained "valuable information regarding the city's proposal for the outdoor dining program," and encouraged the restaurant owner to consult it.  As the head of the outdoor dining program, Shelley surely knew the presentation emphasized that a key "objective" of the program was to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."

287.     Just two days later, on February 9, 2023, the City began planning to announce the ban to North End residents on February 16, 2023.  The City's Assistant Press Secretary circulated to high-level City officials a draft "flyer" providing residents with public notice of "an in-person meeting to learn about the latest outdoor dining updates" with the City's Outdoor Dining Team along with a draft accompanying e-mail to residents.

288.     Knowing the public announcement of the ban was imminent, Shelley nevertheless arranged a private meeting with NEWRA's leadership to occur on February 13 at City Hall, as shown by the e-mail below:

---

**From:** Kristen Shelley <kristen.shelley@boston.gov>
**Sent:** Monday, February 13, 2023 10:30 AM EST
**To:** Cheryl <cdelgreco@comcast.net>
**Subject:** Re: NEWRA meeting

Hi again,

Thank you for taking my call this morning.  If it is easier, I can meet everyone at the entrance on Congress
street and escort them to the 6th floor. Happy to make things easier on everyone. Just let me
know.

Thanks!
Kristen

---

289.     NEWRA's President responded by providing Shelley a list of at least seven and possibly nine members who would attend the meeting.  Romano then sent an internal invitation to Idowu and Shelley indicating that there would be a meeting later that day with "the NEWRA board":

**Subject:** North End Resident (NEWRA) e board meeting
**Location:** TBD by the OEOI Team
**Start:** Monday, February 13, 2023 4:00 PM EST
**End:** Monday, February 13, 2023 4:45 PM EST
**Recurrence:** None
**Organizer:** john.romano@boston.gov
**Required Attendees:** segun.idowu@boston.gov; kristen.shelley@boston.gov; john.romano@boston.gov
The NEWRA board will be coming to meet with you all.I will be out of town this day but can help coordinate prior to the meeting.

290.     The City already had decided to ban all on-street outdoor dining in the North End for the 2023 season.  At that time, the North End restaurant owners' lawsuit against Mayor Wu was still pending in federal court.

### The City's Ban on Outdoor Dining in the North End

291.     The City decided to announce the ban by using a two-step process that would occur simultaneously.  First, the City would hold an in-person public meeting at 6:00 p.m. at Saint Joseph's Hall located on Prince Street in the North End.  Second, at 6:30 p.m., *while the meeting was in progress*, it would disseminate a press release announcing both the citywide program and the North End ban.

292.     On February 14, 2023, the day after the City's private meeting with NEWRA at City Hall, Romano circulated a public notice about an informational North End meeting on outdoor dining to occur on February 16, 2023, at 6:00 p.m. at Saint Joseph's Hall.  The notice said the meeting was to "get updates on On-Street Outdoor Dining in the North End."  The notice made no mention of the ban.  As the date of the meeting approached, City officials deflected residents' questions about the purpose of the meeting with vague responses.

293.     The City then executed its gameplan.  The meeting was held at St. Joseph's Hall on February 16 at 6:00 p.m. with armed Boston Police officers lining the back of the church hall.  The North End restaurant owners were provided with no advance notice and were caught completely off-

guard when it announced the news.  While the meeting was in progress, the City issued a press release at 6:35 p.m. announcing that it would conduct a robust Permanent Outdoor Dining Program for every neighborhood in Boston except the North End (the "Press Release").  As to the North End, all on-street outdoor dining by the Italian restaurants was banned.  With near perfect planning and execution, the City fulfilled its prior retaliatory threats to shut down outdoor dining in the City's Italian section.

294.    The Press Release boasted that the outdoor dining program was the result of a collaborative effort involving Mayor Wu in coordination with the OEOI, the Streets Cabinet, and the Disabilities Commission.  It advised that business owners could apply online beginning on February 23, 2023, and the goal was to open restaurant patios by May 1, 2023.

295.    But the bottom of the first page of the Press Release struck a different tone, stating "The City will not be permitting on-street dining in the North End this year."  The "Outdoor Dining Program" page on the City's website directly under the "Application Portal" stated:

> **Please note:**  The City of Boston will not be reviewing or permitting on street outdoor dining applications in the North End for the 2023 outdoor dining season.

296.    The Press Release also spelled out the following three purported reasons why the City had banned outdoor dining in the North End:

- The scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project are expected to put a greater strain on North End traffic this summer and make it harder for residents and first responders to navigate the area.

- With about 95 restaurants in just over a third of a square mile, the North End has the densest per capita number of restaurants in the state.

- This has brought unique challenges and quality of life issues expressed by residents over the course of the temporary programs, including increased traffic, sanitation issues, and accessibility problems for older residents and those with limited mobility.

297.    Finally, the Press Release advised that the City was creating a "task force" to determine how these issues could be remedied in future iterations of the permanent program.  The City's website

included a section labeled "NORTH END TASK FORCE," which stated in italics: "The City of Boston is committed to stewarding a robust permanent outdoor dining program.  To do that, it is important that all voices are heard and that stakeholder concerns are heard."  The City also implied the North End needed a task force to develop an "*inclusive*" outdoor dining program:

> To help the Office of Economic Opportunity and Inclusion stand up a *robust and inclusive outdoor dining program*, the City will use this season to assemble a North End On-Street Outdoor Dining Task Force.  The task force will be made up of North End residents and business owners.  They will *determine how these issues could be remedied in future iterations* of the permanent outdoor dining program.

Yet, it was the City that made the outdoor dining program less inclusive and less robust by *excluding* the City's Italian restaurants from the citywide program.

### Pretextual Reasons for the Ban

298.    North End restaurant owners were astounded and incensed by the City's discriminatory ban and with good reason.  By all accounts, the 2022 outdoor dining program in the North End was widely viewed as a success.  Initially, the 2022 program was to run from May 1 to September 5 in the North End.  However, the North End restaurants abided by City regulations and guidance throughout the outdoor dining season.  As a result, the City *extended* the program end date to September 30, rewarding the North End with over three additional weeks of outdoor dining.  Notwithstanding this extension, the North End still did not have the benefit of the program's citywide end date of December 31, 2022.

299.    By December 2022, when the City hosted its two information sessions on the 2023 Permanent Outdoor Dining Program, it clearly signaled that the North End restaurants would be participants in the upcoming program as it sought to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."

300.    The City's December 2022 presentation further indicated that it had "collected feedback from community members and businesses" since the start of the temporary program, and

the feedback and input had informed program updates in 2021, 2022, and was "crucial for a permanent program." In other words, to the extent the City had received complaints about outdoor dining in the North End—as well as from all other neighborhoods throughout the City—it had specifically addressed those issues in the design of its 2023 program. Romano acknowledged as much in a mid-December 2022 e-mail to the City's Chief of Streets in which he thanked the Street team for creating the North End traffic and outdoor dining spacing program and spending countless hours measuring curbs and addressing residential safety concerns. Idowu also shared that view, noting that NEWRA's *"feedback has already been used to design the permanent program."*

301.    Rather than provide the public with a transparent explanation about what led to the ban, the City instead relied on three pretextual justifications. Each purported reason either lacked factual support, was erroneous, or did not provide an objectively valid basis for the ban.

### Construction Traffic

302.    The City's first alleged reason was that scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project were expected to put a greater strain on North End traffic during the summer of 2023, thereby making it more difficult for residents and first responders to navigate the area. This claim conflicted with public information about the impact of these construction projects that was known at the time.

#### THE SUMNER TUNNEL

303.    Closure of the Sumner Tunnel dramatically *reduced* the traffic in the North End during the summer of 2023 as opposed to intensifying it. The City knew that would be the case before issuing the Press Release.

304.    The Sumner Tunnel is a southbound underground roadway that handles traffic traveling from East Boston and Logan International Airport to the North End/Government Center area of Boston. The entrance to the Sumner Tunnel is in East Boston—not the North End. The

tunnel passes under Boston Harbor and part of the North End and exits to surface streets near New Chardon Street in the Government Center area.

305.    By no later than 2021, the City announced that it would conduct a three-phase restoration project of the Sumner Tunnel in 2022 and 2023 to address structural and functional system deficiencies using updated technologies.  Phase 1 was scheduled for 2022-2023 and Phases 2 and 3 were to occur from the summer to the winter of 2023.  To accommodate construction, the Sumner Tunnel was set for closures in 2022 and 2023.

306.    In May 2021, the Massachusetts Department of Transportation ("MassDOT") conducted a public hearing discussing the project.  In its written presentation, MassDOT addressed expected traffic impacts from the closures and proposed detours.  All high-impact traffic areas were to occur in East Boston and surrounding communities.  Vehicles had to use various proposed detours to downtown Boston, including the Ted Williams Tunnel and Route 1.  This would result in vehicles exiting in South Boston and Charlestown, respectively.  In other words, MassDOT's proposed detours were designed to divert traffic that would have passed through the tunnel and exited near the North



Estimated Distribution of Trip Diversions During AM and PM Peaks in Summer 2023

End to other parts of the City, as displayed below in a public MassDOT presentation dated May 26, 2021:

307.   In 2022, MassDOT gave similar oral and written public presentations to both the City and NEWRA. It identified the high-impact traffic areas in East Boston and surrounding communities as well as the detours, which showed the diversion of tunnel traffic away from the North End. Therefore, well before the City claimed that it was banning outdoor dining in the North End for the 2023 season due, in part, to anticipated traffic congestion caused by closure of the Sumner Tunnel for restoration work, the City knew that closure of the tunnel would substantially *reduce* North End traffic as opposed to intensifying it.

308.   In fact, that is what precisely occurred during the 2023 outdoor dining season. Beginning on June 10, 2023, the Sumner Tunnel was closed for maintenance for several consecutive weekends from 11:00 p.m. on Fridays through 5:00 a.m. on Mondays. From July 5, 2023, through August 31, 2023, the Sumner Tunnel was completely closed for seven days a week. During that time period, MassDOT regularly reported on its monitoring of daily traffic caused by the tunnel closures.

309.   In written presentations and weekly reports, MassDOT provided statistics showing the "Diversion Volume from the Sumner Tunnel" for vehicles that utilized the Ted Williams Tunnel and the Tobin Bridge as detours. For example, on Monday, July 17, 2023, MassPort reported that an additional 10,471 vehicles that would have used the Sumner Tunnel instead utilized the Ted Williams Tunnel detour. This accounted for 26% of the normal Sumner Tunnel traffic volume. Another 10,979 vehicles used the Tobin Bridge detour, which was 27% of the normal Sumner Tunnel volume. On that day, these two detours diverted over 21,000 vehicles from exiting the Sumner Tunnel near the North End to other parts of Boston, markedly lowering the traffic volume of the North End by approximately 53%.

310.    The City's claim that closure of the Sumner Tunnel during the outdoor dining season would create an undefined "strain" on traffic on the North End not only was inaccurate when made, but also proved to be the exact opposite, as the tunnel closures considerably *reduced* North End traffic.

THE NORTH WASHINGTON STREET BRIDGE

311.    The City also claimed that continued congestion around the North Washington Street Bridge construction project—in combination with expected increased traffic due to closures of the Sumner Tunnel—would cause greater strain on North End traffic.

312.    The North Washington Street Bridge is located at the boundary of the North End and the West End.  It crosses a canal and connects to Charlestown.  Built in 1898, the bridge is being removed and replaced with a new bridge.  Construction began in August 2018 and is scheduled for completion in 2025.

313.    Although construction commenced over five years ago, this is the first time the City had claimed that residual traffic caused by this project on the perimeter of the North End was a basis to ban outdoor dining in the North End.  The North End, West End, Downtown Boston, and Charlestown have lived with construction-related traffic from the bridge project for over five years. During three of those five years (2020, 2021, and 2022), the North End successfully conducted outdoor dining.  The project is now approximately 75% complete.

314.    As far back as 2017, MassDOT identified alternate traffic routes to be used during the bridge construction.  For northbound traffic, MassDOT identified a detour that redirected vehicles from the exit of the Sumner Tunnel to Route 93 North with an exit in Charlestown near the Schrafft's Center.  This alternative route completely bypasses the North End. Any re-routed, additional northbound traffic is sent to Charlestown, not the North End.  Indeed, in view of the closure of the Sumner Tunnel, even the volume of re-routed traffic had been significantly reduced.

315.     For southbound traffic, MassDOT identified a detour directing vehicles onto Nashua Street, Lomasney Way, and Causeway Street.  These destinations are in the West End near the TD Garden and North Station.  They are not in the North End.  Any congestion due to re-routed southbound traffic more directly impacts the West End, not the North End.

316.     MassDOT's solution to any increased traffic caused by the longstanding construction on the North Washington Street Bridge has not caused traffic issues in the North End that impair the ability of residents and first responders to navigate the area.  In fact, in response to Public Records Law requests directed at this very issue, neither the City nor MassDOT produced any documents supporting this claim.  The City's reliance on this excuse as a basis for the ban lacks evidentiary and factual support.  The City's own conduct underscores this point, as the City did not ban outdoor dining in the West End or in Charlestown, which are the two neighborhoods most directly impacted by traffic caused by the bridge construction.

### Number of Restaurants in the North End

317.     The City's second alleged reason for banning outdoor dining in the North End was based on the density of restaurants in the neighborhood.  In the City's words, "With about 95 restaurants in just over a third of a square mile, the North End has the densest per capita number of restaurants in the state."

318.     This purported statistic is both misleading and irrelevant to whether the North End restaurants should be permitted to participate in City's outdoor dining program.  First, the number of restaurants in any Boston neighborhood is of no consequence.  Many restaurants do not want to engage in outdoor dining and have not done so.  The North End is a case in point.  In 2022, only 62 decided to participate in the outdoor dining program.  Approximately 30 others did not.

319.     Second, the number of restaurants permitted to participate in the outdoor dining program is determined by the City itself, not the restaurants.  According to the City, in 2022, 350

restaurants applied for outdoor dining, yet the City approved only 280 applications, thereby rejecting 20% of the applicants.  The applicant does not control the process.

320.    Third, in 2022, the City approved sizeable numbers of restaurants to engage in outdoor dining in several other neighborhoods of comparable size to the North End, including 49 in Back Bay, 36 in South Boston, 35 in Downtown Boston, and 30 in the South End.   But the City has not banned outdoor dining in these neighborhoods due to the concentration of restaurants in them.

321.    The mere number of restaurants in the North End (or in any neighborhood) is not a justifiable basis to ban outdoor dining, particularly since the City determines the number of restaurants that can engage in outdoor dining.  In this instance, the City's reliance on this alleged reason as a basis for the ban is a criticism of the City's own decisions and cannot be blamed on North End restaurants.

### *Quality of Life Issues*

322.    Finally, the City explained that it had banned outdoor dining in the North End because it brought three "unique challenges and quality of life issues expressed by residents," including (1) increased traffic, (2) sanitation issues, and (3) accessibility problems for older residents and those with limited mobility.  None of these purported quality of life justifications provided a legitimate basis for the ban.

#### INCREASED TRAFFIC

323.    Without factual elaboration, the City claimed that residents had complained about "increased traffic" caused by outdoor dining in the North End.  The City's general assertion about "increased traffic" lacks factual support and was not a proper basis for the ban.

324.    First, in 2022, the City, acting with the Mayor's endorsement, decided to convert a portion of Hanover Street to a one-way street before the outdoor dining season as a specific means to reduce traffic on the central street where the majority of restaurants are located.  This had its

intended effect, as vehicles were unable to access Hanover Street from the busiest end of the street near the Greenway during the outdoor dining season.

325.    Second, most people who dine in the North End do not even attempt to drive through the heart of the neighborhood.  There are minimal visitor parking spaces, as most spaces are reserved for residents with North End resident stickers.  There also is limited public parking in the North End itself.  Restaurant patrons commonly use public parking facilities around the perimeter of the North End or parking garages in Government Center, Haymarket Square, and Post Office Square.  Others frequently use Uber, Lyft, or taxis to bring them to drop-off spots on the fringe of the North End.

326.    Third, Boston's horrendous traffic problems pervade the City and are well documented.  They have existed for many years before the advent of the City's outdoor dining program.  Even Mayor Wu acknowledged this fact back in 2020 when she was a Boston City Councilor.  In August 2020, then-City Councilor Wu issued a report titled *Planning for a Boston Green New Deal & Just Recovery*.  In that document, then-City Councilor Wu described Boston's traffic problems as follows:

> Traffic congestion is choking our city too. Boston is ranked as the most congested city in the United States, with the average Boston commuter having lost over 149 hours due to traffic in 2019—the equivalent of more than 18 eight-hour work days spent sitting in traffic that year.[13]

327.    Additionally, national and international studies of traffic in Boston in 2020, 2021, and 2022 have uniformly concluded that Boston has one of the worst traffic problems in the Nation.[14]  Given the City's longstanding traffic problems that have pervaded all of its neighborhoods for years, the City cannot plausibly claim that increased traffic in the North End was *caused by outdoor dining*.

