UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:24-CV-10039-LTS

NORTH END CHAMBER OF COMMERCE, *et al.*,

                Plaintiffs,

v.

CITY OF BOSTON,

                Defendant.

**DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

The City of Boston (the "City") submits this reply brief in support of its Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiffs' (the "Restaurants'") Second Amended Complaint ("SAC") states no valid legal claims.[1]

**I. The Restaurants Failed to Plead Adequate Facts to Support an Equal Protection Claim Under Any Theory.**

**A. The Restaurants Have Not Pleaded Facts to Support an Equal Protection Claim Under a "Class of One" or "Selective Treatment" Theory.**

To plead a "class of one" claim, a plaintiff must show she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).[2] Likewise, "selective treatment" requires that a plaintiff show that she is similarly situated and that her treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen of Town of Randolph, 932 F.2d 89, 92 (1st Cir. 1991) (citations omitted). The City addresses each element sequentially here.

*1. The Restaurants Are Not Similarly Situated to Others.*

A plaintiff must show that they are similarly situated in "*all* respects relevant to the challenged government action." Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 130-31 (1st Cir. 2023) (emphasis added).

As a threshold issue, the Restaurants undermine their "class of one" claim by pleading membership in multiple classes. See, e.g., SAC ¶¶ 428-39.[3] A "class of one" claim is premised

---

[1] For the sake of brevity, the City does not address the issue of associational standing or the declaratory judgment count in this reply. The City stands on the arguments made in its Memorandum in Support of the Motion to Dismiss.
[2] The First Circuit is undecided as to whether malice is required for a "class of one" claim. Middleborough Veterans' Outreach Ctr., Inc. v. Provencher, 502 F. App'x 8, 10 n.3 (1st Cir. 2013). As noted below, the Restaurants did not adequately plead a "class of one" claim, with or without malice as a required element.
[3] In the SAC, the Restaurants identify the relevant class in multiple ways, including "North End Restaurants," ¶ 437, "North End Italian Restaurants," ¶ 535, and "Italian-American Restaurants," ¶ 41. Then in their Opposition, they

on the fact that there is different treatment for individuals who do not claim membership in a class. See Olech, 528 U.S. at 564; see also Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 144 (1st Cir. 2016) (a "class of one" means "aggrieved parties were singled out for reasons unique to them, not because of their membership in a particular group").

Indeed, a "class of one," is, by definition, not a "class of many." Cordi-Allen v. Conlon, 494 F.3d 245, 254 (1st Cir. 2007). This Court has found where "similar enforcement" takes place, a "class of one" claim cannot be sustained. See, e.g., Sec. & Exch. Comm'n v. Navellier & Assocs., Inc., No. 17-CV-11633, 2020 WL 731611, at *5 (D. Mass. Feb. 13, 2020) (Casper, J.). Here, the City's policies addressed the North End as a geographic area and were consistent for all restaurants in that neighborhood, not just the "class of 21." See, e.g., SAC ¶¶ 433, 536. Consistency "undercuts an inference of differential treatment." See Back Beach, 63 F.4th at 130 n.3.

Finally, the Restaurants are not similarly situated to restaurants located in other neighborhoods in all aspects relevant to the City's policies. The North End has many unique features, like the Commonwealth's highest density of restaurants (95 in a third of a square mile), SAC Ex. 4, ¶ 334, the highest number of restaurants participating in outdoor dining, SAC Ex. 4, and 11,000 residents in such a limited space. SAC ¶ 85. These characteristics make the neighborhood distinct. See Cordi-Allen, 494 F.3d at 252.

2. *The Restaurants Have Neither Shown that the City Acted with Malice, Nor that the City Used Its Policies to Punish the Restaurants from Exercising Their Constitutional Rights.*

The Restaurants fail to plausibly allege an equal protection claim based on malice or bad faith. Such a standard must be "scrupulously met." Yerardi's, 932 F.2d at 94. These cases are "infrequent." See id.; see also Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995).

---

identify themselves in several additional ways, including as a "class of 21," Opposition ("Opp.") 1 n. 1, or "white, Italian American restaurant owners," Opp. 23 n. 15 (notably, the "owners" are not plaintiffs in this action).