---

[13]  *Planning for a Boston Green New Deal & Just Recovery*, Office of Boston City Councilor Michell Wu, Aug. 2020, at p. 7, *citing* 2019 Global Traffic Scorecard, INRIX, March 9, 2020.

[14]  *See* 2019 Global Traffic Scorecard, INRIX, March 9, 2020; 2021 Urban Mobility Report, *Texas A&M Transportation Institute*, June 20, 2021; 2022 Global Traffic Scorecard, INRIX, Jan. 23, 2023.

*SANITATION*

328.    The City's vague assertion that "sanitation issues" provided a basis for the ban is erroneous for many reasons, including an acknowledgement by Mayor Wu that rodent control, clean streets, and trash pickup are citywide problems and not the fault of the restaurants.  At the press conference held on March 29, 2022, at City Hall, Mayor Wu made the following comments on this issue:

> For all of the attention, and media, and coverage of this event, what I'm grateful for, is that it has highlighted that there are needs all across our City, all across our City whether it's related to outdoor dining or not.  We need to do better when it comes to rodent control, and clean streets, and trash pickup, and pedestrian safety.  And so, the lessons we're taking from this neighborhood where that is all so concentrated and so intense, we're going to make sure that we apply that all across the City as well.  Had some conversations with some of my colleagues about what our rodent plans need to be in many neighborhoods across Boston.  So surely this has never been a situation where anyone from the City of Boston was trying to assign blame to our restaurant owners or to a particular neighborhood or even to outdoor dining specifically for some of the challenges that we face.

These comments alone show the sanitation issue was not a legitimate basis to single out the North End and ban outdoor dining.

329.    Aside from Mayor Wu's own comments, there are other reasons why this was a pretextual basis for the ban.  First, all restaurant owners in Boston, including those in the North End, are subject to stringent regulations regarding waste and sanitation.[15]  These restaurant regulations are more restrictive than those applicable to residential properties in the North End.  For example, restaurant owners must apply for a Site Cleanliness License each year, which mandates submission of a Site Cleanliness Plan. The City's Inspectional Services Department ("ISD") reviews the application and Plan for compliance with regulations and issues a license if appropriate.

---

[15] *See* City of Boston Municipal Code § 23-9; City of Boston Site Cleanliness Ordinance.

330.     The City's data regarding residents' complaints about sanitation issues further shows that the North End did not have a disproportionate amount of sanitation issues, sanitation-related issues, or sanitation enforcement actions when compared to other Boston neighborhoods during previous outdoor dining seasons. In fact, the neighborhood sanitation complaints in 2022 and 2023 paint quite a different picture.  Based on the table below prepared by the City, the North End falls near the bottom of the list by neighborhood during relevant years:[16]

| Neighborhood | Complaints in 2022 | Neighborhood | Complaints in 2023 |
|---|---|---|---|
| Dorchester | 2,996 | Dorchester | 2,921 |
| Roxbury | 2,148 | Roxbury | 2,064 |
| Allston/Brighton | 1,825 | Allston/Brighton | 1,632 |
| South Boston/South Boston Waterfront | 1,351 | South Boston/South Boston Waterfront | 1,247 |
| Mattapan/Greater Mattapan | 1,114 | Mattapan/Greater Mattapan | 1,028 |
| Jamaica Plain | 1,087 | East Boston | 985 |
| East Boston | 1,064 | Jamaica Plain | 913 |
| South End | 864 | South End | 750 |
| Hyde Park | 665 | Hyde Park | 643 |
| Back Bay | 619 | Back Bay | 598 |
| West Roxbury | 498 | Mission Hill | 474 |
| Roslindale | 497 | Roslindale | 470 |
| Charlestown | 477 | Charlestown | 463 |
| Fenway/Kenmore/ Audubon Circle | 465 | West Roxbury | 417 |
| Mission Hill | 452 | Fenway/Kenmore/ Audubon Circle | 413 |
| Beacon Hill | 359 | Beacon Hill | 358 |
| **North End** | **341** | **North End** | **307** |
| Downtown/Financial District | 203 | Downtown/Financial District | 173 |
| Chinatown | 136 | Chinatown | 130 |
| Chestnut Hill | 11 | Chestnut Hill | 0 |

331.     In 2022, Dorchester had 2,996 sanitation-related complaints assigned to ISD, which was the highest of the 20 Boston neighborhoods.  In 2023, Dorchester again topped the list with 2,921

---

[16] https://data.boston.gov/dataset/311-service-requests

sanitation-related complaints, more than any other neighborhood.  By contrast, the North End had only 341 sanitation-related complaints assigned to ISD in 2022, ranking seventeenth on the list of the twenty neighborhoods.  Through early December 2023, the North End had just 307 complaints, still ranking seventeenth on the list of twenty Boston neighborhoods.

332.    These totals place the North End near the bottom of the list of neighborhoods generating the most sanitation-related complaints.  The North End has performed far better than the majority of other Boston neighborhoods on sanitation matters.  The City, however, did not ban on-street outdoor dining in those neighborhoods that have performed poorly in sanitation matters.

333.    In addition, North End restaurants retain private companies that provide *daily* trash pick-up.  As one North End resident explained in an e-mail to the City, Hanover Street has "never been cleaner when outdoor dining is in session."  The sanitation justification for banning outdoor dining in the North End just another a pretext.

RESIDENTS' ACCESSIBILITY PROBLEMS

334.    The City's last reason for the ban concerned "accessibility problems" that certain North End residents would allegedly face if outdoor dining were to continue.

335.    Accessibility issues are regulated and overseen by the City's Disability Commission, which is a member of the City's Outdoor Dining Program.  Applicants for outdoor dining must submit plans showing that they comply with the City's extensive guidelines and requirements pertaining to accessibility.  These guidelines and requirements govern the layout of the outdoor café for patrons and pedestrians alike.  For example, in the City's "Disability Access & Accommodations" guidance on "Responsibilities, Best Practices and Reminders" for the 2023 outdoor dining program, the City specifically requires that sidewalks must provide clear passage for pedestrians as follows:

> Restaurants must maintain a clear path of travel on the sidewalk for pedestrians – the width must be compliant with what has been approved by the Boston Licensing Board and approved on your Outdoor Dining Application (usually 1 or 2 sidewalk panels wide).

336.    If an application does not abide by the accessibility guidelines and requirements, the City can deny the application or request the applicant to modify its plans.  In addition, once an approved outdoor café is in operation, if it fails to comply with accessibility guidelines and requirements, the restaurant owner can be cited for a violation and risk the loss of its outdoor dining license.  The City is responsible for screening non-compliant applicants as well as enforcing its accessibility guidelines and requirements.  Thus, if a North End restaurant had committed violations in 2020, 2021, or 2022, the onus was on the City to take enforcement action.

337.    Based on information that the City has provided in response to Public Records Law requests, there is no evidence that the North End restaurants that participated in the outdoor dining program had a history of violating the City's accessibility guidance and requirements.  In fact, according to City records, there was only one 311 complaint about an ADA issue in the North End during the entire 2021 outdoor dining season involving 70 restaurants over a five-month period.  *See* Paragraph 196.

338.    City records, however, demonstrate that Boston itself—not the North End restaurants—has long violated the ADA and other disability laws by failing to maintain the City's sidewalk system.  In 2018, counsel for a group of Boston residents and visitors with mobility issues notified the City of its legal obligations to provide an accessible sidewalk system with curb ramps. Court pleadings filed in the U.S. District Court for the District of Massachusetts in a case titled *Michael Muehe, et al. v. City of Boston*, Case No. 1:21-cv-11080-RGS, describe the noncompliant condition of Boston's sidewalk system as follows:

> [I]naccessible curb ramps, including those with surface gaps, excessively steep slopes, and other non-compliant features are widespread throughout the City's pedestrian right of way, and that thousands of corners are missing altogether.  These conditions similarly impede physical access to the pedestrian right of way for all of the City's residents and visitors who have mobility disabilities, including those who use wheelchairs, scooters and assistive devices. …[L]ess than half of the City's 23,000 curb

ramps were in compliance with applicable disability standards.  This figure does not include corners that are missing curb ramps altogether.

339.    After a three-year period in which the parties in the *Muehe* case engaged in extensive discussions, they reached a settlement that was approved by the federal court in November 2021.  The settlement included a Consent Decree requiring the City to conduct a comprehensive survey of its curb ramps; install or upgrade an average of 1,630 curb ramps each year until a compliant curb ramp is present at every location in the City's pedestrian right of way where required by law; and to maintain a curb ramp request system that allows people with mobility disabilities to report missing curb ramps and problems.  The *Muehe* case and resulting Consent Decree demonstrates that, to the extent elderly North End residents and those with limited mobility have had accessibility problems while navigating sidewalks, the source of their problems has been the City, not North End restaurants that participated in outdoor dining.

340.    Finally, even Mayor Wu acknowledged that there were clean streets, trash pickup and pedestrian safety issues **"all across our city"** and **"surely this has never been a situation where anyone from the City of Boston was trying to assign blame to our restaurant owners or to a particular neighborhood or even to outdoor dining specifically for some of the challenges that we face."**  None of the alleged reasons why the City banned outdoor dining in the North End are legitimate.

### Boston Residents Overwhelming Support for On-Street Outdoor Dining in the North End

341.    In March 2023, following the City's announcement of the ban, Boston.com conducted two polls of its readers to gauge their views on the City's decisions regarding outdoor dining in the North End.  They asked readers whether tables should be on the streets in the North End and what practices they would like to see put in place.  Over 2,000 people responded.

342.     As to one poll, Boston.com asked: "What practices would you like to see put in place for outdoor dining in the North End?"  An overwhelming number of people—eighty (80) percent—responded "there should be on-street dining."  Only fourteen (14) percent did not think that the City's current rules should be changed.  Few people, just 4 percent, supported shortening the length of the program or its outdoor dining hours.

343.     As to the other poll, Boston.com asked: "Do you agree with the decision to limit outdoor dining to sidewalks and patios in the North End?"  Sixty-two (62) percent disagreed with the City's decision, and answered they will miss the street tables.  Only thirty-six (36) percent agreed with the ban.

344.     Some readers provided comments.  For example, one North End resident praised the positive impact that outdoor dining has had on the North End:

> I support [the] Pellino's stance.  People do not move to the North End for quiet living—a la the festivals that are much louder than any outdoor dining.  Restaurants are serving meals, not pumping up music and creating a nightclub-like atmosphere.  In addition to the positive financial impact, outdoor dining creates more of a neighborly, friendly and joyful atmosphere in this beloved neighborhood.

345.     A reader from Dorchester emphasized that the Wu Administration was out of touch with reality and failed to understand the need to support small, local businesses:

> The North End is known for its restaurants and small local businesses.  City/government should help support successful operations for entities that provide employment opportunities for those that perhaps need them most.  Seems as though the Wu Administration is dangerously out of touch with reality on how business[es], large and small, operate and finance their operations—operations that employ many, many people.

346.     And a reader from Newton Corner expressed her view that the City had unfairly penalized the North End since other City neighborhoods shared the same issues with outdoor dining:

> Outdoor dining should be allowed, as it was last year.  It adds a lot to the city, and the North End should not be excluded.  The area needs this character, as so much of the North End has been gentrified and lost its charm.  Newbury Street is as crowded and full of traffic as the North End, so it seems unfair to penalize the North End and not

other busy areas—Newbury Street, the South End, etc.   And if there's a fee, all outdoor eating areas should pay the same amount.

347.    The Boston.com readers' comments on these issues decidedly supported the North End's restaurants and conflicted with NEWRA's position.

### The City's Rejection and Denial of
### Monica's, Inc.'s Application for Outdoor Dining

348.    After imposing the ban, the City enforced it by summarily rejecting the on-street outdoor dining application of plaintiff Monica's, Inc., an Italian restaurant in the North End.

349.    On June 28, 2023, Monica's, filed an application for an on-street outdoor dining license with the City of Boston.   Monica's complied with all aspects of the City's application instructions.   Its application included supplementary materials identified in the instructions that the City required, including a site plan and letter from a Professional Engineer.   Monica's used the City's Application Portal and paid the required filing fee.   Upon its filing, the City electronically acknowledged receipt of Monica's completed application and noted that the status of the application was "pending."

350.    Less than two weeks after receiving Monica's submission, the City sent an electronic notice to Monica's stating that it had "denied" Monica's application.   In the "Comment" section of the electronic notice, the City stated: "The City of Boston will not be reviewing or permitting on-street outdoor dining applications in the North End for the 2023 outdoor dining season.   The City's only reason for the refusing to consider the application and denying the application was that Monica's is located in the North End.   The City provided no reason for its denial that was otherwise unique to Monica's or its application for an on-street outdoor dining license.

### Harm Caused by the City's Outdoor Dining Policies

351.    By establishing and implementing its outdoor dining policies in 2022 and 2023 against the North End restaurants, the City interfered with the free market economy of Boston's restaurant industry.   It placed North End restaurants at a substantial competitive disadvantage when compared

to restaurants in every other neighborhood of the City.  In 2022, North End restaurants had to pay hundreds of thousands of dollars in fees to participate in Boston's outdoor dining program. Restaurants in all of the City's other neighborhoods, however, participated for *free*.

352.     In 2023, the City banned outdoor dining in North End restaurants, causing them to incur massive loss of revenue and income as well as causing them to incur costly ongoing storage fees. By banning outdoor dining in the North End, the City effectively steered patrons who prefer to dine outdoors away from the North End to restaurants in all other neighborhoods of the City.  This gave restaurants located in other neighborhoods an unfair competitive advantage over the North End restaurants.

353.     In addition, the North End restaurants draw a high volume of people to the North End, which has the salutary effect of generating customers for other businesses in the North End, many of which are members of the North End Chamber of Commerce.  Now, fewer diners and tourists frequent the North End due to the ban.  As a result, other non-restaurant businesses who are members of the North End Chamber of Commerce have lost revenue that they would have earned from local diners and tourists who also patronize their business establishments.  In addition, the ban led to layoffs of restaurant employees.

354.     Aside from financial harm caused by the City's policies, the City has tarnished its image, its culture, and its sense of citywide community by discriminating against its Italian American citizens who own and operate most of the North End restaurants.  The City's unequal and unfair treatment of Italian Americans in the North End is far reaching and has resonated through Italian America communities across the Nation.

## LEGAL CLAIMS

### COUNT I

**Violation of Fourteenth Amendment to the U.S. Constitution,
Equal Protection Clause Pursuant to 42 U.S.C. § 1983**

355.     The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-354.

356.     The Fourteenth Amendment to the U.S. Constitution provides that "No State shall … deny to any person within its jurisdiction the equal protection of the laws."  Corporations qualify as "persons" entitled to equal protection under the Fourteenth Amendment.

357.     In its establishment, preparation, implementation, and enforcement of municipal policies related to the outdoor dining programs in 2022 and 2023, the City purposefully and intentionally treated the North End Italian restaurants differently from similarly situated restaurants in all other neighborhoods of Boston.

358.     In doing so, the City engaged in intentional and arbitrary discrimination and had no rational basis for its difference in treatment.

**Boston's Policy of Imposing Onerous Fees and
Restrictive Requirements Only on North End Restaurants in 2022**

*Disparate Treatment of North End Restaurants*

359.     In 2022, the City operated an outdoor dining program that was available to all restaurants in the City.  To participate in the 2022 outdoor dining program, restaurants had to comply with the City's rules, regulations, and guidelines, including submitting a timely application to participate.

360.     In 2022, there were approximately 3,000 restaurants operating in various neighborhoods throughout Boston.  According to the City, 360 restaurants applied to participate in the program. The City has stated that it approved the applications of 280 of the restaurants that applied.  Approximately 62 of those approved applications were submitted by restaurants in the North End..  Approximately 218 of those approved applications were submitted by restaurants in Boston neighborhoods other than the North End.

361.     The City has intentionally treated the plaintiffs differently from other similarly situated restaurants located in Boston neighborhoods other than the North End.

362.     That different treatment included the City's imposition of more onerous conditions to participate in the program only on the North End restaurants.  The City required only the North End restaurants to pay a $7,500 fee plus $480 monthly fees for each parking space that they used for their café zones. The City permitted all other restaurants in neighborhoods other than the North End to participate in the program for free.

363.     The City also limited the duration of the outdoor dining season only for restaurants in the North End.  The City's 2022 outdoor dining season for all City restaurants, except those in the North End, began on April 1, 2022, and ended in December 2022.  As to the restaurants in the North End, the outdoor dining season began on May 1, 2022, and ended in September 2022.

364.     The City's imposition of these substantial fees only on the restaurants in the North End placed them at a competitive disadvantage as to restaurants in all of the City's other neighborhoods, who were permitted to participate in the program for free.  Similarly, the City's imposition of a shorter outdoor dining season only on the restaurants in the North End placed them at a competitive disadvantage as to restaurants in all of the City's other neighborhoods, who were permitted to earn more revenue due to a longer season.