2

First, the Restaurants recount nearly every event related to outdoor dining with conclusory language in an attempt to support their claims of bad faith. The Restaurants "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992). This type of language should not be credited by the Court. Id.

Second, the SAC does not show that the City undertook a "malicious orchestrated campaign" against the Restaurants. See Rubinovitz, 60 F.3d at 912. Such a claim requires more than assumptions about intent and innuendo. See, e.g., Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48, 69-71 (D. Mass. 2013) (finding malice where the defendants publicly and falsely disparaged the project, impaired the ability to secure financing, and prevented the plaintiffs' access to water). For example, in Mimeault v. Peabody, the court found there was no bad faith where the plaintiffs submitted a self-serving affidavit and no evidence of "specific statements or actions by the [board] against them." No. 08-CV-11909, 2010 WL 2724002, at *7 (D. Mass. July 8, 2010) (Hillman, J.). The Restaurants attempt to show malice merely by drawing "inferences" from the Mayor's proclamation regarding Indigenous Peoples' Day, the "Electeds of Color" Holiday Party, or the Mayor's speech at the 2022 St. Patrick's Day breakfast. These events do not show any malice and bear no relationship with the City's outdoor dining policies; they do not come close to meeting the threshold of direct, arbitrary action seen in Brockton Power, Rubinovitz, Tapalian, and SBT Holdings.[4] There is ample evidence in the SAC that the City enacted its policies to address the congestion, sanitation, accessibility, and public

---

[4] The cases cited by the Restaurants all underscore the high standard for malice. See Tapalian v. Tusino, 377 F.3d 1 (1st Cir. 2000) (finding the record "laden with the language of personal malice and 'bad faith' retaliation," including a demand from an official for "a forty-foot boat and two girls"); SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28 (1st Cir. 2008) (finding specific targeting where an official wrote, "[w]e've heard that [the owner] is financially insolvent and no longer connected to the project, which is why we started this process in the first place!"); Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000) (summarizing Rubinovitz as involving an official's "vendetta," "enlisting other government officials from various departments to cut off the landlord's gas, water, and sewage services, to charge the landlord with building code violations, and to frustrate relations with a contractor.").

safety issues exacerbated by on-street dining in the North End. See, e.g., SAC ¶¶ 199, 309, 339, 371, 412.[5]

Furthermore, the Restaurants do not adequately plead that the City's policies were based on an intent to punish an exercise of constitutional rights. The Restaurants must put forth "some proof" of the City's intent to effectively allege this claim. See Rubinovitz, 60 F.3d at 911. However, as in Rubinovitz, the Restaurants have done nothing more than enumerate events in the case and then added conclusory allegations. Id.

3. *The City's Outdoor Dining Policies Were Rationally Related to the Legitimate Interest of Protecting the Quality of Life in the North End.*

The Restaurants' rational basis arguments fail on multiple levels. Above all, they ignore the legal standard: the City's actions must be upheld "so long as *any* set of facts could suffice to establish a rational relationship between the law and the government's legitimate objectives." Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 978 (1st Cir. 1989) (emphasis in original).

The City's policies were regulations that reflected the existing conditions of the North End and the reasonably anticipated impacts of outdoor dining. As the Restaurants state, when the policies were enacted, "the North End struggled with trash proliferation, rampant rodents, loud noise, heavy traffic, sidewalks in disrepair, limited parking, crosswalks and street markings in need of painting, and related health and public safety issues." Opp. 17. It is irrelevant that outdoor dining was not the sole cause of these problems. The North End is also unique among Boston's neighborhoods in its characteristics, as noted in Section I(A)(1). Particularly when considered in the context of the North End's unique features, outdoor dining was reasonably expected to exacerbate the above issues, and the City's policies sought to address that reality.

---

[5] The Restaurants ignore Yerardi's main tenet: "different treatment does not itself prove bad faith intent to injure." 932 F.2d at 92.

4

The Restaurants ignore these rational bases for the City's policies, instead arguing that the City's policies could not have been rational because they were, allegedly, flawed in some way. Such empirical arguments again ignore the relevant legal standard. See F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 307 (1993) ("Legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); see also Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003). The City's policies have numerous justifications that were both intuitive and articulated at the time. The Restaurants cannot avoid this reality by making empirical arguments or conclusory inferences of alternative motivations.[6] Furthermore, the Restaurants' only argument for which they cite *any* legal precedent is that the City's policies were motivated by malice, so they could not have been rational. Opp. 16-17. The claims of malice are unsupported as discussed in Section I(A)(2).