365.     All plaintiffs as well as other North End restaurants participated in the 2022 outdoor dining program.  They were required to pay and did pay the participation fees and monthly parking fees during a shorter outdoor dining season.

### Similarly Situated Restaurants in Other Boston Neighborhoods

366.     The North End restaurants that participated in the 2022 Outdoor Dining Program, including the plaintiffs, are similarly situated to restaurants in other Boston neighborhoods that also participated in the program.

COMMON PHYSICAL, GEOGRAPHIC, AND NEIGHBORHOOD FEATURES

367.    The North End restaurants that participated in the City's outdoor dining program in 2021 and 2022 share a host of important physical and geographic features with restaurants in Boston's other neighborhoods that also participated in the program during 2021, 2022, and 2023, the year in which the North End restaurants were banned from the program.  The additionally share common neighborhood settings.

368.    These features include, but are not limited to, factors such as (1) the restaurants' location in residential buildings; (2) the restaurants' proximity to the street; (3) the width of the streets on which the restaurants are located; (4) the size of the restaurants' outdoor on-street patios and cafes; (5) the location of the restaurants to each other within their neighborhoods; (6) the availability of parking near the restaurants; (7) the number of restaurants on a particular street; (8) the type of pedestrian and vehicle traffic near the restaurants; and (9) the type of neighborhoods in which the restaurants are located.  A prudent person objectively comparing the North End restaurants with restaurants in other Boston neighborhoods would consider them to be similarly situated and equivalent in all relevant respects.

369.    For example, several restaurants in both the North End and the other Boston neighborhoods are on the first floor of multi-floor residential buildings that are located on busy streets with a high volume of pedestrian and vehicle traffic, such as Hanover Street in the North End, Newbury Street in the Back Bay, West Broadway in South Boston, Charles Street in Beacon Hill, Shawmut Avenue in the South End, and many others.  Such similarly situated restaurants abound and are found throughout the City.  Numerous examples of such restaurants outside the North End are compared with North End restaurants in photographs that are attached as Exhibits 11-41.  These photographs show remarkable similarities between the restaurants and are described in Paragraphs 370 to 413 below.

*Newbury Street Restaurants, Back Bay*

370.    The Back Bay of Boston is replete with restaurants that have participated in the City's outdoor dining program during relevant years that most strongly resemble the participating North End restaurants.  More specifically, there is an uncanny likeness between the restaurants on Newbury Street in the Back Bay and restaurants on Hanover Street in the North End.  In past years, there have been approximately 20 to 24 Newbury Street restaurants that participated in the program.  In the North End, there were approximately 30 restaurants on Hanover Street that participated in the 2022 program.

371.    To begin with, there are noteworthy similarities between Newbury Street and Hanover Street.  Both streets run through the heart of their respective neighborhoods and are two of the most well-known streets in Boston.  Newbury and Hanover Streets are considered to be "must see" venues for tourists.  Lined with retail shops, popular restaurants, coffee shops, cafes, and residential buildings, both streets are heavily traveled by pedestrians and cars, usually seven days a week.

372.    Newbury Street is one-way, whereas a segment of Hanover Street was designated as one-way too during the outdoor dining season.  The streets have comparable widths:  Hanover Street is approximately 40 feet wide and the slightly narrower Newbury Street is approximately 36 feet wide.  They also are two-lane roads.

373.    Newbury Street and Hanover Street are in vibrant locales with a mix of residential and commercial activity, including dining.  Most restaurants in both locations are on the first floor of residential buildings that typically have no more than three or four floors.  There also are restaurants in both locations on street corner.  For example, Serafina Back Bay is on the corner of Newbury and Fairfield Streets and plaintiffs Trattoria Il Panino (Parmenter) and Trattoria Il Panino (Hanover) are on the corner of Hanover and Parmenter Streets.

374.     Restaurants with on-street outdoor dining are present on both sides of Newbury Street, which also was the case on Hanover Street before the ban.  On Newbury Street, there are several restaurants with on-street patios that are side-by-side or otherwise quite close to each other, which also was true of the on-street patios of restaurants on Hanover Street.  Several on-street patios of restaurants at both locations also are quite long.

375.     Parking is another common feature of Newbury and Hanover Streets.  Both Newbury and Hanover Streets have on-street parking on both sides of the street.  There also are several parking lots and garages within walking distances from these locations.

376.     Due to the popularity and fame of both streets, they are heavily traveled by pedestrians and vehicles on a daily basis throughout the year.  Both streets often experience dense foot traffic throughout the day and night.  Traffic also is impacted on both streets due to the presence of many intersections and crosswalks on both streets.

377.     Specific comparisons of restaurants on Newbury and Hanover Streets are displayed in the photographs attached as Exhibits 11-17.

378.     Exhibit 11 shows three Newbury Street restaurants (PURO Ceviche Bar, Crazy Good Kitchen, and La Voile) compared to four Hanover Street restaurants (plaintiff Tresca, plaintiff Bricco, Dolce Vita, and Lucca).  The restaurants share almost all the common features described in Paragraphs 370 to 376, including the presence of long, side-by-side patios (PURO Ceviche Bar/Crazy Good Kitchen and Bricco/Tresca) on one side of the road with patios on other side of the street directly across from them (La Voile and Lucca).

379.     Exhibit 12 presents two Newbury Street restaurants (Joe's on Newbury and Stephanie's on Newbury) compared to four Hanover Street restaurants (plaintiff Dolce, Cantina Italiana, plaintiff Trattoria Il Panino, plaintiff Casarecce, and plaintiff Carmelina's).  At both locations,

the restaurants are across the street from each other.  Some are side-by-side with long patios.  They further share most of the other common features described in Paragraphs 370 to 376.

380.    Exhibit 13 reveals three Newbury Street restaurants (REDWHITE BONELESS RAMEN, Little Whale Oyster Bar, and Mother Juice) compared to five Hanover Street restaurants (Nando, plaintiff Strega, plaintiff Rina's Pizzeria & Café, Locale, and Cantina Italiana).  At both locations, there are restaurants with long patios that are across the street from each other.  They too share most of the other common features described in Paragraphs 370 to 376.

381.    Exhibit 14 shows two Newbury Street restaurants (Amorino Gelato and La Neta) compared to two Hanover Street restaurants (plaintiff Nico Ristorante and Table Boston).  The restaurants in both locations have side-by-side patios and are on one side of the street with parking available on the other side.   Most of the other common features described in Paragraphs 370 to 376 are also shared by these restaurants.

382.    Exhibit 15 exhibits two Newbury Street restaurants (Dirty Water Dough Company and Piattini) compared to two Hanover Street restaurants (Table and Nico Ristorante).  The restaurants in both locations have side-by-side patios on one side of the street with parking available on the other side.  Most of the other common features described in Paragraphs 370 to 376 are also shared by these restaurants.

383.    Exhibit 16 displays Saltie Girl's outdoor on-street patio on Newbury Street compared to two Hanover Street restaurants (Ristorante Fiore and plaintiff Quattro).  The restaurant is located on Dartmouth Street but its patio is on Newbury Street.  Saltie Girl has a lengthy patio on one side of the street with parking on the other side.  Similarly, the combined patios of Ristorante Fiori (now plaintiff Umbria) and Quattro Ristorante, form a block that is nearly identical to Saltie Girl's patio.  Most of the other common features described in Paragraphs 370 to 376 are also shared by these restaurants.

384.  Exhibit 17 shows Serafina Back Bay on Newbury Street compared to two Hanover Street restaurants (plaintiff Tratttoria Il Panino (Parmenter) and plaintiff Trattoria Il Panino (Hanover)).  Serafina Back Bay is on the corner of Newbury and Fairfield Streets.  It has on-street patios on both Newbury and Fairfield Streets.  There is an intersection with a traffic light and two crosswalks (one on Newbury and one on Fairfield) on the corner.  The crosswalks are adjacent to both of Serafina Back Bay's patios.

385.  Serafina Back Bay's two-patio set-up on the corner is virtually identical to that of Trattoria Il Panino (Hanover) and Trattoria Il Panino (Parmenter) in the North End.  Trattoria Il Panino (Parmenter) is on Parmenter Street at the corner of Parmenter and Hanover Streets.  Its outdoor patio is on Parmenter Street.  Trattoria Il Panino (Hanover) is on Hanover Street also on the corner of Parmenter and Hanover Streets.  Its patio is on Hanover Street.  There is an intersection with a traffic light and two crosswalks (one on Parmenter and one on Hanover) on the corner.  The crosswalks are adjacent to the patios of the two restaurants.  There are many similarities between the set-ups and physical layouts of these Newbury Street and Hanover/Parmenter Street restaurants.

*Gloucester Street Restaurants, Back Bay*

386.  In addition to the Newbury Streets restaurants, two other Back Bay restaurants on Gloucester Street are similarly situated to the Hanover Street restaurants.  Gloucester Street in the same neighborhood as Newbury Street.  It intersects Newbury Street and shares many of its features in terms of geography and setting.   Like Newbury Street, Gloucester Street is a one-way, two-lane road of comparable width.  It is in the same vibrant locale with a mixture of residential and commercial activity and busy pedestrian and vehicle traffic.

387.  Exhibit 18 displays two Gloucester Street restaurants (Select Oyster Bar and Krasi) compared to two Hanover Street restaurants (Ristorante Fiore and plaintiff Quattro Ristorante).  Ristorante Fiore recently changed ownership and is now plaintiff Umbria (Umbria North End, Inc.).

The restaurants at both locations are side-by-side and on one side of the street.  Parking is available on the other side of the street. They also share most of the other common features described in Paragraphs 370 to 376.

*Union Street Restaurants, Downtown Boston*

388.     There also is an extraordinary likeness between restaurants on Union Street in Downtown Boston and those on Salem Street in the North End.  In 2023, eight restaurants on Union Street engaged in outdoor dining.  Some of those restaurants were approved for outdoor dining before the City's official program began in 2020.  The most prominent and well known of the Union Street restaurants, the Union Oyster House, joined the City's 2023 outdoor dining program along with Saus Boston.

389.     Union Street is a one-way street located in close proximity to the North End's boundary. Union Street begins at the intersection of North Street near Faneuil Hall and runs parallel to busy Congress Street, ending at Hanover Street.  It is across the street from City Hall and forms part of the historic Freedom Trail.  The street is lined with restaurants on one side.  It has no on-street parking. There is heavy pedestrian traffic on Union Street by people walking the Freedom Tail and visiting the Union Street restaurants as well as Faneuil Hall.

390.     The eight Union Street restaurants that conducted outdoor dining are side-by-side and form a near solid block of on-street outdoor dining cafes stretching from near Faneuil Hall, on one end of the street to the Union Oyster House, on the other end.   As shown by the photograph attached as Exhibit 19, the block of contiguous on-street cafes considerably reduces the width of the road to provide just enough room for vehicles to pass by.

391.     Exhibit 19 shows eight Union Street restaurants (including the Union Oyster House and Saus Boston) compared to six restaurants on Salem Street in the North End (Libertine North End, plaintiff Euno, Pink Carrot, Benevento's, plaintiff Terramia, and plaintiff Antico Forno).  Union

Street and Salem Street are both well known for their fine restaurants. Each has one of the two most famous oyster restaurants in Boston. On both streets, the outdoor dining cafes are contiguous and form long blocks of side-by-side patios. The streets are of comparable width. They both have one lane that provides enough room for vehicles to pass by. Both areas have heavy foot traffic. Most of the restaurants are on the first floor of the buildings in which they are located, which mainly have three or four floors. There also is ample sidewalk space on Union and Salem Streets along the front of the restaurants.

*Other Downtown Boston Restaurants*

392.    *Tiki Rock* and *Bostonia Public House:*   <u>Exhibit 20</u> shows two Downtown Boston restaurants, Tiki Rock and the Bostonia Public House, compared to the Florintine Café on Hanover Street in the North End. The Bostonia Public House is located at the corner of State and Broad Streets. Tiki Rock is located on Broad Street. Together, they form a block of on-street patios on Broad Street that stretches along Broad Street and resembles the long patio of the Florentine Café on Hanover Street. Broad Street and Hanover Street have near identical width, approximately 41 and 40 feet, respectively. Broad Street is a two-way, two-lane street, as is the section of Hanover Street where the Florentine Café is located. Parking is available on both sides of the two streets in the vicinity of these restaurants. Both streets have busy pedestrian and vehicle traffic.

393.    *Belle In Hand Tavern:*  <u>Exhibit 21</u> presents the Belle In Hand Tavern on Marshall Street in Downtown Boston compared to plaintiff Mare on Mechanic Street in the North End. There is a notable similarity between their unique outdoor dining setups. The small patios of both restaurants are almost identical. The Belle In Hand has two tables that abut the restaurant, whereas Mare has three tables adjacent to the restaurant. The outer edges of both patios are on similar narrow public ways with one lane. There is more pedestrian traffic on Marshall Street as Mare Street has no through access.

394.    *Tradesman Coffee Shop & Lounge:*  <u>Exhibit 22</u> shows the Tradesman Coffee Shop & Lounge on Batterymarch Street in Downtown Boston compared to the North Street Grille on North Street in the North End.  The streets on which the restaurants are located are of similar width.  Both restaurants are the only restaurants on their respective streets and have ample on-street parking.  They also have patios of similar lengths.  While both restaurants are in popular sections of Boston, they are on less frequently traveled streets and have similar vehicle and pedestrian traffic.

395.    *Central Wharf Co.:*  <u>Exhibit 23</u> displays the Central Wharf on Milk Street in Downtown Boston compared to plaintiff Aqua Pazza and Limoncello on North Street in the North End.  The areas where both restaurants are located are a mix of residences and businesses.  Both restaurants are on the first floor of multi-floor residential buildings.  The sections of Milk Street and North Street where the restaurants are located are wide, two-lane, one-way streets.  Central Wharf, Aqua Pazza, and Limoncello all have long patios with on-street parking across the street from them.  Both streets also have ample parking on both sides.

396.    *The Black Rose* and *Sissy K's:*  <u>Exhibit 24</u> shows The Black Rose and Sissy K's on Commercial Street in Downtown Boston compared to plaintiff Assaggio and Caffé dello Sport on Prince Street in the North End.  The Downtown Boston restaurants are located on Commercial Street, a short street the runs from State Street to Faneuil Hall.  The width of Commercial Street is similar to the width of Prince Street where Assaggio and Caffé dello Sport are located.  Both streets have one lane with ample sidewalks on both sides.  There is no on-street parking on Commercial Street and minimal parking on Prince Street.  The patios of The Black Rose, Sissy K's and Assaggio also are on the opposite side of the street from the restaurants, whereas the patio of Caffé dello Sport is on the same side of the street as the restaurant.  There is more pedestrian traffic on Commercial Street due to its proximity to Faneuil Hall.

*Beacon Hill Restaurants*

397.    *75 Chestnut Street:*  Exhibit 25 shows 75 Chestnut Street on Chestnut Street in Beacon

Hill compared to the North Street Grille on North Street.  Both restaurants are located on the first

floor of residential buildings in residential sections of their respective neighborhoods.  Chestnut and

North Streets have parking on both sides of the streets.  The widths of the streets in the vicinity of

both restaurants are quite similar.  Both streets are one-way and provide ample room for vehicles to

pass by the on-street patios.  The restaurants also have patios of similar length.

398.    *21ˢᵗ Amendment:*  Exhibit 26 displays the 21ˢᵗ Amendment on Bowdoin Street in Beacon

Hill compared to Massimino's on Endicott Street in the North End.  The 21ˢᵗ Amendment is located

on the boundary of Beacon Hill, a residential neighborhood, near office buildings and the State House.

Massimino's is located in an area that is primarily residential.  Both restaurants are located on the first

floor of residential buildings.  There is parking on both sides of each road.  The widths of the streets

in the vicinity of both restaurants are quite similar, as both have ample room for vehicles to pass by

the on-street cafes.

399.    *Cobblestones a Beacon Hill Eatery:*  Exhibit 27 shows Cobblestones a Beacon Hill Eatery

on Chestnut Street in Beacon Hill compared to La Summa on Fleet Street in the North End.

Cobblestones a Beacon Hill Eatery's address is 30 Charles Street, though its on-street outdoor patio

is on Chestnut Street.  The neighborhood in this section of Chestnut Street is comprised of

commercial and residential buildings, which is similar to the neighborhood where La Summa is

located.  Both restaurants are located on the first floor of residential buildings. The widths of Chestnut

and Fleet Streets are similar.  Both are one-way and provide ample room for vehicles to pass by the

outdoor patios.  There is parking available on both sides of the streets.  The streets also have similar

sidewalks that provide sufficient room for pedestrians.