### B. The Restaurants Failed to Plead Facts to Show That They Are Entitled to Heightened Scrutiny.

In order to be subject to heightened scrutiny, the City must have grouped individuals based on a suspect classification. See, e.g., Romer v. Evans, 517 U.S. 620, 631 (1996). Here, the Restaurants pleaded no facts to show that they are members of a suspect class based on race, alienage, or national origin. "Bald assertions," like the City targeted businesses having an Italian ethnicity, are not sufficient. See, e.g., Coyne, 972 F.2d at 444. Moreover, the inconsistency with which the Restaurants have alleged their class undercuts their claim of entitlement to heightened scrutiny, as it is unclear whom the City has allegedly targeted. See, e.g., SAC ¶¶ 525-532; see also Opp. 23 n. 15. Similarly, as a suspect class is discrete and insular, see, e.g., Massachusetts

---

[6] For example, the Restaurants say that the policy distinction between the North End and other neighborhoods "[i]n and of itself . . . create an inference that the City's plan was motivated by spite and ill-will." Opp. 6. If this logic were true, any government policy or decision that affected individuals or entities differently–as most government policies do–could be challenged based on a claimed "inference" of malice.

5

Bd. of Ret. v. Murgia, 427 U.S. 307, 313 (1976), multiple entities should not be able to move in and out of the class as the Restaurants are able to do here.

Furthermore, the Restaurants acknowledge: "the policies do not reference ethnicity or race." Opp. 23. Rather, the City enacted its policies for a neighborhood based wholly on that neighborhood's unique features. An economic regulation for a neighborhood, even where the neighborhood has a predominant cultural identity, does not elevate the standard of review to strict scrutiny, and does not constitute discrimination. See, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 304 (1976) (upholding the regulation of street vendors in the French Quarter).[7]

In the alternative, the Restaurants attempt to plead a "disparate impact" claim, which requires a disparate impact on a suspect class and a discriminatory purpose behind the government action. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). As stated above, the Restaurants have not established that the corporate plaintiff entities are part of a suspect class based on race or national origin. Additionally, they have failed to demonstrate any discriminatory purpose, as discussed in Section I(A)(2) above.

**II. The Restaurants Have Not Plausibly Alleged Due Process Violations.**

**A. Neither the Text of the Statutes Passed by the Legislature Nor the "Mutual Understandings" of the Parties Created a Property Interest.**

The Restaurants first contend that they have a property interest in continued participation in the outdoor dining program based on the statutory and regulatory scheme created by the Commonwealth. Opp. 33-37. But the Restaurants fundamentally misunderstand the Governor's COVID-19 Orders and subsequent state laws, which created no property interest. These state authorities gave *municipalities* the discretion to license outdoor dining as they saw fit; they did

---

[7] While the cases cited by the Restaurants may have implicated equal protection concerns, none of the cases cited deal with an economic policy, and thus, are not analogous this case.

not give *restaurants* any specific rights or entitlements.[8] The Restaurants' analysis of the statutory text gives short shrift to the provisions stating that "a city or town *may* approve a request for expansion of outdoor table service," and that "a city, town or local licensing authority *may modify* the scope of the approval *as the city, town or local licensing authority deems proper and appropriate . . . .*" St. 2021, c. 20, § 19(b), (d) (emphasis added).

Second, the Restaurants now argue for the first time that they have a property interest in continued participation in the program that stems from "mutual, explicit understandings between the parties." Opp. 33. There were no such understandings. By setting an extended end date in 2022, the City made no representations or assurances about future years of outdoor dining. In fact, the 2022 program was a "pilot." E.g., SAC ¶¶ 139, 160. And City communications referring to North End restaurants planning to participate in the program as "licensees"[9] simply did not create a property interest in outdoor dining or imply that obtaining a license for on-street outdoor dining was not subject to City approval. Finally, the communications regarding the 2023 season (Opp. 38) or the North End Outdoor Dining Task Force (Opp. 39) expressed hope that the North End could be included in future years, but were not a "mutually explicit understanding[]," Perry v. Sindermann, 408 U.S. 593, 601 (1972), that the North End would be so included.