400. *Charles Street Restaurants:* Exhibit 28 presents three restaurants on Charles Street in Beacon Hill (The Upper Crust Pizzeria, Bin 26 Enoteca, and the Beacon Hill Hotel) compared to three restaurants on Hanover Street (plaintiff Casarecce, plaintiff Trattoria Il Panino, and plaintiff Dolce). The neighborhoods of both areas provide a mix of residences and businesses. Charles Street and Hanover Street are major roads in their respective neighborhoods that are heavily traveled by pedestrians and vehicles. Both roads are wide. This section of Charles Street accommodates three lanes while Hanover Street is 40 wide and has two lanes. There is parking on both sides of each street. The set-ups of the restaurants are quite similar. On Charles Street, the Upper Crust Pizzeria and Bin 26 Enoteca are side-by-side restaurants with long patios on one side of the street. There is a single restaurant, the Beacon Hill Hotel, across the street from them. Similarly, Dolce and Trattoria Il Panino are contiguous with lengthy patios on one side of Hanover Street with a single restaurant, Casarecce Ristorante, across the street from them.

*South End Restaurants*

401. *The South End Buttery (Union Park Street Patio):* Exhibit 29 shows the South End Buttery's patio on Union Park Street in the South End compared to Prezza on Fleet Street in the North End. The South End Buttery, which is located at 313 Shawmut Avenue, has outdoor dining patios on both Union Park Street and Shawmut Avenue. This section of Shawmut Avenue in the South End is largely a residential area with some retail businesses and restaurants. Both restaurants are located on the first floor of residential buildings and have lengthy patios. There is parking on both sides of each road. The roads are both one-way and provide abundant room for vehicles to pass by the on-street cafes.

402. *South End Buttery (Shawmut Ave. Patio)* and *KAVA Neo-Taverna:* Exhibit 30 shows the South End Buttery's patio on Shawmut Avenue and KAVA Neo-Taverna on Shawmut Avenue in the South End compared to Riccardo's Ristorante, Limoncello, and plaintiff Aqua Pazza on North Street.

112

Both neighborhoods are composed of residences with some retail businesses.  The restaurants are located in residential buildings in both neighborhoods.  Shawmut Avenue and this segment of North Street are one-way and have ample width for vehicle passage. The South End restaurant patios are across the street from each other and are quite lengthy.  The same holds true for the North End restaurant patios.

403.    *Petit Robert Bistro:*  <u>Exhibit 31</u> shows the Petit Robert Bistro on Columbus Avenue in the South End compared to the Rocco's Cucina & Bar on Commercial Street in the North End.  Both restaurants are located in neighborhoods that are comprised of a mix of residences and businesses. The restaurants are located on the first floor of residential buildings.  There are strong similarities between Commercial Street and Columbus Avenue.  Both are major streets in their respective neighborhoods.  They are wide streets that are heavily traveled by vehicles and pedestrians with parking available on both sides of each street.  Commercial Street has three lanes and Columbus Avenue has two lanes with a wide middle divider where trucks can park.  The restaurants each have long patios and there no other nearby restaurants that provide on-street outdoor dining.[17]

404.    *ANNEX (South End Buttery)*:  <u>Exhibit 32</u> portrays the ANNEX (South End Buttery) on Clarendon Street in the South End compared to plaintiff Ristorante Villa Francesca on Richmond Street in the North End.  The ANNEX and Villa Francesca are located on the first floor of residential buildings in neighborhoods that are primarily residential with some commercial businesses.  Both Clarendon and Richmond Streets are one-way.  They easily accommodate vehicle traffic and have parking on both sides of each street.  The restaurants have patios of similar length.

---

[17] The 2023 ban prohibited Rocco's Cucina & Bar from participating in on-street outdoor dining.  However, Rocco's Cucina & Bar obtained a license to operate outdoor sidewalk dining in 2023, which was not covered by the ban.

*South Boston Restaurants*

405.    *Publico Street Bistro & Garden*:  Exhibit 33 presents the Publico Street Bistro & Garden on W. First Street in South Boston compared to plaintiff Vinoteca di Monica on Richmond Street in the North End.  These sections of South Boston and the North End are largely residential with some retail businesses and restaurants.  Both restaurants are located on the first floor of residential buildings.  The widths of W. First Street and Richmond Street are comparable, and vehicles can easily pass by the outdoor patios even though there is parking on both sides of each street.

406.    *Loco Taqueria and Oyster Bar:*  Exhibit 34 shows Loco Taqueria and Oyster Bar on W. Broadway Street in South Boston compared to plaintiff Aqua Pazza on North Street.  Loco Taqueria and Oyster Bar's outdoor patio is on F Street, which is a heavily traveled South Boston road.  These sections of South Boston and the North End are largely residential with some retail businesses and restaurants.   F Street and North Street are one-way with parking on both sides of each street.  The streets in the vicinity of both restaurants provide ample width for vehicles to pass by the on-street cafes.  Loco Taqueria & Oyster Bar and Aqua Pazza have long patios with on-street parking across the street from them.

*Charlestown Restaurants*

407.    *Warren Tavern*:  Exhibit 35 displays the Warren Tavern on Pleasant Street in Charlestown compared to plaintiff Monica's Trattoria on Prince Street in the North End.  These sections of Charlestown and the North End are largely a residential area with some retail businesses and restaurants.  Pleasant Street and Prince Street are quite similar.  The streets are narrow, one-way streets with minimal parking on both streets.  The sidewalks in front of both restaurants are comparable.  The restaurants have on-street patios of similar length.  Both restaurants also are located at the corner of streets in the vicinity of multi-laned intersections.

408.   *Figs by Todd English*:  Exhibit 36 shows Figs by Todd English on Main Street in Charlestown compared to plaintiff Villa Francesca on Richmond Street in the North End.  Figs and Villa Francesca are located on the first floor of residential buildings in neighborhoods that are primarily residential with some commercial businesses.  Main Street and Richmond Street are one-way.  Both restaurants are on a corner where two streets meet and are in the middle of short residential blocks. Main Street and Richmond Street easily accommodate vehicle traffic and have parking on both sides.  The restaurants have on-street patios of similar length.

*East Boston Restaurants*

409.   *Rino's Place*:  Exhibit 37 shows Rino's Place on Saratoga Street in East Boston compared to the North Street Grille on North Street.  Both restaurants are located on the first floor of residential buildings in residential sections of their respective neighborhoods. There is parking on both sides of each road.  Saratoga Street and North Street are one-way streets that provide abundant room for vehicles to pass by the restaurants' on-street patios.  The two streets also have parking on both sides and ample sidewalk space.   The restaurants have on-street patios of similar length.

410.   *Mexicali Sushi Bar* and *D'Parma Restaurant:*  Exhibit 38 shows Mexicali Sushi Bar and D'Parma Restaurant on Sumner Street in East Boston compared to plaintiff Quattro, plaintiff Dolce, and plaintiff Casarecce on Hanover Street in the North End.  These sections of East Boston and the North End are a combination of residences, retail businesses, and restaurants.  The restaurants in both neighborhoods are on the first floor of residential buildings.  Sumner Street and Hanover Street are major roads in their respective neighborhoods.  They are wide roads with parking on both sides and easily accommodate heavy pedestrian and vehicle traffic.  The set-ups of the restaurants are quite similar.  On both Sumner Street and Hanover Street, there are restaurants are on both sides.  The restaurants both have long on-street patios.

*The Industry Bar & Grill, Dorchester and Sweet Life, Mattapan*

411.   Exhibit 39 shows The Industry Bar & Grill on Adams Street in Dorchester and Sweet Life on Dorchester Avenue in Mattapan (on the Mattapan/Dorchester boundary) compared to Nando on Hanover Street in the North End.  These sections of Dorchester, Mattapan and the North End are a mix of residences and commercial businesses.  Dorchester Avenue, Adams Street, and Hanover Streets are major roads in their respective neighborhoods that have heavy pedestrian and vehicle traffic.  The streets have two-lanes with parking on both sides.  The widths of the streets in the vicinity of three restaurants are quite similar and provide abundant space for vehicles to pass by the on-street cafes.

*Cask 'n Flagon, Fenway*

412.   Exhibit 40 displays the Cask 'n Flagon on Landsdowne Street in the Fenway compared to Massimino's on Endicott Street in the North End.  Landsdowne Street is in a commercial business near Fenway Park, home of the Boston Red Sox.  Endicott Street in the North End is mainly a residential area with some small businesses. There is heavy pedestrian and vehicle traffic on Landsdowne Street, particularly during Red Sox games and other events at Fenway Park.  Endicott Street has less traffic.  While the Cask 'n Flagon is located in far busier area than Massimino's, the set-ups of their outdoor patios are quite similar.  The width of the sidewalks in front of the restaurants and the two roads are comparable.  Both restaurants also have lengthy patios.

*Tres Gatos, Jamaica Plain*

413.   Exhibit 41 shows Tres Gatos of Centre Street in Jamaica Plain compared to plaintiff Vinoteca di Monica on Richmond Street in the North End.  Tres Gatos is located on the first floor of a house on Centre Street, which is a residential area with some nearby retail businesses and restaurants.  Vinoteca di Monica also is on the first floor of a residential building in an area that has a mix of residences and commercial businesses.  The outdoor patio of Tres Gatos is on Roseway Street,

which is a side street that intersects Centre Street, a main road in Jamaica Plain.  Similarly, Vinoteca di Monica's outdoor patio is on Richmond Street, a side street that intersects Hanover Street, a main road in the North End.  Both Roseway and Richmond Streets are one-way with parking on both sides. They have ample room for vehicles to pass by the outdoor patios.

COMMON REGULATORY CONTROLS AND REVIEW BY CITY DEPARTMENTS

414.    The North End restaurants and restaurants outside the North End also share common regulatory controls and review by City departments on matters such as fire and safety codes, licensing, types of employees, and taxes.

415.    All restaurants that participated in the 2022 outdoor dining program were subject to strict regulatory controls and review by City departments.  Those with a seating capacity of over 50 people had to be equipped with a sprinkler system or a second means of egress as wells as additional fire safety requirements.

416.    The City's Inspectional Services Department performed annual inspections to ensure that all restaurants complied with applicable provisions of the safety codes. The inspection includes review of the restaurants' Ansul (fire safety) systems, fire alarms, and fire extinguishers.  Hood exhaust systems of all restaurants had to be cleaned twice yearly by a professional company. All restaurants were required to display their ISD report on site.

417.    Restaurants also were subject to two inspections each year by City's Board of Health for food safety.  The Board of Health had a right to perform random walk-in inspection.  If the Board of Health discovered a problem, such as the presence of rodents, the restaurant was subject to follow up visits by an exterminator.   Restaurants had to display a letter grade from Board of Health in their windows that was visible to the public.  Restaurants were subject to enhanced regulations regarding waste disposal and sanitation.

418.   There were other common requirements of all restaurants regarding the operation of their businesses.  If a restaurant had a liquor license or entertainment license, those licenses had to be renewed annually.  Restaurants were required to have an allergen warning on their menus written by the Board of Health.  All restaurants were required to have 5% handicapped access tables, adhere to the requirements of the Americans with Disabilities Act, and allow service animals.  Most restaurants used delivery companies to receive products unless they shopped at a restaurant depot.

419.   As to employees, restaurants were required to have either a kitchen manager or chef with a "Serve Safe" certification.  They all employed two tiers of employees.  The standard pay for waitstaff was approximately $6.75 per hour plus tips, whereas owners and managers were not permitted to share in tips.  All restaurants were permitted to enhance business by providing third-party takeout orders with Uber Eats and Grubhub.  In terms of taxes, all restaurants had to charge a seven (7) percent meal tax, which was divided between the Commonwealth (6.25 %) and the City (.75%).  All restaurants had to pay taxes.

420.   These common physical, geographic, and neighborhood features combined with their common regulatory controls and review by City departments show that the North End restaurants and those outside the North End that participated in the City's outdoor dining programs are similarly situated.

### No Rational Basis for Disparate Treatment

421.    The City had no rational basis for intentionally treating the plaintiffs differently from the City's other similarly situated restaurants that participated in the 2022 outdoor dining program.

422.   On March 25, 2022, the City sent a letter to the North End Italian restaurants stating three reasons why it decided to impose onerous participation requirements on them as a condition for their participation in the 2022 outdoor dining program.  As alleged in Paragraphs 186 to 201, all three reasons were pretextual, as they either lacked factual support, were erroneous, or did not provide an

objectively valid basis for the more stringent requirements. The City had no rational basis for establishing, implementing, and enforcing its discriminatory outdoor dining policy in 2022, which was unrelated to any legitimate governmental or state interest.

423.     The City's use of some of the fees paid by the North End restaurants also demonstrates that the reasons it gave as the bases to impose the fees were pretextual.  The $7,500 "impact fee" was supposed to be used to fund enhance city services in the North End and to create a North End Community Benefit Fund to improve the quality of life for residents during the outdoor dining season.  Funds were to be earmarked for community events, such as the purchase of holiday lights and athletic equipment, payment for children's arts and crafts and harbor cruises for seniors.

424.     As alleged in Paragraphs 216 to 235 and 238 to 250 and based on documents provided by the City in response to Public Records Act requests, the City never channeled funds to a North End Community Benefit Fund, causing North End residents to question what had happened to the money.  Instead, according to City records, the City used some of the funds to pay for an electric street sweeper that cost $552,000, which it "expensed" to the North End outdoor dining program. In this manner, the City misused the funds paid by the North End restaurants to further its unrelated political agenda, showing the so-called justifications for the imposition of the fees were not valid.

**Boston's Policy of Banning Outdoor Dining by North End Restaurants in 2023**

***Disparate Treatment of North End Restaurants***

425.     On February 16, 2023, the City issued a Press Release announcing its 2023 Permanent Outdoor Dining Program.  Restaurants in all neighborhoods of Boston were eligible to participate in the program except all restaurants in the North End.  The Press Release stated, "The City will not be permitting on-street dining in the North End this year." The City's "Outdoor Dining Program" page on its website further states: "The City of Boston will not be reviewing or permitting on street outdoor dining applications in the North End for the 2023 outdoor dining season."

426.     The City implemented and enforced the ban on on-street outdoor dining in the North End in 2023.  On June 28, 2023, plaintiff Monica's, Inc. filed an application for an on-street outdoor dining license with the City of Boston.  Monica's complied with all aspects of the City's application instructions.  The City denied Monica's application, stating "The City of Boston will not be reviewing or permitting on-street outdoor dining applications in the North End for the 2023 outdoor dining season."

427.     As alleged in Paragraphs 366 to 420, restaurants in Boston's neighborhoods other than the North End that participated in the City's 2023 Outdoor Dining Program are similarly situated to the plaintiffs and other North End Italian restaurants that the City had banned from the program.

428.     By implementing and enforcing a ban on on-street outdoor dining against the North End restaurants, including the plaintiffs, in 2023, the City has intentionally treated the plaintiffs' differently from other similarly situated restaurants located in all of Boston neighborhoods other than the North End.

### No Rational Basis for Disparate Treatment

429.     The City of Boston had no rational basis for intentionally treating the plaintiffs differently from the City's other similarly situated restaurants that participated in the 2023 Outdoor Dining Program.

430.     In its Press Release, the City cited three reasons for the ban: (1) traffic caused by ongoing construction projects that would purportedly put a greater "strain" on North End traffic, making it more difficult for residents to navigate the area, (2) the density of restaurants in the North End, and (3) quality of life issues such as traffic, sanitation, and accessibility issues.

431.     As alleged in Paragraphs 298 to 340, the City's three reasons were pretextual, as they either lacked factual support, were erroneous, or did not provide an objectively valid basis for the ban.

The City had no rational basis for establishing, implementing, and enforcing its discriminatory outdoor dining policy in 2023, which was unrelated to any legitimate state interest.

432.    The events leading up to the ban also undermine the validity of reasons given to justify the ban.  The 2022 outdoor dining season in the North End was viewed as a success, even by the City.  The season was originally scheduled to end on September 5, 2022.  The City extended the season until September 30, 2022, because all North End restaurants had complied with the program's rules and there was a lack of complaints about the outdoor dining operations.

433.    In addition, as of December 2022, the City hosted public presentations on the upcoming 2023 Outdoor Dining Program at which it represented that an objective of the new program was to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."

434.    The City already was familiar with NEWRA's complaints about the concept of outdoor dining and its efforts to ban it in the North End.  There were no additional events that occurred or new information developed between the December 2022 presentations by the City and the announcement of the ban on February 16, 2023, that warranted the City's imposition of the ban.

**The Ban Was Motivated by Animus, Ill-Will, and Discriminatory Bias**

435.    On information and belief, a series of significant events beginning in mid-March 2022 and continuing to the date of the ban on February 16, 2023, show the City's decision to impose the ban was motivated by its animus, ill-will, and discriminatory bias towards the plaintiffs and other North End restaurants.

436.    The relationship between the City and the North End Italian restaurant owners began to deteriorate on March 18, 2022, when the City waylaid the restaurant owners with its announcement that they would all have to pay a $7,500 participation fee and monthly parking fees during a shortened outdoor dining season.  Though the North End plan had been finalized since February, the City waited

to spring it on the North End restaurants at the last possible moment.  At the eleventh hour—just two weeks before the start of the outdoor dining season—the City announced the draconian terms of the North End plan at a mandatory meeting on a Friday night.