Separately, the Restaurants assert that the "importance of outdoor dining to the Plaintiffs provides an additional basis for their protected property interests." Opp. 37. But an expression of the importance of outdoor dining amounts to "an abstract need or desire" that, absent a legitimate

---

[8] The deficiencies in the Restaurants' legal theory are so glaring that at one point in the Opposition, they are obliged to characterize the property interest at stake as a "property interest[] in participating in the City's on-street outdoor dining program on equal terms with all other restaurants in the City from June of 2020 through April 1, 2024." Opp. 36. Here, the Restaurants all but concede that their due process arguments are in reality equal protection arguments shoehorned into a due process framework.

[9] In their Opposition, the Restaurants claim that the City sent communications in late 2022 and 2023 referring to prospective 2023 applicants as "licensees." Opp. 38. However, the only references to City communications mentioning "licensees" in the SAC concern communications sent in March 2022 regarding the 2022 outdoor dining program. See SAC ¶¶ 174, 176, 632. Similarly, the communication regarding the 2023 outdoor dining program cited in footnote 24 of the Opposition does not appear in the SAC.

7

claim of entitlement, is legally insufficient to create a property interest. See Board of Regents v. Roth, 408 U.S. 564, 577 (1972).[10]

B. **The City Did Not Violate the Restaurants' Procedural Due Process Rights Because the City's Rules Regarding On-Street Outdoor Dining Were Legislative Determinations Not Subject to the Requirements of Notice and a Hearing.**

While the Restaurants assert that their procedural due process rights were violated because they were deprived of a hearing, nowhere do they address the City's contention that the outdoor dining rules—which applied to a large group of businesses based on geography—were legislative determinations for which individual due process rights did not attach. See Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 445 (1915). Instead, the Restaurants solely highlight cases involving adjudicative decisions about individuals' rights. See Yerardi's Moody Street v. Board of Selectmen, 19 Mass. App. Ct. 296, 303–304 (1985) (hearing over liquor license "should tend toward the adjudicatory… because the object of the exercise is not to formulate a general rule of governance, but to reach a decision in a particular case"); see also MacLaurin v. City of Holyoke, 475 Mass. 231, 238 & n.19 (2016) (fire chief's investigation and written decisions were "quasi judicial proceedings"). Neither case is applicable here.

C. **The City's Outdoor Dining Policies Were Rational and Did Not "Shock the Conscience," as Required to Constitute a Substantive Due Process Violation.**

In addition to the Restaurants' lack of a property interest, their substantive due process claims fail because the City's actions were simply ordinary policymaking decisions. "[A]ny permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 33 (1st Cir. 2006).

---

[10] Citing a Ninth Circuit case, Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310 (9th Cir. 1989), the Restaurants also argue that the goodwill in their businesses is a protected property interest, and that they cannot be deprived of it without due process. Opp. 40. But the Restaurants' reliance on Soranno's is misplaced. In that case, county officials not only suspended the plaintiff's permits but also sent letters to its customers "informing them that [the permits] were suspended and that [the plaintiff] could not lawfully deliver gasoline while under suspension" and even threatening to revoke the customers' permits if the customers continued to receive gasoline from the plaintiff. Id. at 1313.

8

The Restaurants' citation to Brockton Power, 948 F. Supp. 2d 48, ignores that the allegations in that case were far more specific, egregious, and resistant to alternative (*i.e.*, non-malicious) interpretations than those made by the Restaurants. Brockton Power involved the plaintiffs' desired use of their own land and, as noted in Section I(A)(2), direct targeting of the plaintiffs' project.[11] Here, the Restaurants have no property interest in hosting outdoor dining on the public way and have made no specific factual allegations of government actions directly targeting them. Rather they resort to conclusory characterizations of an ordinary policymaking process that affected an entire neighborhood.

The Restaurants' substantive due process claims fall in the expansive category of local decisions that courts have found, "with a regularity bordering on the monotonous," do not implicate substantive due process. Pagán, 448 F.3d at 33.[12]

### III. The Fees Were Directly Related to the Anticipated and Actual Impacts of Outdoor Dining on the North End; They Did Not Constitute a Tax.