437.    The unanticipated news blindsided and angered the North End restaurants owners.  Many had struggled mightily to get back on their feet following the dark days of the pandemic.  They could not afford to pay additional costs.  And North End restaurants were infuriated when they learned that the City had singled them out by permitting every other restaurant in the City to participate in the same City program for *free*.  The North End restaurant owners responded loudly, criticizing the City and the Mayor for their unequal treatment, calling the fees unfair, and questioning their legality.  Some restaurant owners openly discussed the possibility of filing a lawsuit to challenge the City's discriminatory North End plan.

438.    That weekend, on Sunday, March 20, 2022, the City reacted to the "pushback" by plotting a response to a possible lawsuit.  As a potential solution, the City could have considered treating all restaurants participating in the program equally by requiring all of them to pay participation and parking fees and by setting a common time-period for the season. Rather than ruminate about a possible solution to the fiasco that it had created, the City instead contemplated throwing a powerful economic counterpunch—a retaliatory ban of outdoor dining in the North End.

439.    The next day, March 21, 2022, at the St. Patrick's Day breakfast, Mayor Wu personally injected herself into the controversy by commenting that she was ***"getting used to dealing with problems that are expensive, disruptive and white."***  The North End restaurant owners believed that the Mayor made disparaging comments that were racially and/or ethnically biased and directly aimed at them.

440.    Days later, concerned citizens and a North End restaurant owner started a petition to solicit public support to oppose the City's imposition of the excessive fees.  The public quickly sided

with the restaurants, as the petition amassed over 37,500 supporters.  The petition and its results were communicated to Mayor Wu and other City Officials, showing them that there was massive public opposition to the City's policy.

441.    On their own, other outraged and disappointed North End residents contacted Mayor Wu and other City officials and opposed the City's treatment of the North End's restaurants.  One even denounced the City's actions, noting they signaled an unnecessary attack on Italian Americans.

442.    Mayor Wu, however, remained defiant and doubled down.  On March 25, 2022, she intensified the dispute by sending a public letter to the North End restaurants threatening to ban outdoor dining in the North End unless a "critical mass" of North End restaurants capitulated and agreed with the terms of the City's North End plan.  The restaurant owners considered the Mayor's response to be an act of economic coercion, leaving them with little choice as the effect of a ban would have dire financial consequences for them.

443.    Mayor Wu's letter, however, earned a harsh rebuke from *The Boston Globe*, which disapproved the unfairness of the fees and criticized Mayor Wu's judgment.  *The Boston Globe* accused Mayor Wu of "holding on to a misguided plan to impose a hefty fee only on the North End restaurants" and then exacerbating the situation by "threatening to impose a greater hardship on the North End by rescinding outdoor dining."

444.    Days later, on March 29, 2022, at a press conference held at City Hall to address the controversy, the City banned certain North End restaurant owners, who had protested the fees, from attending.  Having eliminated any opposing views, Mayor Wu then began the press conference by explaining ***"[e]quity doesn't mean equality all across the board."***  Coupled with her letter on March 25, Mayor Wu's comments indicated that, in her view, she had a right to treat the North End restaurants unequally—in the name of "equity"—and if they would not support her decision, she would punish them economically.

445.    In May 2022, several North End restaurant owners, including some of the plaintiffs, filed a lawsuit against Mayor Wu in the U.S. District Court for the District of Massachusetts, alleging that the fees discriminatory in violation of the U.S. Constitution and Massachusetts law.

446.    Local and national media chastised Mayor Wu and the City for their handling of the outdoor dining controversy in the North End.  One article, referencing the fee dispute, claimed "many of the Mayor's policies have been anything but free of discrimination" and called them "anything but equitable."  The *Boston Business Journal* counseled Mayor Wu to refocus by working with the small business community rather than adopting measures that hampered their ability to recover from the hardship caused by the pandemic.  And on a national level, the prominent publication questioned whether Mayor Wu hated the City's restaurants, noting she "seems hellbent on making things difficult or impossible for city restaurants" due to "her administration's unfair and outrageous outdoor-dining polices."

447.    Shortly after the North End's abbreviated outdoor dining season ended and four days before Columbus Day, Mayor Wu issued a Proclamation that a new holiday, Indigenous Peoples' Day, would now be celebrated in Boston on Columbus Day. The Mayor easily could have chosen one of hundreds of other days of the year on which Bostonians could celebrate Indigenous Peoples' Day, but she did not.  Mayor Wu chose to celebrate the new holiday on Columbus Day, the only Federal Italian holiday, and chose to make her announcement just four days before Columbus Day.  Many North End Italian Americans and the plaintiffs reasonably interpreted the Mayor's actions to be a deliberate ethnic affront meant to overshadow or symbolically replace the only Federal Italian holiday.

448.    Then, following the end of the North End's outdoor dining season, the City began collaborating extensively with NEWRA, which it knew was antagonistic to the North End restaurant owners and had pressed for the ban.  From November 2022, through February 2023, the City

maintained constant communication with NEWRA about a possible ban whereas it had minimal communication the North End restaurants and never mentioned a possible ban.

449.    Throughout this time period, the City and the Mayor were actively embroiled in the federal civil rights lawsuit with several North End restaurants, including at the time of the ban.

450.    The City did not hesitate to use the threat of a ban as economic coercion to force North End restaurants to accede to its stringent North End plan.  It stifled vocal opposition from North End restaurants when they attempted to express their divergent view at a public press conference.  And while the City had no valid basis to ban outdoor dining in the North End, it provided the public with pretextual reasons for the ban.

451.    On information and belief, the City blamed the North End restaurants and their owners for the wave of adverse publicity and public opinion against the City and the Mayor arising out of the dispute about the North End plan, the filing of the federal discrimination lawsuit, and initiation of the public petition opposing the fees.

452.    On information and belief, collectively, the City's threat to retaliate and its actual retaliation in the form of enacting the on-street outdoor dining ban in the North End was motivated by animus, ill-will, and discriminatory intent.

453.    Aside from the comments made at the St. Patrick's Day breakfast, a recent incident pertaining Mayor Wu's hosting of a segregated holiday party held at City-owned property highlights her racial views.  On December 13, 2023, Mayor Wu hosted a holiday party for "Electeds of Color" held at the City's Parkman House.  As indicated by the title of the event, the segregated celebration was held for minority groups only. The day before the event, the City's Director of City Council Relations mistakenly sent the invitation to all City Councilors, seven of whom are white, referring to the intended recipients as "Honorable Members."  Realizing her error, the Director quickly sent a follow up message to "Councilors and Team," apologizing for sending her invitation "to everyone by

accident." Some City Councilors, a prominent pastor and leading voice for blacks in the City, and many others publicly denounced the segregated event as divisive.  Yet Mayor Wu unapologetically defended her hosting of a segregated event on City property, expressing regret only for sending the invitation to white members of the City Council.  Mayor Wu's exclusion of whites from a holiday party held at City-owned property underscores her racial views and provides context for her treatment of the Italian restaurant plaintiffs in this case.

454.    The City had no rational basis for establishing, implementing, and enforcing its discriminatory outdoor dining policies in 2022 and 2023, which were unrelated to any legitimate state interest.

455.    The City's actions based on its discriminatory treatment of the plaintiffs violate the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

456.    At all relevant times, the City acted under the color of state law within the meaning of 42 U.S.C. § 1983, in its establishment, preparation, implementation, and enforcement of its outdoor dining programs and related municipal policies in 2022 and 2023 in the Commonwealth.

457.    As a direct and proximate cause of the City's discriminatory treatment of the North End's Italian restaurants, the plaintiffs have suffered significant monetary damages and other damages.

458.    The plaintiffs have suffered harm as a direct and proximate result of the City's actions including at least the following: (1) loss of goodwill; (2) monetary losses in 2022 due to the payment of unlawful fees; and (3) loss of profits and incidental damages including payment of ongoing storage fees as a result of being excluded from the on-street outdoor dining program in 2023.

## COUNT II

### Violation of Fourteenth Amendment to the U.S. Constitution, Equal Protection Clause Pursuant to 42 U.S.C. § 1983

459.    The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-458.

### *The North End's Italian Restaurants*

460.    The North End is widely known as the Italian section of Boston and viewed by many as the best-preserved Italian neighborhood in the country.  Its legendary Italian restaurants are world renowned.  The authentic Italian cuisine of the North End's Italian restaurants contributes to the ethnic ambiance that pervades this section of the City.  People from near and far visit the North End to dine at its Italian restaurants.

461.    The City publicly recognizes and promotes the North End as an Italian American neighborhood populated with Italian restaurants, Italian cafés, and other Italian-themed businesses. On the City's website, it describes the North End as the "hub for the City's Italian-American community."[18]

462.    The Boston Planning and Development Agency similarly refers to the North End as "Little Italy" and a "vibrant Italian community," whose businesses, including its restaurants, reflect the "Italian culture pervasive in this neighborhood":

> This historic neighborhood occupies the northeastern corner of the city and is surrounded on two sides by the Boston Harbor. It is considered to be Boston's oldest residential community and has been settled since the 1630s.
>
> . . .
>
> Recognized as Boston's "Little Italy", the North End has long been home to a vibrant Italian community and is a popular destination for both Bostonians and tourists.
>
> . . .
>
> The businesses of the North End reflect the Italian culture pervasive in this neighborhood.  Hanover and Salem Streets form the district's main commercial spines, and are lined with Italian restaurants, bakeries, and shops.[19]

---

[18] https://www.boston.gov/neighborhood/north-end.

[19] https://www.bostonplans.org/neighborhoods/north-end/at-a-glance.

463.     In December of 2022, the City's Office of Tourism, Sports, and Entertainment enthusiastically endorsed the North End's Italian restaurants by providing the public with a link to the "Top Italian Restaurants in Boston's North End":

> One of Boston's most iconic foodie neighborhoods, the North End is a staple for visitors and locals alike. Whether you're searching for the best chicken parmesan, the city's best espresso martini, or cooking that reminds you of your Nonna while away from home, this neighborhood is a must-visit for some of the best Italian restaurants in Boston. Perfect for a cozy night in cooler weather, an intimate date night with someone special, European-like energy in the summer with outdoor dining, or just an amazing meal ….

464.     On a recent public posting, Mayor Wu referred to the North End as 'lil' Italy when announcing the opening of a new North End Italian restaurant:

> Congratulations to Umbria, a new Italian steakhouse in the North End, on their grand opening!  Umbria owner Frank DePasquale has found a passion in finding a way to bring Italy to 'lil' Italy.

### The City's Facially Discriminatory Outdoor Dining Program Policies

465.     From 2020 to 2022, the first three years of the City's outdoor dining program before the City banned North End restaurants from participating in the program, the vast majority of North End's restaurants that participated in the program were Italian restaurants.  In 2020, North End Italian restaurants comprised approximately ninety percent (90%) of the North End restaurants that participated in the program (81 of 90). In 2021, approximately ninety-one percent (91%) of the North End restaurants that participated in the program were Italian restaurants (74 of 81).  And in 2022, North End Italian restaurants accounted for approximately ninety-two percent (92%) of the North End restaurants that participated in the program (57 of 62).[20]

---

[20] As of the end of 2022, approximately 89 restaurants in the North End were impacted by the City's on-street outdoor dining ban. This excludes restaurants that engaged in the City's sidewalk dining program, private patio dining, and dining on public property, such as the park in North Square.  Of those 89 restaurants, 79 are Italian restaurants, which is approximately ninety percent (90%) of the total.

466.     The City's references to the "North End's restaurants" or the "restaurants in the North End" in its outdoor dining program's policies in 2022 and 2023 can reasonably and objectively be read to mean the "North End's *Italian* restaurants."  This reasonable and objective reading is based on (1) the North End's well-known history as Boston's "Little Italy," (2) the City's public recognition of the North End as Boston's Italian neighborhood known for its top Italian restaurants, (3) the fact that approximately ninety percent of the North End restaurants that participated in the outdoor dining programs for three years were Italian restaurants, and (4) the fact that close to ninety percent of the restaurants in the North End are Italian restaurants.

467.     Italian Americans are a protected class for equal protection purposes and are shielded by the Equal Protection clause against discrimination on the basis of ancestry.  The City has endorsed and embraced this concept in its own ordinances and policies that prohibiting discrimination of all forms, including ethnic discrimination.[21]

468.     **The 2022 North End Plan:**  In 2022, in the wake of the pandemic, the City intentionally enacted a policy that, on its face, targeted the Italian restaurants in the North End.

469.     The City singled out the North End's restaurants and imposed more onerous conditions *only* on the North End's restaurants to participate in the City's 2022 outdoor dining program. The City did not impose these stringent requirements on restaurants in any Boston neighborhood other than the North End.

470.     When the City established and implemented its policy targeting the North End restaurants in 2022, it knew that its policy would disproportionally cause the North End Italian restaurants to sustain financial hardship.

---

[21] City of Boston Municipal Code §§ 12-9 (Human Rights), 15-10 (The Boston Fair Chance Act); Executive Order October 2000, City of Boston, "Policy/Investigation on Discrimination, Sexual & Other Forms of Harassment and Retaliation."

471.    ***The 2023 North End Ban:*** In 2023, the City again intentionally enacted a policy that, on its face, targeted the Italian restaurants in the North End.

472.    The City singled out the North End's restaurants by banning them from participating in the City's 2023 outdoor dining program. The City did not impose a ban on restaurants in any other neighborhood in Boston.

473.    When the City established and implemented its policy targeting the North End restaurants in 2023, it knew that its policy would disproportionally cause the North End Italian restaurants to sustain financial hardship.

474.    The City's outdoor dining policies in 2022 and 2023, both of which were reduced to written policies, are discriminatory on their face and violate the Equal Protection Clause of the Fourteenth Amendment because they targeted businesses having Italian ethnicity and/or Italian national origin.

475.    The City had no rational basis for establishing, implementing, and enforcing its facially discriminatory outdoor dining policies in 2022 and 2023, which were unrelated to any legitimate state interest.

### *Disparate Impact of the City's Discriminatory Outdoor Dining Program Policies*

476.    Aside from the facial invalidity of both the City's 2022 and 2023 policies, the City's implementation, application, and enforcement of its discriminatory policies have had a disparate impact on the plaintiffs and all other Italian restaurants in the North End.

477.    On information and belief, as alleged in Paragraphs 435 to 457, the City's decision to impose the ban was motivated by its animus, ill-will, and discriminatory bias towards the plaintiffs and other North End restaurants.

478.    At all relevant times, the City acted under the color of state law within the meaning of 42 U.S.C. § 1983, in its establishment, preparation, implementation, and enforcement of its outdoor dining programs and related municipal policies in 2022 and 2023 in the Commonwealth.

479.    The plaintiffs have suffered and continue to suffer harm as a direct and proximate result of the City's establishment, implementation, and enforcement its discriminatory outdoor dining policies in 2022 and 2023, including at least the following: (1) loss of goodwill; (2) monetary losses in 2022 due to the payment of unlawful fees; and (3) loss of profits and incidental damages including payment of ongoing storage fees as a result of being excluded from the on-street outdoor dining program in 2023.

## COUNT III

**Violation of Fourteenth Amendment to the U.S. Constitution,
Procedural Due Process Pursuant to 42 U.S.C. § 1983**

480.    The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-479.

481.    The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."

482.    The plaintiffs have protected property interests in participating in the City's 2022 and 2023 outdoor dining programs.

483.    In 2022 and 2023, the City acted under color of state law to deprive the plaintiffs of their property interests without due process of law in violation of their procedural due process rights under the Fourteenth Amendment.

**State Emergency Outdoor Dining Orders and Legislation**

***COVID-19 Emergency Executive Orders Nos. 35 and 50***

484.    In March of 2020, Governor Baker declared a state of emergency in Massachusetts due to the outbreak of COVID-19.[22]  As conditions in Massachusetts related to COVID-19 began to improve sufficiently to allow some relaxation in the constraints that had been placed on businesses, Governor Baker issued COVID-19 Order No. 35 on June 1, 2020.  This Order stated that "[r]estaurants *will be authorized* to provide outdoor table service at the commencement of Phase II of the Commonwealth's phased re-opening of workplaces" (emphasis supplied).

485.    On September 10, 2020, Governor Baker issued COVID-19 Order No. 50, which provided additional support for restaurants to continue outdoor dining "without interruption or undue complication" as follows:

> WHEREAS, expanded opportunities for outdoor dining, as approved by local authorities, have provided valuable support to restaurants and a popular amenity to the public that should be permitted to continue during the state of emergency without interruption or undue complication ….