The Restaurants' argument that the fees constituted a tax makes three claims: that the fees were for "standard services" unrelated to outdoor dining; that other neighborhoods did not have to pay the fees; and that the fees were not voluntary. Opp. 46-48. Each of these arguments fails.

As to the first assertion, the services provided by the City, including the street sweeper, specifically dealt with the impacts of outdoor dining, such as increased challenges with vehicle

---

[11] The Restaurants also cite an unpublished case from the Southern District of Florida, Mad Room, LLC v. City of Miami, 2023 WL 8598151 (S.D. Fla. Dec. 12, 2023), but that case is not analogous to the present situation. Critically, like Brockton Power, it involved the plaintiffs' *own properties*. Id. at *2. Further, in Mad Room, the City's action "exempt[ed] every single similar business establishment in [the neighborhood]," such that the plaintiff was the only business affected. Id. at *5. And the municipality took specific enforcement actions that targeted the plaintiffs, such as "constant inspections" that "usually includ[ed] 10 or more officers wearing bulletproof vests and often fully armed." Id. at *1. This type of targeting is not alleged or supported in the SAC.

[12] An analogous case is Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990), which involved allegations that a discretionary government licensing process was motivated by "animosity" and as a "device" to force someone out of business, resulting in "loss of business and injury to professional reputation." Id. at 751. In Amsden, prior to litigation, a state board had even found that the decision in question was made with the desire to put a private party out of business. Id. Nonetheless, the court found that the conduct "was not so 'shocking or violative of universal standards of decency' as to transgress Amsden's federal constitutional rights." Id. at 757 (quoting Furtado v. Bishop, 604 F.2d 80, 95 (1st Cir. 1979)).

9

and pedestrian volume, sanitation, accessibility, and public safety. These issues were reasonably expected to be exacerbated by outdoor dining, particularly in the dense, heavily trafficked North End.[13] The impact fee was an attempt to address precisely these issues, which would enable the Restaurants to enjoy the particular benefit of additional revenues derived from outdoor dining.

As to the second assertion, this merely restates the Restaurants' Equal Protection claims. It does not relate to the question of whether the fees constituted a tax.

As to the third assertion, the SAC alleges: "whether a restaurant decided to participate in outdoor dining was purely a voluntary choice for each restaurant." ¶ 289. And in fact, many North End restaurants chose not to participate in outdoor dining each year. Opp. 24 n. 16 (citing SAC ¶ 575). The on-street outdoor dining program was, both in policy and in practice, voluntary.

### VI. The Complaint Must be Dismissed Under Rule 8.

The Restaurants' Opposition functionally concedes that the SAC violates Rule 8. The Restaurants say the "short and plain statement required by the rule" is satisfied by the SAC's 14-page, 51-paragraph introduction. Opp. 50. If this is true[14] then the SAC is 189 pages and 691 paragraphs too long. The Restaurants' claim that Rule 8 merely requires that a pleading "**contain** a short and plain statement," Opp. 50 (emphasis in original), is creative but incorrect. On that logic, a pleading could be thousands of pages, as long as there was a "short and plain statement" somewhere in it.

### VII.   Conclusion

For the foregoing reasons, the City of Boston respectfully requests that this Court grant its Motion to Dismiss all of the counts of the Second Amended Complaint with prejudice.

---

[13] The Restaurants' Opposition states as much, saying that North End residents complained there weren't *more* City services in the North End, including "Boston Police detail," "hokeys to clean the streets," and ways to handle "graffiti, traffic, and the lack of trash bins." Opp. 46-47.
[14] The City does not address here whether this is true, as a motion to further amend the SAC is not before the Court.

10

Date:   June 3, 2024	Respectfully submitted,

**DEFENDANT CITY OF BOSTON**

By its attorneys:

Adam Cederbaum
Corporation Counsel

*/s/ Samantha Fuchs*
Samantha H. Fuchs (BBO # 708216)
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
Samantha.Fuchs@boston.gov

Randall F. Maas (BBO # 684832)
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4042
randall.maas@boston.gov

Sam Dinning (BBO #704304)
Senior Assistant Corporation Counsel
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
samuel.dinning@boston.gov

## **CERTIFICATE OF SERVICE**

I, Samantha Fuchs, hereby certify that on June 3, 2024, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                         */s/ Samantha Fuchs*
                                         Samantha H. Fuchs