486.    COVID-19 Order No. 50 additionally authorized cities and towns to approve requests to expand outdoor table service or to extend prior approvals of outdoor table service:

> Notwithstanding chapter 40A of the general laws, or any special permit, variance or other approval thereunder, or any other general or special law to the contrary, a city or town *may approve requests* for expansion of outdoor table service or extensions of earlier granted approvals …. (emphasis supplied).

487.    COVID-19 Order No. 50 further permitted cities, towns, and local licensing authorities to modify the scope of any prior approval before approving any request to expand outdoor table service or to extend a prior approval:

> *Before approving* any request made under this Order *or extending a prior approval* issued pursuant to Section 4 of COVID-19 Order No. 35, a city, town or LLA ["local licensing authority"] *may modify the scope* of any prior approval issued pursuant to Section

---

[22] Executive Order No. 591, March 10, 2020.

4 of COVID-19 Order No. 35 as the city, town, or LLA deems proper and appropriate including, without limitation, modifying the terms of an earlier granted approval to address potential issues with snow removal, pedestrian traffic, or similar concerns (emphasis supplied).

488.     Neither COVID-19 Order No. 35 nor COVID-19 Order No. 50 contain any language or provision that authorizes a city, town or local licensing authority to suspend any provision of the Orders or exclude restaurants in any geographic section of a city or town.

489.     In 2020, plaintiffs participated in the City's outdoor dining program authorized by COVID-19 Order No. 35 and COVID-19 Order No. 50 with on-street dining approved by the City.

490.     On December 10, 2020, Mayor Walsh issued a press release announcing the Outdoor Dining Pilot Program for 2021 in Boston, which was authorized by COVID-19 Order No. 35 and COVID-19 Order No. 50.  Mayor Walsh fully supported the program, declaring:

> The 2021 Outdoor Dining Pilot Program will continue many of the successful initiatives from this year's program, such as streamlined permitting and outdoor patios on roadways that enable restaurants with narrow sidewalks to offer patio seating to patrons.  *See* Exhibit 1.

### Emergency Legislation: Acts of 2021, Chapter 20, Section 19

491.     On June 16, 2021, the Massachusetts Legislature approved an emergency law that extended certain COVID-19 measures, including the authorization of outdoor dining.  The emergency law was titled "An Act Relative To Extending Certain COVID-19 Measures Adopted During The State of Emergency."  *See* Session Law, Acts of 2021, Chapter 20.  Section 19 of this Act relates to outdoor dining.

492.     Section 19(b) of Chapter 20 of the Acts of 2021 contains language similar to COVID-19 Order No. 35 and COVID-19 Order No. 50 as to approval of outdoor dining requests by cities and towns:

> Notwithstanding chapter 40A of the General Laws, any special permit, variance or other approval issued thereunder or any general or special law to the contrary, from the effective date of this act until April 1, 2022, a city or town *may approve a request* for expansion of outdoor table service, including in the description of licensed premises

as described in subsection (c), *or an extension of an earlier granted approval* issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50 (emphasis supplied).

493.    Section 19(d) of Chapter 20 of the Acts of 2021 also contains language similar to COVID-19 Order No. 35 and COVID-19 Order No. 50 with respect to modifications of earlier granted outdoor dining approvals by cities and towns:

> *Before approving* any request to extend an earlier granted approval issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50, a city, town or local licensing authority *may modify the scope* of the approval as the city, town or local licensing authority deems proper and appropriate including, but not limited to, modifying the terms of an earlier granted approval to address potential issues with snow removal, pedestrian traffic or similar concerns (emphasis supplied).

494.    Section 19(b) of Chapter 20 of the Acts of 2021 authorizes certain municipal officials, boards or officers to "establish the process for approving" requests for outdoor dining:

> Before such approval, the mayor, select board or other chief executive officer, as established by charter or special act, shall *establish the process for approving* such requests. Such process shall not be required to comply with the notice and publication provisions of section 11 of said chapter 40A (emphasis supplied).

495.    There is no language in Section 19 of Chapter 20 of the Acts of 2021 that authorizes a city, town, or local licensing authority to suspend any provisions of the Act or exclude restaurants in any geographic section of a city or town.

496.    Section 19(e) of Chapter 20 of the Acts of 2021 governs the timeline for the status of outdoor dining rights:

> Any outdoor table service approved for expansion under this section, including an amended license issued by a local licensing authority under subsection (c), *shall automatically revert back to the status prior to the approval of the change for expansion of outdoor table service or in the description of a licensed premises on April 1, 2022*. Any extension of an earlier granted approval issued under section 4 of the governor's COVID-19 Order No. 35 or section 1 of the governor's COVID-19 Order No. 50 *shall automatically revert back to the status prior to the approval issued under said section 4 of the governor's COVID-19 Order No. 35 or said section 1 of the governor's COVID-19 Order No. 50 on April 1, 2022* (emphasis supplied).

497.   In 2021, plaintiffs participated in the City's Outdoor Dining Pilot Program for 2021 in Boston with on-street dining as authorized by COVID-19 Order No. 35 and COVID-19 Order No. 50 as extended by Section 19 of the Acts of 2021, Chapter 20.  The City approved the plaintiffs' applications for 2021.

498.   By virtue of Section 19(e) of the Acts of 2021, Chapter 20, the plaintiffs had property rights in the form of seasonal on-street outdoor dining property rights that they held until April 1, 2022.

### Emergency Legislation: Acts of 2022, Chapter 42, Section 27

499.   On April 1, 2022, the Massachusetts Legislature approved an emergency law that extended certain COVID-19 measures, including the authorization of outdoor dining.  The emergency law was titled "An Act Making Appropriations For Fiscal Year 2022 To Provide For Supplementing Certain Existing Appropriations And For Certain Other Activities And Projects."  *See* Session Law, Acts of 2022, Chapter 42.

500.   Section 27 of this Act relates to outdoor dining and amends Section 19 of Chapter 20 of the Acts of 2021 "by striking out the words 'April 1, 2022', each time they appear, and inserting in their place, in each instance, the following words: 'April 1, 2023'."  Section 27 of Chapter 42 of the Acts of 2022 made no other amendments.

501.   There is no language in Section 27 of Chapter 42 of the Acts of 2022 that authorizes a city, town, or local licensing authority to suspend any provisions of the Act or exclude restaurants in any geographic section of a city or town.

502.   In 2022, the plaintiffs participated in the Outdoor Dining Pilot Program for 2022 in Boston with on-street dining as authorized by COVID-19 Order No. 35 and COVID-19 Order No. 50 as extended by Section 19 of the Acts of 2021, Chapter 20, as amended by Section 27 of the Acts of 2022, Chapter 42.  The City approved the plaintiffs' applications for 2022.

503.     By virtue of Section 19(e) of the Acts of 2021, Chapter 20, as extended by Section 27 of the Acts of 2022, Chapter 42, the plaintiffs had property rights in the form of seasonal on-street outdoor dining property rights that they held until April 1, 2023.

### Emergency Legislation: Acts of 2022, Chapter 2, Section 38

504.     On March 29, 2023, the Massachusetts Legislature approved an emergency law that extended certain COVID-19 measures, including the authorization of outdoor dining, that was titled "An Act Making Appropriations For The Fiscal Year 2023 To Provide For Supplementing Certain Existing Appropriations And For Certain Other Activities And Projects." *See* Session Law, Acts of 2023, Chapter 2. Section 38 of this Act relates to outdoor dining and further amends Section 19 of Chapter 20 of the Acts of 2021, as amended by section 27 of chapter 42 of the Acts of 2022, "by striking out the words 'April 1, 2023', each time they appear, and inserting in their place, in each instance, the following words: 'April 1, 2024'." Section 38 of Chapter 2 of the Acts of 2023 made no other amendments.

505.     There is no language in Section 38 of Chapter 2 of the Acts of 2023 that authorizes a city, town, or local licensing authority to suspend any provisions of the Act or exclude restaurants in any geographic section of a city or town.

506.     By virtue of Section 19(e) of the Acts of 2021, Chapter 20, as extended by Section 27 of the Acts of 2022, Chapter 42, and further extended by Section 38 of Chapter 2 of the Acts of 2023, the plaintiffs had property rights in the form of seasonal on-street outdoor dining property rights that will not automatically revert back to their pre COVID-19 status until April 1, 2024.

507.     By virtue of Section 19(e) of the Acts of 2021, Chapter 20, as extended by Section 27 of the Acts of 2022, Chapter 42, and further extended by Section 38 of Chapter 2 of the Acts of 2023, the plaintiffs had a property right, granted by the Commonwealth of Massachusetts, to apply to take part in the 2023 temporary outdoor dining program.

136

508.     The City had no authority to suspend any provisions of the temporary program that the Commonwealth authorized or to exclude restaurants in any section of Boston from the temporary program by enacting a ban.  The City was authorized to "*establish the process for approving*" applications.

509.     The plaintiffs have property rights based on the emergency orders promulgated by Governor Baker and the emergency legislation enacted by the Massachusetts Legislature.  These emergency orders and statutes established a legal framework that supported a property right in continued participation in the temporary outdoor dining program.

510.     In light of the surrounding circumstances, the plaintiffs' property rights extended to the on-street dining portion of the City's 2023 outdoor dining program in Boston based on the emergency orders promulgated by Governor Baker and the emergency legislation enacted by the Massachusetts Legislature.

511.     As Mayor Walsh stated in his press release on December 10, 2020, allowing restaurants to establish outdoor patios on roadways "*enable restaurants with narrow sidewalks to offer patio seating to patrons.*"

512.     The plaintiffs participated in on-street dining in 2020, 2021, and 2022, which allowed them to offer outdoor dining.  Some plaintiffs investigated the possibility of taking part in sidewalk only outdoor dining for 2023 and found it was not feasible due to sidewalk size.

513.     Under the emergency orders promulgated by Governor Baker and the emergency legislation enacted by the Massachusetts Legislature, the plaintiffs also had a property right to apply for participation in the outdoor dining program, including on-street dining, and to have the City review their applications according to a process for approving and modifying outdoor dining extensions previously granted.

**The City's Violation of Plaintiffs' Due Process Rights**

514.    In 2022 and in 2023, the City's outdoor dining programs and related policies deprived the plaintiffs of their procedural due process rights as to the above property rights in violation of the Fourteenth Amendment.

### *Due Process Violations in 2022*

515.    In March of 2022, the City announced that restaurants in the North End had to pay a fee of $7,500 to participate in the outdoor dining program, as well as pay for alternate parking for parking spaces used in on-street dining.  The City also shortened the duration of the North End's outdoor dining season.

516.    The participation fees and parking fees and shortened outdoor dining season imposed on restaurants in the North End for participation in the 2022 outdoor dining program were not imposed on restaurants in any other sections of Boston.

517.    The plaintiffs were unjustly prejudiced from an economic perspective from competing with businesses similarly situated in other sections of Boston because the fees and shortened outdoor dining season only applied to restaurants in the North End.

518.    The City did not provide notice to the plaintiffs before setting the fees and shortened season for the North End only.  However, the express language of the notice provided shows the City knew of the plaintiffs' property rights in participation in the 2022 outdoor dining program authorized by state law. It was titled "NOTICE OF MANDATORY INFORMATIONAL HEARING REGARDING TEMPORARY OUTDOOR DINING FOR NORTH END LICENSEES."  The City defined "North End Licensees," as "all establishments located in the North End planning to participate in the 2022 Outdoor Dining program" (emphasis in original).

519.    The plaintiffs did not receive any pre-deprivation hearing before being deprived of their competitive rights in 2022.  The plaintiffs received no process whatsoever regarding these rights.

520.    In fact, the City threatened the plaintiffs with expulsion from the 2022 outdoor dining program if they did not agree to pay the fees and partake in a shortened season that it imposed on North End restaurants only.

521.    In a letter dated March 25, 2022, Mayor Wu stated she was "prepared to rescind North End outdoor dining" for the 2022 season if a "critical mass of restaurant owners" felt the program, which included North End-only fees, was "unworkable as proposed."

522.    In an internal e-mail, the City even discussed banning the plaintiffs from 2022 Outdoor Dining Program, if any of the North End Italian restaurants brought suit to challenge the validity of the fees: "If they sue, we can just say 'fine, we are shutting down the North End program."

### Due Process Violations in 2023

523.    On February 16, 2023, the City announced that restaurants in the North End were banned from participating in on-street outdoor dining during the 2023 outdoor dining season in Boston.

524.    The plaintiffs had protectable property rights to participate in the 2023 outdoor dining program.

525.    The plaintiffs received no notice that the City intended to ban the restaurants in the North End only from participating in on-street outdoor dining until the City issued its decision.

526.    The plaintiffs did not receive any pre-deprivation hearing before being banned from participation in on-street outdoor dining in 2023.  The plaintiffs received no process whatsoever regarding these rights.

527.    The City enforced the ban against on-street dining in the North End in the 2023 outdoor dining program.  The City states on its 2023 outdoor dining program website the following: "The City of Boston will not be reviewing or permitting on street outdoor dining applications in the North End for the 2023 outdoor dining season."

528.     Plaintiff Monica's, Inc. filed an application on June 28, 2003, for an on-street dining license in accordance with the instructions issued by the City.  The City summarily rejected the application, stating: "The City of Boston will not be reviewing or permitting on-street outdoor dining applications in the North End for the 2023 outdoor dining season."

529.     The plaintiffs include companies that operate restaurants in the North End of Boston. The City's refusal to review and approve Monica's, Inc.'s application for an on-street outdoor dining license was based solely on the applicant's restaurant being located in the North End.

530.     It would be futile for any of the other plaintiffs that operate restaurants in the North End to submit an individual application for an on-street outdoor dining license.

531.     The City's actions and failure to afford the plaintiffs due process of law violates principles of procedural due process under the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

532.     The plaintiffs have suffered harm as a direct and proximate result of the City's actions included at least the following: (1) loss of goodwill; (2) monetary losses in 2022 due to the payment of unlawful fees; (3) storage fees, and (4) loss of profits and incidental damages as a result of being excluded from the on-street outdoor dining program in 2023.

## COUNT IV

### Violation of Fourteenth Amendment to the U.S. Constitution, Substantive Due Process Pursuant to 42 U.S.C. § 1983

533.     The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-532 and 603 to 624.

534.     The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."

535.     The plaintiffs have protected property interests in participating in the City's 2022 and 2023 outdoor dining programs.

536.    In 2022 and 2023, the City acted under color of state law to deprive the plaintiffs of their property interests in violation of their substantive due process rights under the Fourteenth Amendment.

537.    The plaintiffs' substantive due process rights under the Fourteenth Amendment protects them from (1) the City's use of governmental power for purposes of oppression, (2) the City's use of governmental power that shocks the conscience, and (3) the City's exercise of government conduct that is legally irrational because it is not keyed to any legitimate state interest.

538.    In 2022 and 2023, the City violated the plaintiffs' substantive due process by using its power to oppress the plaintiffs in a manner that shocks the conscience and was irrational because it was not based on any legitimate state interest.  The City did so by engaging in outrageous government conduct from late 2021 through the spring of 2023 involving the following acts:

(1)    abusing governmental power at a high level;

(2)    systematically depriving the plaintiffs of any procedural rights by failing to provide adequate notice, a pre-deprivation process, and a post-deprivation process;

(3)    implementing discriminatory policies by treating the plaintiffs differently than similarly situated restaurants in all of Boston's other neighborhoods;

(4)    implementing discriminatory policies based on the plaintiffs' ethnicity;

(5)    providing the public with pretextual information to justify its disparate treatment of the plaintiffs;

(6)    implementing policies against the plaintiffs based on ill-will, animus, and discriminatory intent;

(7)    issuing a retaliatory threat and subsequently retaliating against the plaintiffs;

(8)    using economic coercion to force the plaintiffs to accede to an unlawful policy;

(9)    levying an unlawful tax on the plaintiffs to raise funds that were misused, in part, to support a personal political agenda (as set forth in Count VI);

(10)    misusing funds paid by the plaintiffs to support a political agenda; and

(11)  providing misinformation on the City's website regarding its use funds paid by the plaintiffs for the 2022 outdoor dining program in the North End.

539.  **_The 2022 North End Plan:_**  In 2020 and 2021, the City conducted the first two years of outdoor dining in a fair and just manner that balanced the residents' interests in public safety and quality of life with the need to share the public way. Having more time to prepare the 2021 plan, the Walsh Administration relied heavily on feedback from residents and restaurants. The City's 2021 program was designed to provide consistent regulatory oversight and enforcement to ensure safe and enjoyable outdoor dining. The City treated all participating restaurants equally and fairly, regardless of the neighborhood in which they were located and irrespective of the ethnicity of the businesses and their owners as well as the color of the owners' skin.

540.  The Walsh Administration's 2021 outdoor dining plan for the North End was based on a collaborative process involving input from residents, businesses, restaurants, community groups, organizations, elected officials, and other stakeholders. Numerous North End Italian restaurants, including most of the plaintiffs, participated in the City's 2020 and 2021 programs.

541.  Unlike the Walsh Administration, the Wu Administration immediately chose to target and single out the North End restaurants by imposing harsh economic penalties on them as the price to participate in the program in 2022. Because the vast majority of the North End restaurants are Italian restaurants, the City knew the brunt of its draconian measures would adversely impact one ethnic group—Italian Americans. The City prepared its North End plan from December 2021 to mid-February 2022, when it finalized the plans terms and requirements.

542.  Aware that public disclosure of the City's 2022 North End plan would stir citywide controversy, the City deployed a stealth strategy to ensure there were no leaks. It prepared the plan largely behind closed doors. There was no meaningful public collaboration or transparency. Essential stakeholders were left in the dark, including the North End Outdoor Dining Committee.

543.    In late February 2022, the City announced that it was conducting a so-called a "community review" of the outdoor dining in the North End and welcomed comments. Because the City withheld the harsh terms of the North End plan from the public, the purported "community review" was merely symbolic, as the public's comments merely spoke to whether one favored outdoor dining.

544.    The 2022 outdoor dining season was scheduled to begin on April 1, 2022. The City strategically delayed announcing the details of the North End plan until a mandatory meeting of North End restaurants held on March 18, 2022, only two weeks before the start of the season. The City knew the restaurant owners would be caught off-guard and unprepared to respond substantively.

545.    The flawed process the City used to develop the North End plan precluded the restaurants from participating. The City never asked for the restaurants' input or even told them that it was forming the plan. Rather, it sent the restaurants a generic notice of the mandatory meeting at the eleventh-hour containing no information about the plan.

546.    The North End restaurants were stunned to hear the harsh terms and requirements of the North End plan. The City also informed them that it would use the fees to provide mitigation programs and services for the North End based on recommendations of a North End community committee. The restaurant owners had no idea the City had planned to discriminate against them and were taken aback because they had participated in the program for the past two years on equal terms with all Boston restaurants.

547.    Many restaurant owners protested the City's disparate treatment of the North End restaurants and some vocally suggested that they challenge the legality of the North End plan in court. The City's plan instantly generated backlash from the North End community. One resident denounced the City's actions, claiming it signaled an unnecessary attack on Italian Americans.

548.    On Sunday, March 20, 2022, just two days after the mandatory meeting, the City immediately considered imposing a retaliatory ban of outdoor dining in the North End if the restaurants sought to enforce their legal rights in court.

549.    The next day, March 21, 2022, at the St. Patrick's Day breakfast, Mayor Wu stated that she is **"getting used to dealing with problems that are expensive, disruptive and white,"** which the North End restaurant owners viewed as a racially discriminatory and disparaging statement aimed at them.

550.    That week concerned citizens and a North End Italian restaurant owner started a petition to oppose the City's assessment of fees, which quickly received an overwhelming positive response of over 37,500 supporters.  The petition and its results were made known to Mayor Wu and other City officials.

551.    The Mayor swiftly responded by issuing a public threat to the restaurants that had the potential to economically crush them. In a letter dated March 25, 2022, to North End restaurant owners, Mayor Wu threatened to rescind outdoor dining in the North End unless a "critical mass" of them acceded to the City's harsh terms of the North End plan.  To make matters worse, the letter cited three pretextual reasons why the fees were necessary.  Those reasons either lacked factual support, were erroneous, or failed to provide an objectively valid basis for the more stringent requirements.  From the restaurants' perspective, the Mayor used economic coercion to force them to accept the North End plan or again face disastrous financial hardship.

552.    The City then took other extreme steps to squelch opposition to its North End plan. As public criticism of the Mayor and the City continued to mount, Mayor Wu scheduled a press conference at City Hall on March 29, 2022, to address the controversy.  When a group of vocal North End Italian restaurant owners who opposed the North End plan arrived at City Hall, City officials

abruptly banned them from attending the press conference.  This eliminated public discussion of the issue by those with opposing views.

553.    Mayor Wu then began the press conference by stating her political philosophy on why the City could treat the North End restaurants differently than all of Boston's other restaurants.  She declared: ***"Equity doesn't mean equality all across the board."***  North End restaurant owners, including the plaintiffs, viewed this comment as further proof of the City's discriminatory intent.  In their view, the dispute with the City was based on the City's "unequal" treatment of them when compared to the City's treatment of other similarly situated businesses participating in a City program.  They believed they were entitled to have equal access and benefit from all City programs and to be treated fairly and equally under Boston's own laws, which prohibit unequal treatment of Boston residents based on their ethnicity, race or skin color.  From their standpoint, the Mayor's reference to *"equity"* was irrelevant to the dispute, was an invalid reason for overt discrimination, and was a slap in their faces.

554.    During the press conference, however, Mayor Wu also conceded there are ***"needs all across our City"*** pertaining to rodent control, clean streets, trash pickup, and pedestrian safety, and no one from the City ascribed blame for these problems to the restaurant owners or even to outdoor dining.  Yet, those issues were the same so-called "quality of life" issues that the City had relied on to impose the fees on the North End restaurants in the first place.  But by the Mayor's own admission, the issues existed long before outdoor dining "across the city" and they were not caused by the North End restaurant owners.  The Mayor's statements confirmed that the City's levying of hefty fees on the North End restaurants was arbitrary, capricious and not keyed to any legitimate government interest.

555.    Mayor Wu's repeated public statements at the press conference about how the City intended to use the funds also turned out to be inaccurate.  She emphasized the City would use the

fees to specifically address the "impacts" caused by outdoor dining in the North End and guaranteed that "[w]e are putting every dollar that we have to good use."

556.    But The City did not later allocate funds to provide mitigation programs and services, despite the Mayor's promise.  Instead, it used some of the funds to purchase an electric street sweeper for $552,000 to advance the Mayor's Green New Deal political agenda.  The City "expensed" this high-priced vehicle to the 2022 North End outdoor dining program, even though it was purchased for citywide use and was unrelated to the North End program.

557.    In essence, the City used proceeds from the North End plan—which singled out one of the City's longstanding ethnic groups—to promote the Mayor's political climate justice agenda, which called for the electrification of City's entire fleet of vehicles.

558.    The City also provided no process for the North End restaurant owners to appeal or challenge the terms of the North End plan.  Shortly after the outdoor dining season began in the North End, several aggrieved restaurant owners filed a complaint in federal court against Mayor Wu, alleging that the discriminatory fees were unconstitutional and violated Massachusetts law.

559.    The City's formation and implementation of the 2022 North End plan were marred by (1) high-level abuse of government power; (2) systematic procedural irregularity; (3) extraordinary efforts to eliminate protest and opposition to the plan, including use of government economic coercion; (4) discrimination and animus against the North End Italian restaurants, including the plaintiffs, as set forth in Paragraphs 435 to 458; (5) personal hostility to the plaintiffs; (6) a threat of retaliatory treatment against the plaintiffs; (7) use of pretextual reasons as a basis to take punitive measures against the plaintiffs; and (8) misallocation of fees paid by the plaintiffs to further a political agenda.

560.    **The 2023 North End Ban:**  In 2023, the City again singled out the North End Italian restaurants by banning them from participating in that season's outdoor dining program.  In doing so,

the City used a highly irregular process to limit the Italian restaurants from meaningfully participating in discussions leading to the ban while providing favored treatment and extraordinary access to a politically powerful community organization that supported the ban.  In the end, the City used the most extreme anti-competitive measure available—*a retaliatory ban*—to economically punish the North End Italian restaurants and fundamentally alter the balance of competition in Boston's restaurant industry.

561.    As the North End's 2022 outdoor dining season drew to a close in September, the relationship between the City and the North End Italian restaurants had significantly deteriorated because (1) the restaurants had just paid hefty fees during a shortened season while all Boston restaurants participated for free; (2) aggrieved restaurant owners had filed a federal discrimination lawsuit against Mayor Wu; (3) local and national media had chastising the Mayor and City on their handling of the matter; and (4) Mayor Wu announced that a new City holiday, Indigenous Peoples' Day, would be celebrated in Boston on Columbus Day, which Italian American viewed as a deliberate ethnic affront.

562.    The City soon aligned itself with NEWRA, the powerful lobbying group representing a small fraction of North End residents that supported banning outdoor dining in the North End and was openly antagonistic to the restaurants.  NEWRA began applying political pressure on City Hall to ban outdoor dining in the North End.  From November 2022 through early February 2023, the City sent representatives to NEWRA's monthly meetings, exchanged e-mails and calls with its members, and hosted private meetings with NEWRA's leadership at City Hall.

563.    On January 12, 2023, NEWRA held its monthly meeting, which was devoted to opposing outdoor dining.  The future of outdoor dining in the North End was the main issue on the City's outdoor dining program agenda at that time.  The City needed to discuss this vital issue in a public forum where all stakeholders would have a fair opportunity to be heard.  Instead, it opted to

send a legion of its key decision-makers associated with the outdoor dining program to NEWRA's meeting.  The City abdicated its responsibility to organize and conduct a properly noticed public meeting on the issue and delegated that task to a private, partisan advocacy group with a known anti-outdoor dining agenda.

564.    The meeting was a one-sided gathering of a small group that was "non-representative" of the North End, according to a resident in attendance who covers North End news and events. NEWRA did not allow any debate from those who disagreed with them.  The resident concluded it was "unfortunate that the City took what they heard there as a representative voice" because the meeting bore little resemblance to an intelligent discussion of the issues surrounding outdoor dining. This account was echoed by another lifelong North End resident who also attended. In a follow up e-mail to the City, she wrote that much of the opposition to outdoor dining in the North End was generated by "a small group of residents that will always be against it [outdoor dining] and some for personal reasons against a restaurant owner."

565.    In the days following the meeting, City officials continued to accommodate NEWRA by holding private phone calls with its members and even hosting private meetings with them, all outside the public's eye and without the public's knowledge.  Conversely, the City had limited contact with the North End restaurant owners and made little effort to ensure that its dealings with NEWRA and the North End restaurants were on a level playing field.

566.    But high-level private communications between the City and NEWRA about a ban continued until three days before the City announced the ban.  On January 25, 2023, just two weeks after NEWRA's meeting on January 12, NEWRA's President sent an e-mail to high-level City officials to request them to attend yet another meeting with NEWRA's Executive Committee.  This time, NEWRA's President raised questions about legal and regulatory requirements related to alcohol, fire safety, and misuse of public property if the City permitted outdoor dining to continue as follows:

From: Cheryl <cdelgreco@comcast.net>
Sent: Wednesday, January 25, 2023 9:59 AM EST
To: Segun Idowu <segun.idowu@boston.gov>
CC: Ciara D'Amico <ciara.damico@boston.gov>; John Romano <john.romano@boston.gov>; Kristen Shelley
<kristen.shelley@boston.gov>
Subject: Re: Outdoor Dining Meeting with Restaurants Jan 19
Attachment(s): "Jan 12 NEWRA NEWNC Outdoor Dining.pdf","ATT00002.bin"

Good morning,

I write to request a meeting with members of the NEWRA Executive Committee and other North End residents to discuss
further our concerns about continuing an outdoor dining program in the North End - most notably:
- Legal and regulatory requirements and approvals related to alcohol licensing, use of public property, fire safety, etc.
- Fire safety review that ensures outdoor dining patios, increased number of tables and diners outside, sidewalk congestion,
and traffic do not compromise the BFD's ability to respond to a fire or call for medical assistance - or people's ability to
escape a fire.
- How will the City mitigate the numerous neighborhood impacts raised by the community to you at the January 12, 2023,
NEWRA meeting? (See attached list of impacts.)
- How will the City mitigate the inequity created by greatly increasing visitor presence, dining capacity, alcohol service, and
associated revenue for North End businesses to the detriment of the business communities in other neighborhoods?

Please advise of some dates and times for a meeting and I'll work to coordinate.

Cheryl

567.    Significantly, NEWRA's President also played the "*equity*" card, as it was well known
that "*equity*" was the centerpiece of the Mayor's political campaign and platform.  She questioned how
the City planned to correct the "*inequity*" caused by the North End restaurants' success to the
"*detriment*" of other neighborhoods:

> How will the City mitigate the *inequity* created by greatly increasing visitor presence,
> dining capacity, alcohol service, and associated revenue for North End businesses to
> the detriment of the business communities in other neighborhoods?

On information and belief, in light of NEWRA's countless communications with the City advocating
a ban and the context of this e-mail, the message intimated that a ban was necessary to redistribute
the "associated revenue for North End businesses" to "business communities in other
neighborhoods."

568.    The City understood that the consequences of a ban would be monumental for the
North End restaurants and had already threatened to ban outdoor dining in the North End on March
25, 2022.  A ban meant that patrons who preferred outdoor dining would likely be re-channeled to
restaurants in other neighborhoods that offered outdoor dining, such as those in Back Bay, the
Seaport, Downtown Boston, and other nearby areas.  A ban would penalize the North End restaurants

due to their success and have an anticompetitive impact. The City further knew that imposing a ban on the North End would dramatically alter fair, free-market competition in Boston's restaurant market and have a devastating financial impact on the North End Italian restaurants.

569. The City, however, remained tight-lipped with the North End restaurant owners about a potential ban.

570. On February 9, 2023, the City began planning to announce the ban to North End residents on February 16, 2023. On February 13, 2023, knowing the public announcement of the ban was imminent, the City arranged a private meeting with a team of seven or more NEWRA leaders at City Hall, offering to personally meet them at the elevator and escort them to the meeting.

571. The City decided to publicly announce the ban at an in-person public meeting at Saint Joseph's Hall in the North End while simultaneously disseminating a press release announcing the citywide program and the North End ban. On February 14, 2023, the City finally circulated a public notice about an informational North End meeting on outdoor dining on February 16, 2023, at Saint Joseph's Hall. The notice said the meeting was to "provide an update to the neighborhood" on the outdoor dining program. It made no mention of the ban.

572. As planned, the meeting was held at St. Joseph's Hall on February 16 with armed Boston Police officers lining the back of the church hall, as shown in the photograph below:



573.     The North End Italian restaurant owners were thunderstruck and outraged when the City announced the ban at the meeting.  The meeting was a sham as far as providing a mere "update" on the program.  As a final insult, as planned, while the meeting was in progress, the City issued a press release announcing that it would conduct a robust Permanent Outdoor Dining Program for every neighborhood in Boston except the North End.  As to the North End, the Press Release stated, "The City will not be permitting on-street dining in the North End this year."

574.     The Press Release stated three purported reasons for the ban.  As was the case with Mayor Wu's ostensible justifications for the imposition of the harsh fees in 2022, all three of the City's reasons were pretextual.  They either lacked factual support, were erroneous, or did not provide an objectively valid basis for the more stringent requirements.

575.     The City later enforced the ban when it denied Monica's, Inc.'s 2023 application for on-street dining simply because the restaurant is located in the North End.

576.     The City fulfilled its prior retaliatory threat to end outdoor dining in the North End. The City's ban was a product of the City's yearlong bias, hostility, and ill will towards the North End restaurants and the plaintiffs, some of which were parties to a federal lawsuit against the Mayor.  The ban was discriminatory because it treated the North End restaurants differently than similarly situated restaurants in other parts of Boston and because it targeted an ethnic group, Italian Americans, for disparate treatment that was not keyed to a legitimate state interest.

577.     The ban further was at odds with the Policy of Boston's "Human Rights" ordinance, which states, "It is the policy of the City of Boston to assure that every resident shall have equal access to and benefit from all public services."[23]  The Policy further declares that "behavior which denies equal treatment to any of our citizens as a result of their … race, color …national origin …deprives persons of the benefits of a free and open society."  Finally, the Policy asserts that "it is the intention

---

[23] City of Boston Municipal Code §§ 12-9 (Human Rights).

of this ordinance that all persons be treated fairly and equally and it is the expressed intent of this ordinance [sic] guarantee to all of our citizens fair and equal treatment under law."

578.    The process by which the City made its decision was highly irregular, unfair and the product of political favoritism.  Although the North End Italian restaurants, including the plaintiffs, participated in City's outdoor dining programs in 2020, 2021, and 2022, the City gave no advance notice to the plaintiffs that it was investigating or even contemplating the ban.  Despite the seriousness of a potential ban, the City did not organize or hold a single public meeting to collect comments or opinions on the ban.  The City afforded no process or opportunity by which the North End restaurant owners could present evidence and advance arguments in support of their position.  And the City provided no process to appeal or challenge the imposition of the ban.

579.    One the other hand, the City provided biased and favored treatment to NEWRA, which long supported a North End ban.  It maintained continuous communication with NEWRA's leadership, engaging in behind-closed-doors and back-channel decision making with NEWRA.  In addition, the City provided the public with inaccurate and misleading information as to why it imposed the ban.

580.    By imposing the ban, high-level City officials misused governmental power to punish and oppress the North End restaurants, which had publicly disagreed with City Hall's outdoor dining policies, sought public support for their position, and exercised their First Amendment rights to seek legal recourse against the City.  The ban was an arbitrary and retaliatory act that was not keyed to any legitimate state interest.

581.    The City's collective actions in 2022 and 2023 amounted to a devastating "systematic denial of any pre-deprivation process at all," thereby running afoul of the plaintiffs' substantive due process rights.

582.     The plaintiffs have suffered harm as a direct and proximate result of the City's actions, including (1) loss of goodwill; (2) monetary losses in 2022 due to the payment of unlawful fees; (3) loss of profits and incidental damages as a result of being excluded from the on-street outdoor dining program in 2023, including ongoing storage costs and expenses.

## COUNT V

**Declaratory Judgment under 28 U.S.C. §§ 2201 and 2202:**
**Boston's Outdoor Dining Program's Policies as Arbitrary, Capricious and Contrary to Law**

583.     The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-582.

584.     Under 28 U.S.C. §§ 2201 and 2202, the Court may issue a declaratory judgment in any case of actual controversy within its jurisdiction.

585.     There is an actual, substantial, and continuing justiciable controversy between the plaintiffs and the City regarding the City's 2022 and 2023 outdoor dining programs and policies related to those programs.

586.     There also is an actual, substantial, and continuing justiciable controversy between plaintiff Monica's, Inc. and the City regarding the City's summary refusal to consider and denial of Monica's, Inc.'s application for an on-street outdoor dining license for the City's 2023 outdoor dining program.

### The 2022 North End Plan

587.     As alleged in Counts I, II, III, IV, and VI, the City's decisions, policies, and practices imposing onerous fees and restrictions only on the North End Italian restaurants in 2022 were arbitrary, capricious, and contrary to law because they (1) lacked any rational explanation that reasonable people might support; (2) were based on factual inaccuracies; and (3) were based on pretextual reasons; (4) were imposed to promote the City's political agenda unrelated to outdoor dining; (5) violated the plaintiffs' Equal Protection rights under the Fourteenth Amendment of the

U.S. Constitution; (6) violated the plaintiffs' Procedural Due Process rights under the Fourteenth Amendment of the U.S. Constitution; (7) violated the plaintiffs' Substantive Due Process rights under the Fourteenth Amendment of the U.S. Constitution; (8) constituted the assessment of an unlawful tax as alleged in Count VI; and (9) conflicted with the City's own anti-discrimination policies, practices, and ordinances.[24]

## The 2023 North End Ban

588.    As alleged in Counts I, II, III, and IV, the City's decisions, policies, and practices imposing a ban only the North End restaurants from participating in the City's 2023 outdoor dining program were arbitrary, capricious, and contrary to law because they (1) lacked any rational explanation that reasonable people might support; (2) were based on factual inaccuracies; and (3) were based on pretextual reasons; (4) were imposed to promote the City's political agenda unrelated to outdoor dining; (5) violated the plaintiffs' Equal Protection rights under the Fourteenth Amendment of the U.S. Constitution; (6) violated the plaintiffs' Procedural Due Process rights under the Fourteenth Amendment of the U.S. Constitution; (7) violated the plaintiffs' Substantive Due Process rights under the Fourteenth Amendment of the U.S. Constitution; and (8) conflicted with the City's own anti-discrimination policies, practices, and ordinances.

## Denial of Monica's, Inc.'s Application for Outdoor Dining in 2023

589.    The City maintains a website that provides information on the Outdoor Dining Program.  The City's website includes a link to a 21-page presentation on "How to Submit an Outdoor Dining Application" with instructions on submitting applications. The application process is electronic, in which documents and other information are uploaded into an "Application Portal."

---

[24] City of Boston Municipal Code §§ 12-9 (Human Rights), 15-10 (The Boston Fair Chance Act); Executive Order October 2000, City of Boston, "Policy/Investigation on Discrimination, Sexual & Other Forms of Harassment and Retaliation."

590.     As alleged in Paragraphs 348 to 350, on June 28, 2023, plaintiff Monica's, Inc., which operates an Italian restaurant in the North End, filed an application for an on-street outdoor dining license in accordance with the instructions, using the Application Portal, and paid the associated filing fee.  The application included supplementary materials identified in the instructions that the City required, including a site plan and letter from a Professional Engineer.  The City electronically acknowledged receipt of the complete application.

591.     Less than two weeks after its submission, the City rejected Monica's, Inc.'s application. In its rejection, the City stated that it "will not be reviewing or permitting on-street outdoor dining applications in the North End for the 2023 outdoor dining season."  The City's only reason for the refusing to consider the application and denying the application was that Monica's, Inc. is located in the North End.  The City provided no reason for its denial that was otherwise unique to Monica's, Inc. or its application for an on-street outdoor dining license.

592.     Under Governor Baker's orders related to COVID-19, as extended through April 1, 2024, the City was authorized to implement a process to approve requests for outdoor dining.  There is no language in these orders or their extensions that authorized the City to exclude restaurants in any geographic section of a city or town from the authorized process.  The City committed errors with respect to the application of Monica's, Inc.

593.     The City's refusal to review the application and its summary denial of the application of Monica's, Inc. is contrary to law, is not supported by substantial evidence, is arbitrary and capricious, and exceeded the City's authority.  It also constituted a violation of Monica's, Inc.'s Equal Protection rights under the Fourteenth Amendment to the U.S. Constitution and its Substantive and Procedural Due Process rights under the Fourteenth Amendment to the U.S. Constitution.

594.    Monica's, Inc. has suffered substantial injury and injustice arising from the City's refusal to review and approve the application of Monica's, Inc. for an on-street outdoor dining license for the 2023 season.

## Other Similarly Situated Plaintiffs

595.    Like Monica's, Inc., the other plaintiffs operate Italian restaurants in the North End. It would have been futile for any of the other plaintiffs that operate Italian restaurants in the North End to submit individual applications for an on-street outdoor dining license for the 2023 season because the City refused to review and summarily denial Monica's, Inc.'s application based solely on its location in the North End.

596.    It is inevitable that the City would have refused to review and would have summarily denied an application for an on-street outdoor dining license for the 2023 season from every other plaintiff because they all operate Italian restaurants located in the North End.

597.    The City's refusal to review applications for on-street outdoor dining licenses from Italian restaurants in the North End from the outset (1) prevented the creation of a factual record of the City's decision-making and (2) prevented other plaintiffs that operate restaurants in the North End of Boston from pursuing an administrative process.

598.    It is inevitable that judicial intervention would be necessary for the other plaintiffs that operate Italian restaurants in the North End to obtain relief.

599.    The City's blanket refusal to review and approve any application for an on-street outdoor dining license for restaurants in the North End is contrary to law, is not supported by substantial evidence, is arbitrary and capricious, and exceeds the City's authority.  It also violates all plaintiffs' Equal Protection rights under the Fourteenth Amendment to the U.S. Constitution and all plaintiffs' Substantive and Procedural Due Process rights under the Fourteenth Amendment to the U.S. Constitution.

600.    There exists an actual, substantial, and continuing justiciable controversy between plaintiffs and the City as to the legality of the City's blanket refusal to review and approve any application for an on-street outdoor dining license for Italian restaurants in the North End for the 2023 season.

601.    Monica's, Inc. is entitled to a declaration that the City's refusal to review and approve its application for an on-street outdoor dining license in 2023 was arbitrary, capricious, and contrary to law.

602.    The other plaintiffs also are entitled to a declaration that the City's blanket refusal to review and approve any application for an on-street outdoor dining license for restaurants in the North End for the 2023 season was arbitrary, capricious, and contrary to law.

## COUNT VI

### Declaratory Judgment under 28 U.S.C. §§ 2201 and 2202:
### The City's Unlawful Tax

603.    The plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-602.

604.    On March 18, 2022, the City announced its requirements for restaurants in the North End to participate in the City's 2022 Outdoor Dining Program.

605.    The City imposed a requirement that all North End restaurants must pay a $7,500 fee to participate in the program and additional $480 monthly parking fees for each on-street parking space that the establishment used for a dining area.  The City singled out North End restaurants and did not assess these fees against restaurants and cafés located outside of the North End.  Rather, restaurants outside the North End all participated in the program for *free* and were not required to pay for on-street parking spaces used by their outdoor cafés.

606.    When the City developed a "special plan" for outdoor dining for North End Italian restaurants in late 2021 and early 2022, it determined that they would pay an "Impact Fee" to address

the alleged impacts of the program on the North End neighborhood.  It was initially called an "Impact Fee" because the funds were to be used (1) to fund enhanced city services to improve the outdoor dining program, and (2) to create a North End Community Benefit Fund to improve the quality of life for residents during the outdoor dining season.  Later, the City re-labeled the "Impact Fee" as a "Permit Fee" due to concerns about the name in the event of a legal challenge.

607.    Most of the so-called "enhanced" city services were traditional, standard services that the City had provided to all neighborhoods for many years *before* there even was outdoor dining.  They included street cleaning, sidewalk cleaning, rodent control, trash pickup, painting of streetlight poles, placing of banners on streetlight poles, and painting of road lane markers.  In addition, Mayor Wu admitted that there are ***"needs all across our City"*** pertaining to rodent control, clean streets, trash pickup, and pedestrian safety, and no one from the City ascribed blame for these problems to the restaurant owners or even to outdoor dining.  None of these services were unique to outdoor dining or for the benefit of the North End's restaurants.

608.    The other purported "enhanced" services consisted largely of "overtime" payment of City personnel for enforcement for licensing compliance and parking.  Such regulatory enforcement services also were uniformly provided for *free* to *all* City neighborhoods where restaurants participated in outdoor dining.  The "enhanced" city services provided no particular or unique benefit to the North End Italian restaurant owners.

609.    As to the North End Community Benefit Fund, members of the North End community were supposed to provide input on how the funds would be used.  Members of the community had suggested that funds could be used to pay for sundry matters ranging from aquarium access, holiday and festival lights, athletic equipment for the Langone/Puopolo Park, Spirit of Boston cruises for Seniors, lessons for children at the North End Music and Performing Arts Center, an arts and crafts program, and various special event functions.

610.     City records indicate that none of the revenue from the fees were used by the North End Community Benefit Fund for any of these purposes.  This caused both the media and residents to question how the City had used the funds it obtained from the Impact Fee.

611.     City records, however, show that the City quietly used thousands of dollars from the fees to buy an electric street sweeper as part of the Mayor's Green New Deal for Boston.  The cost of vehicle was $552,000—more than twice the cost of all other expenses for the 2022 North End outdoor dining program.  The City bought the electric street sweeper in the summer of 2022.  It has used the electric street sweeper to clean the streets in all Boston neighborhoods, not just the North End, as alleged in Paragraphs 216 to 236 and shown by Exhibits 8, 9 and 10.

612.     The City's accounting spreadsheets reveal that an indeterminate amount of the fees was used to buy the electric street sweeper.  As shown on Exhibit 5 and alleged in Paragraphs 216 to 224, the financial documents state the City's projected revenue from the fees for the program was $450,000. The program's total expenses— "minus the sweeper"—was just $242,356.  If the projected revenue was collected, the City would have had approximately $208,000 over the actual expenses to fund the North End Community Benefit Fund or return to the restaurants.

613.     As noted in Paragraph 243, the City currently has reported publicly that it collected at least $300,000 from the fees but has failed to provide current information regarding its use of the funds.

614.     As shown by Exhibit 5, 6 and 7 and alleged in Paragraphs 228 to 232, the City expensed the entire cost of a new electric street sweeper—$552,000—to the 2022 North End outdoor dining program.  City records show no funds were allocated to the North End Community Benefit Fund or returned to the North End restaurants.  Rather, they indicate that all projected revenue was allocated to payment of the Total Expenses, which included the cost of the electric street sweeper.

615.    The City had no need or possible justification for purchasing a brand-new electric street sweeper as an expense of outdoor dining in the North End, as set forth in Paragraphs 217, and 233 to 235.  In fact, as alleged in Paragraph 236, the City touted its purchase as proof of its efforts to electrify the City's vehicle fleet, which was a high priority, climate justice agenda item of the City's Green New Deal.

616.    In addition, as alleged in Paragraphs 239 to 251, some residents questioned whether the City actually spent the funds to provide the so-called enhanced services to the North End.  For example, residents complained about the lack of a Boston Police detail on Hanover Street and the City's failure to provide hokeys to clean the streets.  Another complained about graffiti, traffic, and the lack of trash bins.

617.    The plaintiffs also did not voluntarily pay the fees.  Many paid the fees "under protest." Several other plaintiffs went even further, filing a federal lawsuit challenging the lawfulness of the City's imposition of the fees.

618.    In addition, the City's imposition of the fees was highly coercive.  The City permitted all other restaurants to participate in its 2022 outdoor dining program for free.  Had the plaintiffs and other North End restaurants refused to pay the participation and parking fees, they would have been barred from the outdoor dining program. This, in turn, would have immediately placed them at a competitive disadvantage as to all other participating restaurants outside the North End as well as those restaurants in the North End that paid the fees.

619.    Finally, the City collected the fees to raise revenue.  It used the funds to pay for standard services that the City had long provided to the North End and other neighborhoods in the City well before outdoor dining even existed in Boston.  The City also collected the fees to pay for the electric street sweeper, which was part of the Mayor's Green New Deal and was unrelated to outdoor dining in the North End.

620.     Internal comments from one City official further indicate that even he thought the $7,500 fee was questionable.  According to one City licensing expert:

> I'm a little curious about [sic] $7,500 fee, how they come to that.  what is the basis for that?  In 2020-21, the fees are waived.  The sidewalk café fee is calculated by PWD for sidewalk occupancy without calculating the lost parking meter revenues.

These statements suggest the City had no understanding as to how that amount was calculated, such as correlating it to actual costs for services and showing how it would defray expenses.

621.     Another City official raised the prospect of depositing the funds from the fees in the City's general fund, to be allocated an undefined future time based on the vote of a neighborhood advisory group.

622.     The City's uncertainty about the amount of the fees indicates they were arbitrary and unconnected to the cost of specific government services.  The City's plan to deposit the funds into a general account is a strong indicator that the payment was meant to raise revenue.

623.     The fees the City required the plaintiffs to pay were unrelated to the costs that the City incurred in connection with outdoor dining in the North End in 2022.  As such, the fees were arbitrary, capricious, and constituted an unlawful tax.

624.     There exists an actual, substantial, and continuing justiciable controversy between the plaintiffs and the City as to the legality of the fees.  The plaintiffs seek a declaration that the fees they paid to the City as a requirement to participate in the 2022 outdoor dining program constitute an unlawful exaction and the City must return all fee payments to the plaintiffs and other North End restaurants.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request the following relief:

1.     An award of damages to the plaintiffs equal to their losses sustained due to the imposition of the fees to operate outdoor dining in the North End in 2022 including, without

limitation, mitigation fees and fees to provide alternative parking and lost profits due to an abbreviated outdoor dining season;

2.     An award of damages to the plaintiffs equal to their losses sustained due to the imposition of the ban on outdoor dining in the North End for the 2023 season including, without limitation, losses due to the reduction in the number of patrons at plaintiffs' restaurants and continued payment of storage fees;

3.     A preliminary and permanent injunction requiring the City, its officials, agents, and employees to accept future outdoor dining applications from North End restaurants and process them in the same manner as other applications submitted by restaurants in other areas of the City;

4.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the City's imposition of the fees to operate outdoor dining in the North End in 2022 including, without limitation, mitigation fees and fees to provide alternative parking was arbitrary, capricious, and contrary to law;

5.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the City's imposition of a ban on outdoor dining in the North End in 2023 was arbitrary, capricious, and contrary to law;

6.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the City of Boston's blanket refusal to review and approve any application for an on-street outdoor dining license for restaurants in the North End for the 2023 season was arbitrary, capricious, and contrary to law;

7.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the City of Boston must promptly process and approve plaintiffs' future complete applications for outdoor dining;

8.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the City of Boston unlawfully imposed an illegal exaction and must return the payments that the plaintiffs made to it in connection with outdoor dining in the North End in 2022;

9.     An award to the plaintiffs of their attorneys' fees, costs and expenses under 42 U.S.C. § 1988, and any other applicable laws; and

10.     An award of such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the plaintiffs demand a trial by jury on all issues so triable.

DATED: January 4, 2024                          Respectfully submitted,

*/s/ Thomas C. Frongillo*
Thomas C. Frongillo (BBO No. 180690)
CAMPBELL CONROY & O'NEIL, P.C.
20 City Square, Suite 300
Boston, MA  02129-3733
(617) 241-3000
tfrongillo@campbell-trial-lawyers.com

/s/ *James J. Cipoletta*
James J. Cipoletta (BBO No. 084260)
207 Hagman Road - Suite 200
Winthrop, Massachusetts 02152
Telephone (781) 289-7777
jim@cipoletta.com

*/s/ Kieran G. Alteiri*
Kieran G. Altieri (BBO No. 690310)
ALTIERI & FIRRIOLO, PLLC
271 Derry Road – Suite 1
Litchfield, N.H. 03052
(603) 413-5285
kaltieri@altierilaw.net

*Attorneys for Plaintiffs*