UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>NORTH END CHAMBER OF<br>COMMERCE et al.,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil No. 24-10039-LTS</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CITY OF BOSTON,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
</table>

ORDER ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 22)

December 20, 2024

SOROKIN, J.

The North End Chamber of Commerce and several restaurants in the North End ("Plaintiffs") filed this lawsuit against the City of Boston ("the City"), alleging violations of their rights under the United States Constitution and the laws of the Commonwealth of Massachusetts. The case arises out of the response to the COVID-19 pandemic, when the City exercised authority given to it (and all municipalities) by the Commonwealth to allow restaurants to serve customers on public streets. Disputes developed beginning with the 2022 season, when the City began curtailing on-street dining in the North End, initially imposing fees and eventually banning it altogether. The fees and termination of the program applied only to restaurants in the North End. According to the Plaintiffs, Mayor Michelle Wu explained that she pursued this course in light of the "unique" impact of on-street dining in the North End, including issues affecting the residents' quality of life and its proximity to two construction projects. The wisdom of such

decisions is fundamentally a policy judgment ordinarily entrusted to elected officials in our democratic society, not to federal judges.

Of course, elected officials do not possess unbridled authority when making such judgments. They are bound by and must operate within the limits established by the United States Constitution as well as federal and state laws. Here, the decisions of the Mayor fall squarely within those legal parameters for a number of reasons. First, the fees and eventual termination of on-street dining do not infringe upon an express or fundamental constitutional right, such as free speech or the free exercise of religion. Second, Plaintiffs have not stated a colorable claim that they were singled out based upon their race, ethnicity, or national origin. Numerous restaurants owned by people of all races, ethnicities, and nationalities (including white Italian Americans) were able to offer on-street dining under the City's policy. Finally, Plaintiffs have not plausibly pled that the North End is similarly situated to other neighborhoods where on-street dining was permitted. The City regulated on-street dining by neighborhood, just as it regulates many other matters by neighborhood, and Plaintiffs themselves emphasize the uniqueness of the North End. In any event, Plaintiffs have also failed to plausibly allege that the different on-street-dining policies in the North End lacked a rational basis or otherwise sprung from bad faith or a desire to punish the Plaintiffs.

Plaintiffs are understandably upset with the City's policy authorizing on-street dining in other neighborhoods while banning it in the North End. No doubt they disagree with the Mayor's evaluation of the various factors bearing on her decision and believe the City could reasonably and safely authorize on-street dining in the North End. Plaintiffs' unhappiness, however, cannot alone give rise to a cause of action against the City and unlock the doors of discovery in federal court. To accomplish that, Plaintiffs must state a claim that the City's policy

violates the law under the standards applicable to all plaintiffs in all civil cases. This they have not done. For these reasons, and as explained in detail below, the Court ALLOWS the Motion to Dismiss.

I.      BACKGROUND

The Court draws the following facts from the Second Amended Complaint ("SAC"), Doc. No. 21, and accepts them as true for purposes of resolving the Motion to Dismiss, Doc. No. 22. See Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). In response to the COVID-19 pandemic in 2020, the City implemented an outdoor-dining program, which authorized restaurants in designated areas of Boston to offer dining on public streets.[1] Doc. No. 21 ¶ 2. For the 2020 and 2021 outdoor-dining seasons, the City waived certain fees for this opportunity in the North End. Doc. No. 21 ¶ 191. In 2022, the City imposed an "impact fee" of $7,500 on participating North End restaurants and a monthly fee of $480 for each parking space used by the restaurants' outdoor patios.[2] Id. ¶ 12. The City did not charge an impact fee or a monthly parking fee on participating restaurants in any other neighborhood of Boston. Id. The impact fee would pay for:

> (1) increased enforcement of outdoor café compliance and parking, (2) Boston Transportation Department enforcement overtime, (3) Boston Police Department presence overtime, (4) initial licensing and ongoing site enforcement, (5) full-time and seasonal 'hokeys,'[3] (6) rat baiting, (7) power washing of sidewalks, (8) painting of streetlight poles, (9) placement of banners on streetlight poles; and (10) painting of street lane lines.

---

[1] Before the pandemic, the City permitted dining on public sidewalks. That program, which may have expanded somewhat during the pandemic, is not at issue here.

[2] The SAC also alleges that some North End restaurants qualified for hardship waivers, enabling them to pay a reduced fee, and that others could pay prorated fees based on the period of time they participated in outdoor dining that season. Doc. No. 21 ¶ 224.

[3] The SAC refers to the personnel from both the Department of Public Works and the Boston Police Department staffed by the City and stationed in the North End as "hokeys." Doc. No. 21 ¶ 129.

Id. ¶ 150.  The City also limited the outdoor-dining season in the North End to just five months, compared to the eight-to-nine months outside of the North End.  Id.  Mayor Wu justified the different treatment of North End restaurants because of the "unique impacts of outdoor dining on the quality of residential life," such as "trash, rodents, traffic, and parking problems."  Id. ¶ 22.

In response to this change in City policy, in 2022, four North End restaurant owners sued Mayor Wu in her official capacity, challenging the fees the City charged for on-street-dining licenses in the North End as unconstitutional and in violation of Massachusetts law.  See Mendoza v. Wu, No. 1:22-cv-10710, 2022 U.S. Dist. LEXIS 189785, at *1 (D. Mass. Oct. 18, 2022).  After the filing of two sets of motions to dismiss, an amended complaint, and several related pleadings, the plaintiffs in that action (by then including the restaurant owners as well as the restaurants themselves) moved to voluntarily dismiss the case without prejudice prior to any ruling by the Court.  First Mot. Dismiss Pls.' Cause Action Voluntarily Pursuant to Rule 41(a)(2) Without Prejudice, Mendoza v. Wu, No. 1:22-cv-10710 (D. Mass. May 31, 2023), ECF No. 36. Judge Talwani allowed the motion, rendering no ruling on the merits of the claims.

After the 2022 outdoor-dining season, the North End/Waterfront Residents Association ("NEWRA"), a community organization, lobbied against continuing outdoor dining for future seasons in the North End.  Doc. No. 21 ¶¶ 29, 31.  The City also assembled a "North End On-Street Outdoor Dining Task Force" to "determine how certain outdoor dining issues could be remedied in future iterations of the program."  Id. ¶ 44.  In 2023, the City banned on-street dining in the North End,[4] id. ¶ 29, "due to reasons including the North End's high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related

---

[4] The City did allow dining on other public property, chiefly in North End Park, for restaurants adjacent to the park, and continued to issue permits for sidewalk patios.

considerations," id. ¶ 412.  Specifically, "[w]ith about [ninety-five] restaurants in just over a third of a square mile, the North End has the densest per capita number of restaurants in the state."  Id. ¶ 334.  The City also said the "scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project [were] expected to put a greater strain on North End traffic [that] summer and make it harder for residents and first responders to navigate the area."  Id. ¶ 309.  The City did not ban on-street dining elsewhere.

Approximately six months after voluntary dismissal of the first lawsuit, and in light of the City's policy prohibiting on-street dining (but not sidewalk dining) in the North End, the North End Chamber of Commerce ("NECC"), joined by the four named restaurants in the prior suit, along with several others, filed this action.  Doc. No. 1.  Plaintiffs argue that treating restaurants in the North End differently than restaurants in other areas of the City evinced animus against Italian Americans.  Id. ¶ 544.  They allege that most of the restaurants in the North End serve Italian American food, id. ¶ 13, and "almost all" of the Plaintiffs "are owned by people who have Italian heritage and are white," id. ¶ 565.

To further buttress these claims, Plaintiffs cite a number of statements made by Mayor Wu prior to the termination of on-street dining in the North End.  On March 21, 2022, at the St. Patrick's Day breakfast, Mayor Wu stated that she was "getting used to dealing with problems that are expensive, disruptive and white."  Id. ¶ 192.  Four days later, Mayor Wu sent a letter to North End restaurant owners, stating: "If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of the season."  Id. ¶ 21.  Finally, in 2022, Mayor Wu proclaimed the second Monday in October to be Indigenous Peoples' Day, the same day as Columbus Day, a move

Plaintiffs describe as "a deliberate ethnic affront meant to overshadow or symbolically replace the only federal Italian holiday."[5]  Id. ¶ 268.

Plaintiffs filed their original Complaint in this Court on January 4, 2024, amending it for the first time on March 7, 2024, and then again on April 1, 2024.  Doc. Nos. 1, 16, 21.  In the SAC, Plaintiffs advance five claims: Counts I and II assert violations of the Equal Protection Clause; Count III asserts violations of Procedural and Substantive Due Process; and Counts IV and V request declaratory judgments concerning the outdoor-dining program policies.  Doc. No. 21 at ii.  The City moved to dismiss, contending each count fails to state a claim and that the SAC violates Rule 8(a)(2) of the Federal Rules of Civil Procedure ("Rule 8").  Doc. No. 22.  Plaintiffs have opposed.  Doc. No. 27.  The Court held a hearing on December 6, 2024.

## II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In so doing, the complaint must advance "factual allegations, either direct or

---

[5] The Court takes judicial notice that the second Monday in October is a federal "legal public holiday" called Columbus Day.  5 U.S.C. § 6103.  The Supremacy Clause of the United States Constitution provides that "every State shall be bound" by federal law.  U.S. Const. art. VI, cl. 2. Therefore, local officials cannot repeal, eliminate, or "replace" Columbus Day or any other federal holiday.  Of course, nothing in the text of § 6103 either requires state or local governments to observe Columbus Day or prevents local or state officials (or federal officials, for that matter) from designating the second Monday in October as also commemorating other events, people, or causes.  Indeed, that is precisely what Mayor Wu's predecessor did by designating the second Monday in October as Indigenous People's Day in 2021.  Exec. Order of Mayor Kim Janey Relative to Indigenous Peoples in Boston (Oct. 6, 2021), https://drive.google.com/file/d/1W3bWMFH3d5gKaC4dgtEJ69xpoV-trv6L/view [https://perma.cc/AYF3-EHKZ].  In addition, federal law does not require states or municipalities to declare Columbus Day as a state or local holiday, and, apparently, several states do not celebrate such a holiday.  See Drew Desilver, Working on Columbus Day or Indigenous Peoples' Day? It Depends on Where Your Job Is, Pew Rsch. Ctr. (Oct. 5, 2023), https://www.pewresearch.org/short-reads/2023/10/05/working-on-columbus-day-or-indigenous-peoples-day-it-depends-on-where-your-job-is/ [https://perma.cc/GDP9-AJWQ].

inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997). Courts must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

III.    DISCUSSION

The Court proceeds as follows. First, it will consider the alleged Rule 8 violation. Next, it will address whether one particular Plaintiff has standing to bring its claims. Finally reaching the merits, it will evaluate the Equal Protection claims, then the Procedural and Substantive Due Process claims, and end with the claims arising under the Declaratory Judgment Act.

A.    Rule 8 Violation

"A district court has the power to dismiss a complaint when a plaintiff fails to comply with the Federal Rules of Civil Procedure." Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993). Rule 8 requires plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule "protect[s] a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008). A complaint "should be short because 'unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'" Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).

"Unnecessary prolixity" fairly describes the SAC.  It contains well over 700 numbered paragraphs spanning over 200 pages.  It is neither "short" nor "plain."  This is one type of prolix pleading against which Rule 8 safeguards.  See Jackson v. Polaroid Corp., 181 F.3d 79 (1st Cir. 1999) (unpublished table decision) (affirming dismissal of "long and redundant" 350-paragraph complaint because of noncompliance with Rule 8).

Nonetheless, Plaintiffs defend their SAC, not by asserting it is either "short" or "plain," but rather contending it complies with Rule 8 because the pleading "contains" a short and plain statement in the form of a fourteen-page "introduction."  Doc. No. 27 at 50.  This view of the Rule is misguided.  While laying out in detail the theory of a complaint, along with supporting factual allegations, can be helpful, the SAC goes substantially too far.  "A complaint should not be a preview of counsel's argument to the jury at the end of the case and it should avoid unnecessary facts, descriptive terms, repetitions[,] argumentative language, or characterizations."  Washburn v. Kingsborough Cmty. Coll., No. 20-cv-00395, 2022 U.S. Dist. LEXIS 51086, at *4 (E.D.N.Y. Mar. 22, 2022) (cleaned up).  Here, Plaintiffs summarized several meetings and communications, included photos of those meetings and of an electric sweeper, provided a "brief" history of Italians in the North End, repeated Mayor Wu's statement at the St. Patrick Day breakfast five times, quoted several seemingly random "residents," inserted multiple characterizations of "legendary" restaurants and "jaw dropping" fees, described the media's response to the on-street-dining ban, omitted virtually no detail of the entire course of events, and much more.  The Court has considered whether each or even many of these assertions are necessary to advance the causes of action set forth in the SAC; they are not.  To require the City to answer the SAC as presently drafted imposes an unfair and unnecessary burden—one of the harms Rule 8 seeks to prevent.  It also imposes a significant burden on the Court as it attempts to

sift through the allegations of the pleading.  Accordingly, for this reason alone—failure to comply with Rule 8—the Motion to Dismiss is ALLOWED.

Ordinarily, in such circumstances, the Court would provide leave to amend the complaint.  However, the Court does not do so here for three reasons.  First, despite facing a Rule 8 challenge, Plaintiffs, represented by counsel, did not request leave to amend in their Opposition to the Motion to Dismiss (spanning over fifty pages), nor in their surreply (also spanning over fifty pages with exhibits).  Second, the SAC is the third complaint filed by Plaintiffs in this action, which was preceded by several pleading attempts in the prior action before Judge Talwani.  Third, the Court proceeds to review the substance of the claims and, as the Court explains below, the claims pursued in the SAC do not survive on the merits.

B.  <u>Standing</u>

The Court must first attend to standing.  <u>See</u> <u>United States v. AVX Corp.</u>, 962 F.2d 108, 113 (1st Cir. 1992).  The City does not dispute the standing of the individual Plaintiffs and, of course, the allegations in the SAC establish their standing at this stage of the proceedings.  The City does, however, contend that NECC lacks associational standing to sue either directly or on behalf of its members.  Doc. No. 23 at 41.

To satisfy the case-or-controversy requirement of Article III of the United States Constitution, plaintiffs must establish "each part of a familiar triad: injury, causation, and redressability."  <u>See</u> <u>Katz v. Pershing, LLC</u>, 672 F.3d 64, 71 (1st Cir. 2012) (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).  In addition, an organizational party must demonstrate that "(1) one or more of its members would have standing to sue as an individual; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977) (cleaned up).

NECC has satisfied, and the City does not challenge, the first prong of the standing test because some of the restaurants named as Plaintiffs are members of the NECC, and those restaurants allege having suffered harm from the City's outdoor-dining policies. Regarding the second prong, Plaintiffs assert that NECC's purpose is to "advance[e] [sic] the business, commercial, industrial, and civic interests of the North End district of Boston and its trade areas." Doc. No. 27 at 49. This plausibly satisfies the second prong of the standing requirement for motion-to-dismiss purposes.

The third prong is a bit more complicated. "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." Warth v. Seldin, 422 U.S. 490, 515 (1975). If the association seeks equitable relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Id. Therefore, the claims arising out of the Declaratory Judgment Act and those seeking injunctive relief requiring the City to change its policies "turn[] on a question of law . . . not particular to each member of the Association, and because the declaration [or other equitable relief] [would apply] equally to all members of the Association, there is no need for individual proof or participation." Playboy Enters. v. Pub. Serv. Comm'n, 906 F.2d 25, 35 (1st Cir. 1990). Thus, for these claims, NECC has established the third prong and thus has associational standing.

The claims seeking monetary damages are different. NECC is not "entitled to be compensated for the various injuries suffered by its members," and the member restaurants are necessary as parties to assess each of their damages separately. Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 307 (1st Cir. 2005). Thus, NECC does not have associational standing to

press the claims for monetary damages.  The Motion to Dismiss is thus ALLOWED as to NECC

insofar as it seeks monetary damages.

C.  Equal Protection Claims

"The Equal Protection Clause requires states to treat alike all persons similarly situated."

Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006).  To determine whether a state violates this

provision of the Constitution by treating two groups differently, courts must first assess whether

the state action burdens a suspect class or impinges upon a fundamental right.  See Cook v.

Gates, 528 F.3d 42, 61 (1st Cir. 2008).  Certain suspect classifications, such as race or national

origin, are subject to "strict scrutiny, which entails both a compelling governmental interest and

narrow tailoring."  Massachusetts v. U.S. Dep't of Health & Hum. Servs., 682 F.3d 1, 8-9 (1st

Cir. 2012).  However, where there is no fundamental right or suspect classification implicated, a

plaintiff must establish that "no rational basis exist[ed] for that difference in treatment, and that

the different treatment was based on a malicious or bad faith intent to injure."  Rocket Learning,

Inc. v. Rivera-Sánchez, 715 F.3d 1, 10 (1st Cir. 2013).

Plaintiffs advance three main arguments.  First, Plaintiffs contend that implementing a

different outdoor-dining policy in the North End triggers strict scrutiny because it constitutes

discrimination based on national origin and race—"white, Italian Americans"—and implicates a

fundamental right—on-street-dining licenses.  Doc. No. 27 at 23, 39.  In the alternative, they

allege a "class-of-one" claim.  See id. at 1.  Finally, they argue that the City's policies treating

the North End differently could not survive rational-basis review.  Id. at 16.  The Court considers

each argument in turn.

1.  Strict Scrutiny

At the outset, the Court dispenses with Plaintiffs' assertion that the United States

Constitution vests in them a "fundamental right" to use public streets for private profit as an

extension of their restaurants.  Such a right is neither expressly created in the Constitution nor fairly inferred from any provision thereof.  See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (listing recognized fundamental rights as those guaranteed by Constitution, including "specific freedoms protected by the Bill of Rights," "the right[] to marry," "to have children," "to direct the education and upbringing of one's children," "to marital privacy," "to use contraception," "to bodily integrity," and stating that Court has "always been reluctant to expand the concept").  Thus, to trigger strict scrutiny, Plaintiffs must successfully implicate a suspect classification.

"When the government uses explicit [suspect] classifications for the distribution of benefits, discriminatory intent is presumed, and those policies are always subjected to strict scrutiny."  Anderson v. City of Bos., 375 F.3d 71, 82 (1st Cir. 2004).  The policies cited by Plaintiffs do not explicitly classify based on race,[6] ethnicity, or national origin.[7]  They are facially neutral and, as a result, Plaintiffs fail to state a claim for express use of prohibited classifications.

When policies do not explicitly discriminate based on suspect classification, as is the case here, strict scrutiny may still apply if "the legislation in some sense was designed to accord disparate treatment on the basis of racial [or national origin] considerations."  Washington v. Seattle Sch. Dist., 458 U.S. 457, 484-85 (1982).  A discriminatory purpose may be shown in two

---

[6] At times, Plaintiffs claim the ban on-street dining in the North End constitutes racial discrimination against white people. Doc. No. 21 ¶¶ 19, 41, 74, 192, 565.

[7] Membership within a suspect class involves characteristics that define a discrete group, which are generally immutable or otherwise not within the members' control.  See Lyng v. Castillo, 477 U.S. 635, 638 (1986).  Owning a restaurant in the North End is plainly a characteristic that one would have control over and likely does change from time to time.  Cf. Walsh v. Massachusetts, 618 F.2d 156, 158 (1st Cir. 1980) ("The shortest way of disposing of this complaint is to note that it erroneously assumes that a distinction drawn upon strictly county lines is on that account a violation of the Equal Protection Clause.").

ways.  See Anderson, 375 F.3d at 82-83.  First, Plaintiffs may demonstrate that "a clear pattern, unexplainable on grounds other than race [or national origin], emerges from the effect of the state action."  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).  Second, and alternatively, a discriminatory purpose may be proved via "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 45 (1st Cir. 2021).  Such discriminatory intent may be shown by evaluating "the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical background of the decision."  Id. (quoting Anderson, 375 F.3d at 83).

Plaintiffs' factual allegations fail to plausibly allege a discriminatory purpose by way of a pattern of action explainable only on grounds of national origin.  Plaintiffs fail to identify a pattern of conduct historically targeting the North End, Italian restaurants, or "white Italian Americans."  Doc. No. 27 at 23.  At most, they allege shifts in policy in 2022 and 2023 affecting the North End: eliminating the fee waiver for outdoor dining, shortening the outdoor-dining season, and eventually no longer allowing on-street dining.  These changes were not "unexplainable on grounds other than race [or national origin]," but rather justified, as Plaintiffs allege in their SAC, by the unique impacts of the program on the North End.  The policy also applied uniformly without regard to the identity of the owner or the type of food served by the restaurant.  With respect to the "degree of disproportionate racial effect," the very policy Plaintiffs allege harms "white Italian Americans" or "Italian restaurants" actually benefits several Italian restaurants (and likely restaurants owned by those of Italian descent) that enjoyed

on-street dining outside the North End.[8]  See Doc. No. 21 ¶¶ 453, 454, 459, 487, 504, 506, 507. This favorable treatment undermines any inference of discriminatory purpose or intent against the "class" that Plaintiffs purport to allege.  See, e.g., Turner v. Eastconn Reg'l Educ. Serv. Ctr., 588 F. App'x 41, 44 (2d Cir. 2014) (holding plaintiff's allegation that member of same protected class "received favorable treatment would undermine any inference that the [d]efendants were motivated by [discriminatory] animus"); Fitzgerald v. Nat'l R.R. Passenger Corp., No. 13-6979, 2016 U.S. Dist. LEXIS 91114, at *16 (E.D. Pa. July 13, 2016) ("The fact that several African American employees were chosen for the very positions that Plaintiff sought undercuts Plaintiff's claim that the decisions were motivated by racial animus").  In sum, these facts do not plausibly support a "clear pattern" from which one can reasonably infer discriminatory purpose sufficient to invoke strict scrutiny.

Plaintiffs also fail to allege legislative or administrative history that would support a claim of discriminatory intent.  Plaintiffs offer no facts supporting the inference that the City imposed the challenged regulations because many restaurants in the North End serve Italian food or are owned by those of Italian heritage or white people.  A joke, perhaps about white people, made by the Mayor at the St. Patrick's Day breakfast hardly suggests animus against Italian Americans.[9]  Similarly, the designation of Indigenous People's Day is not evidence of animus.

> The government does not violate the Equal Protection Clause every time it affirms
> or celebrates an ethnicity.  Otherwise, Columbus Day itself would arguably have
> been an [E]qual [P]rotection violation—but of course it wasn't.  Under Plaintiffs'
> theory, every national or ethnic group in [the city]—Asians, Scandinavians, Arabs,

---

[8] Plaintiffs have not alleged that no restaurants outside of the North End are owned by white people or Italian Americans.  Based on Plaintiffs' pleadings, that is not a reasonable inference to draw.

[9] The Court notes no basis to infer discrimination against "white" people.  The challenged regulations apply to any restaurant in the North End and the restaurants not subject to these stricter limitations are located in all the other neighborhoods without regard to the race of its owners.

Pacific Islanders, and so on—could assert claims against [the mayor] and the city
for declaring a holiday celebrating a nationality or ethnicity different than theirs.

Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila., No. 22-1116, 2023 U.S.

App. LEXIS 2200, at *6 (3d Cir. Jan. 27, 2023).  Nothing about these designations supports the

inference of discriminatory intent, especially given the fact that a different mayor had designated

Indigenous People's Day as a holiday the year before the challenged conduct here.[10]  Finally,

Plaintiffs also allege that Mayor Wu's hosting a holiday party for "Electeds of Color"

"underscores her racial views and provides context for her treatment of the plaintiffs in this case,

almost all of which are owned by people who have Italian heritage and are white."  Doc. No. 21

¶ 565.  None of these facts, in isolation or together, plausibly allege discriminatory intent.

Plaintiffs also attempt to show discriminatory intent by pointing to a disproportionate

impact of the challenged regulations on persons of Italian heritage.  This approach fails.  What

Plaintiffs have alleged is a regulation of restaurants, in a certain neighborhood, predominately

serving Italian food, and predominately owned by persons of Italian heritage.  "But a disparate

impact standing alone does not demonstrate discriminatory intent, and a few instances of

disparate impact in enforcement do not amount to a consistent pattern."  Bruce & Tanya &

Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., 854 F. App'x 521, 533 (4th Cir. 2021)

(cleaned up).  And Plaintiffs have not augmented these facts with other allegations describing a

pattern of discriminatory actions toward persons of Italian heritage.  In fact, the SAC alleges

several Italian restaurants in other neighborhoods obtained on-street-dining permits.  See Doc.

No. 21 ¶¶ 453, 454, 459, 487, 504, 506, 507.  Therefore, even with the benefit of the plaintiff-

---

[10] A court may consider "documents that are incorporated into or attached to the complaint, as
well as matters of public record subject to judicial notice."  Cebollero-Bertran v. P.R. Aqueduct
& Sewer Auth., 4 F.4th 63, 69 n.4 (1st Cir. 2021).

favorable standard governing motions to dismiss, Plaintiffs fail to plausibly allege the sort of discrimination that would trigger strict scrutiny.

### 2. Class-of-One

"[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008) (cleaned up). "A claim for a 'class of one' equal protection violation is cognizable when—and only when—a plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[11] SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir.2008) (cleaned up). The First Circuit has hesitated "to open[] up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric," and it has more generally limited "class of one" analysis by imposing two additional requirements. Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 44 (1st Cir. 1992). First, to be similarly situated requires asking "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent." SBT Holdings, 547 F.3d at 34. In other words, Plaintiffs must show that they are "similarly situated in all respects relevant to the challenged government action." Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013). To do so requires an "extremely high degree of similarity" which "must be enforced with particular rigor in the land-use context because zoning

---

[11] Plaintiffs advance a class-of-one claim and a selective-treatment claim in Count I. In addition to showing that a plaintiff was treated differently from those similarly situated, a selective treatment claim requires that the treatment was based on impermissible considerations such as race, religion, or the exercise of constitutional rights or bad faith. Id. at 508. As the Court will explain, the selective-treatment claim fails for the same reasons that the class-of-one claim fails; namely, Plaintiffs fail to allege that others were indeed similarly situated, and Plaintiffs fail to sufficiently allege that the treatment was motivated by impermissible considerations such as membership in a suspect class or bad faith.

decisions will often, perhaps almost always, treat one landowner differently from another."
McCoy v. Town of Pittsfield, 59 F.4th 497, 507-08 (1st Cir. 2023).  Second, in determining
whether the differential treatment withstands a rational basis, courts examine whether the
defendants' conduct was "motivated by malicious or bad faith intent to injure."  SBT Holdings,
547 F.3d at 35 (cleaned up).

     Measured against these standards, the SAC fails to plausibly plead a class-of-one claim.
Most permitting decisions in which such classes-of-one are considered concern the use of private
property.  See, e.g., SBT Holdings, 547 F.3d at 30; Custodio, 964 F.2d at 34.  Not so here, where
Plaintiffs claim a right to use public property—portions of streets in Boston—for private profit.
Unsurprisingly, Plaintiffs cite no case supporting their position involving the use of public
property for private profit.[12]

     Turning to the requirements for such a claim, Plaintiffs fail on all grounds.  The other
neighborhoods Plaintiffs cite are not similarly situated.  None of those neighborhoods, to the eye
of "a prudent person, looking objectively," are "roughly equivalent" "in all relevant respects" to
the North End, nor have Plaintiffs pled plausibly "an extremely high degree of similarity."  The
North End, as characterized by Plaintiffs in their own pleading, is an exceptionally dense

---

[12] Plaintiffs instead repeatedly invoke Brockton Power LLC v. City of Brockton, where this
Court denied a motion to dismiss a class-of-one Equal Protection claim.  948 F. Supp. 2d 48, 70
(D. Mass. 2013).  That case, however, offers little help to Plaintiffs here.  In Brockton Power, the
plaintiffs alleged that the defendants, in a years-long, targeted effort, employed several strategies
to thwart the plaintiffs' efforts to develop a power plant, including "improper attempts to change
applicable zoning regulations; refusal to process, or summary denial of, necessary review and
approval of project plans and applications, without regard for applicable regulations and legal
standards; discriminatory efforts to prevent the plaintiffs from gaining access to drinking and
cooling water; persistent litigation and manipulation of state agency and court proceedings; total
disregard for repeated warnings from the City's legal counsel; and stringent, public opposition to
the project and its proponents."  Id. at 56.  Brockton Power also concerned the use of private
property.  Plaintiffs' situation is wholly different.

neighborhood, with the highest density of restaurants in the state, located adjacent to the Sumner Tunnel and the North Washington Street Bridge construction project.  Plaintiffs allege that the restaurants in the North End should be compared to other restaurants in other neighborhoods of Boston.  Doc. No. 21 ¶ 439.  But the different treatment Plaintiffs describe and complain of concerns the neighborhood of the North End.  See id. ¶ 717 ("The City's blanket refusal to review and approve any application for an on-street outdoor dining license for restaurants in the North End is contrary to law . . . ").  The most salient comparator, then, would not be other restaurants, but other neighborhoods in Boston.  Cf. Back Beach Neighbors Comm. v. Town of Rockport, 63 F.4th 126, 131 (1st Cir. 2023) (explaining, where different treatment was based on failure to enforce regulations at Back Beach, appropriate unit of comparison would be other public beaches in town similar in all relevant respects).

But even if the Court were to compare restaurant to restaurant, Plaintiffs cite certain relevant aspects, such as "width of the streets" or the "restaurants' location in residential buildings," while averring that restaurants outside the North End are similarly situated.  Doc. No. 21 ¶ 439.  That is not a valid application of the law.  Plaintiffs cannot pick and choose the aspects that would make the restaurants similar; they must contend with all aspects relevant to the regulation, including the neighborhood in which the restaurant is located.  See Back Beach, 63 F.4th at 131.  This requires comparing neighborhoods, as that is a relevant aspect pertaining to the policy.  Plaintiffs allege that the justification of the policy was that the "North End is different from other neighborhoods because of the unique impacts of outdoor dining on the quality of residential life."  Doc. No. 21 ¶ 198.  Beyond that, they have not identified any other neighborhood with similar relevant aspects pertaining to restaurant density, residential quality of life concerns, and proximity to construction projects, that would make a valid comparator.

Therefore, the restaurants in the North End are not similarly situated with restaurants outside the North End.  This alone is fatal to the class-of-one claim.

Next, Plaintiffs fail to plausibly plead bad faith or malicious intent to injure.  Plaintiffs do not advance allegations establishing that the City bore an affirmative intent to harm them.  They do state that the alleged "quality of life" justification for the different treatment was baseless (and therefore pretext masking bad faith), because the outdoor-dining program did not actually cause the issues relating to rats, rodents, traffic congestion, accessibility problems, and trash afflicting the neighborhood.  Even accepting this as true (i.e., assuming that outdoor dining did not cause all of these issues), the SAC alleges something materially different.  The statements of and decisions by the City set out in the SAC allege that the City concluded on-street dining exacerbated, rather than created, these problems, and that this conclusion led first to its decision to limit on-street dining and then to eliminate it altogether.  While Plaintiffs may argue that the City could have addressed these concerns in other ways, that is not before the Court to decide, nor does it convert the rationale to one made in bad faith.  The City's weighing and prioritizing different considerations yielding a decision different from the one Plaintiffs might prefer is not evidence of bad faith or an attempt to harm or injure Plaintiffs.[13]

Plaintiffs also argue that the City acted in bad faith by retaliating against them after the exercise of their constitutional rights to petition the government and to seek redress in the Courts.  See Fabiano v. Hopkins, 352 F.3d 447, 453 (1st Cir. 2003).  The former arises from the exclusion for fire safety reasons of some restaurant owners from a press conference held by

---

[13] Plaintiffs also complain of a lack of transparency or consultation in the course of the Mayor's decision making regarding on-street dining in the North End.  Doc. No. 21 ¶ 13.  They point to no law requiring the Mayor to have conducted herself differently.  Further, Plaintiffs have not alleged that the Mayor conducted herself differently when dealing with other restaurant owners in other neighborhoods.

Mayor Wu addressing on-street dining.  The latter emerged from a statement by Mayor Wu after a few Plaintiffs filed the first lawsuit.  In particular, Mayor Wu stated that "[i]f a critical mass of restaurant owners also believe this program is unworkable as proposed, then [she was] prepared to rescind North End outdoor dining before the start of the season."  Doc. No. 21 ¶ 21.  Even if the Court construed the latter comment as a "public threat,"[14] Plaintiffs "adduce no direct evidence establishing retaliatory motive.  Instead, they rely entirely on circumstantial evidence: that is, [the complained of action] followed the" plaintiffs' exercise of their constitutional rights. Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995).  The law requires that "the malice/bad faith standard should be scrupulously met."  Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 932 F.2d 89, 94 (1st Cir. 1991).  Plaintiffs have alleged the Mayor decided the North End was a unique neighborhood (a point on which Plaintiffs agree), and that various aspects of this "uniqueness" caused the Mayor to first impose a fee and then eliminate on-street dining. Whether this decision was the "best policy" or the "wisest" decision is not for a court to decide. See New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines[.]").  That the Mayor said she would go only so far, accepting the facts as pled by Plaintiffs, is not a retaliatory threat. Plaintiffs have not plausibly alleged the decision was made in bad faith.  Cf. Rubinovitz, 60 F.3d at 912 (finding "enough indication of a malicious orchestrated campaign causing substantial harm" where one city official sought to punish single landowner after landowner evicted

---

[14] Plaintiffs contend that the preceding statement by Mayor Wu, given its timing, was a public threat.

official's friend, going so far as to arrange for city to terminate utility services to landowner's property).

### 3. Rational-Basis Scrutiny

Absent a classification triggering strict scrutiny, the court will deploy rational-basis review, which is generally deferential to the government actor.  See Massachusetts v. United States HHS, 682 F.3d 1, 9 (1st Cir. 2012).  "Under rational basis scrutiny, a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational."  D'Angelo v. N.H. Sup. Ct., 740 F.3d 802, 806 (1st Cir. 2014); see also Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003) (noting "even foolish and misdirected provisions will be upheld under this test" (cleaned up)). "[A] classification 'must be upheld against [E]qual [P]rotection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Heller v. Doe, 509 U.S. 312, 320 (1993) (emphasis added) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)).

The Court need not imagine a set of facts that would provide a rational basis for the City's policies because Plaintiffs have already supplied them.  To justify the fees imposed on Plaintiffs, the City considered the "unique impacts of outdoor dining on the quality of residential life," such as "trash, rodents, traffic, and parking problems."  Doc. No. 21 ¶ 22.  To justify the ban on on-street dining in the North End, the City cited "the North End's high density of restaurants and foot traffic, narrow streets and sidewalks, resident parking scarcity, and other related considerations."  Id. ¶ 412.  The City also pointed to the "scheduled closures of the Sumner Tunnel and continued congestion around the North Washington Street Bridge construction project."  Id. ¶ 309.  These explanations more than suffice to show that the reasons underlying the policies were rationally related to legitimate government interests.  Plaintiffs do

not challenge the accuracy of the concerns; that is, they do not allege that the construction projects or the rodent problem did not exist. Instead, Plaintiffs argue that they were not the real reasons the City shifted its policies. However, the law does not require the City to "prove" the legitimacy of these justifications, only that the reasons it provided rationally related to valid government interests. In addition, the City is entitled to proceed one step at a time in addressing public concerns. Dukes, 427 U.S. at 30 ("Legislatures may implement their program step by step . . . in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations."). While these considerations may not be entirely absent from other neighborhoods, Plaintiffs' own allegations establish that the City has sufficiently articulated a rational basis for treating the North End differently. These reasons are neither arbitrary nor irrational. Cf. Willowbrook v. Olech, 528 U.S. 562, 563 (2000) (holding village's demand of thirty-three-foot easement as opposed to fifteen-foot-easement applied to others was "irrational and wholly arbitrary"). Therefore, Plaintiffs' Equal Protection claims fail under rational basis review. The Motion to Dismiss is ALLOWED as to Counts I and II.

D. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This prohibition "applies fully to a state's political subdivisions, including municipalities and municipal agencies." Harron v. Town of Franklin, 660 F.3d 531, 535 (1st Cir. 2011). The Due Process Clause has both procedural and substantive components. "The former ensures that government, when dealing with private persons, will use fair procedures." Id. at 535-36 (cleaned up). The latter "functions to protect individuals from particularly offensive actions on the part of government officials, even when the government

employs facially neutral procedures in carrying out those actions." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006). Plaintiffs' claims invoke both components.

### 1. *Procedural Due Process*

"The threshold issue in a [P]rocedural [D]ue [P]rocess action is whether the plaintiff had a constitutionally protected property interest at stake." Clukey v. Town of Camden, 717 F.3d 52, 55 (1st Cir. 2013). Property interests are defined by state law. Id. To establish a constitutionally protected property interest, "the plaintiffs must identify a legitimate claim of entitlement to the property in question—a claim of entitlement created and defined by existing rules or understandings that stem from an independent source such as state law." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005) (cleaned up). "[A]n abstract need or desire or a unilateral expectation are not sufficient to cement a constitutionally protected interest." Id. (cleaned up). In general, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).

Plaintiffs plainly do not have a property interest in on-street-dining licenses. They make five arguments why they do. None succeed.

First, Plaintiffs argue that because their 2022 licenses were in effect when the 2023 ban was announced, they had a "reasonable and legitimate expectation of receiving the continuous benefit." Doc. No. 27 at 36-37. Yet nothing in the Executive Orders or statutes authorizing the City to approve applications for on-street dining required the approval of such requests or established criteria for the approval of such requests. Governor Baker issued an executive order enabling—but not requiring—cities and towns to grant approvals permitting outdoor-dining

service.[15]  See Governor's COVID-19 Order No. 50 § 1, https://www.mass.gov/doc/september-10-2020-order-making-certain-phase-iii-adjustments/download (last visited Dec. 18, 2024) (providing cities "may" allow outdoor dining).  Massachusetts then enacted law cementing this discretionary authority.  See 2021 Mass. Acts ch. 20, § 19(b) (stating "a city or town may approve a request for expansion of outdoor table service").  It also provided that "a city, town or local licensing authority may modify the scope of the approval as the city, town or local licensing authority deems proper and appropriate."  Id. § 19(d).  Massachusetts law now provides that "a city or town may approve a request for expansion of outdoor table service," and that "the mayor, board of selectmen, select board or other chief executive officer, as established by charter or special act, shall establish the process for approving such requests."  Mass. Gen. Laws ch. 40A, § 3B(b) (2024); accord 2021 Mass. Acts c. 20, § 19(b) (providing for the same).  Further, none of the Executive Orders or statutes stated or implied that the outdoor-dining program would continue the following year.  Cf. Bd. of Regents v. Roth, 408 U.S. 564, 578 (1972) (noting plaintiffs "secured absolutely no interest" where terms of employment "made no provision for renewal whatsoever").

The grant of licenses, as explained by Plaintiffs in their SAC, see Doc. No. 21 ¶ 201, was never automatic and thus not an entitlement.  See Roth, 408 U.S. at 577.  Of course, this explanation mirrors the actual provisions of the relevant laws delegating authority to the City to establish the scope of the program and the process by which restaurants may apply.  As would-be

_____

[15] Plaintiffs' counsel contended at the hearing that once the City authorized on-street outdoor dining anywhere in Boston, it was required to allow it everywhere.  Not so.  City zoning ordinances designate various portions of the city for residential or commercial uses; for example, no on-street dining exists where restaurants may not operate.  More importantly, Plaintiffs fail to cite any language in the City's policies or regulations requiring the City to offer on-street dining in the North End.  Nor do they cite any language in either the Executive Order or subsequent statutes precluding a locality from authorizing on-street dining in some areas, but not others.

holders of the on-street-dining licenses issued pursuant to a discretionary permitting system, and in the absence of a fundamental right, Plaintiffs do not have a property interest in the licenses. Cf. Harron, 660 F.3d at 537 ("As a would-be holder of a liquor license, [Plaintiff] had no property interest in the license."); see also Caesars Mass. Mgmt. Co., LLC v. Crosby, 778 F.3d 327, 333-34 (1st Cir. 2015) ("Massachusetts courts have held that, if the state actor retains discretion to grant or withhold the permit or license, there is no protected property interest.").

Second, Plaintiffs assert that the importance of outdoor dining created a protected property interest. Doc. No. 27 at 37. The subjective importance of on-street dining to Plaintiffs does not create a protected property interest. In fact, a need for property is not sufficient to create a property interest in it. The Supreme Court has made clear that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577. Plaintiffs contend that the fees and ban also "placed North End restaurants at a substantial competitive disadvantage when compared to restaurants in every other neighborhood." Doc. No. 21 ¶ 421. But a business does not have a protected property interest to be free from competition. See Ill. Transp. Trade Ass'n v. City of Chi., 839 F.3d 594, 596 (7th Cir. 2016) (holding property "does not include a right to be free from competition"). As Plaintiffs do not have a legitimate claim of entitlement to on-street-dining licenses, that the licenses were important does not render the licenses a property interest.

Third, Plaintiffs allege that certain "mutual understandings" existed such that Plaintiffs came to expect the continuation of the program in the North End. Doc. No. 27 at 37-39. In so doing, they rely on a case, pertaining to a plaintiff's entitlement to continued employment, that draws upon contract principles. See Perry v. Sindermann, 408 U.S. 593, 602 (1972). This

argument also fails.  For one thing, there is no contract or contractual provision explicitly evincing a formal entitlement of on-street-dining licenses.  Even if there were, Perry does not aid Plaintiffs as they suggest.  There, the Court held that evidence of a contractual provision "would not, of course, entitle [the plaintiff] to reinstatement," but rather would obligate the government officials "to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency."  Id. at 603.  Plaintiffs point to a slide in a presentation, identifying the objectives of the outdoor-dining program, stating that the City intended to "[r]etain as many restaurants from this year's program while increasing the participation rate in neighborhoods that are underrepresented."[16]  Doc. No. 21 ¶ 277.  They also point to a statement made in a press release hinting that there could be "future iterations" of the program.  Doc. No. 27 at 39.  Indeed, Plaintiffs also alleged:

> The City invited all Boston restaurants to participate in the program.  The City decided whether to approve or deny a restaurant's application.  The City itself— not the restaurants or the neighborhoods—made the call on how many restaurants would participate.  And this is precisely what happened in 2021 and 2022.  In 2022, under the Wu Administration, 350 restaurants applied for outdoor dining, yet the City approved just 280 of them, turning away 20% of the applicants.  In addition, the City reviewed and approved the size of the on-street patio for each restaurant.

Id. ¶ 201.  None of these allegations, separately or together, plausibly make out the creation of a property right or some shared agreement or entitlement to a particular form of outdoor dining.  They, at most, reflect a discretionary policy decision to continue a discretionary program.  Nor

---

[16] The Court notes that several other slides in a presentation for North End restaurants participating in the outdoor-dining program stated: (1) "Restaurants that participated in the 2021 temporary outdoor dining program must re-apply for 2022"; (2) "Restaurants with permanent patios who wish to extend beyond their currently licensed patio will need to apply for the temporary program as well"; and (3) "The use of the public way is a privilege and must be shared by businesses, residents, visitors, and special events.  The City may ask the licensee to remove their patio at any time."  2022 Temporary Outdoor Dining Requirements, City of Boston Webinar, https://drive.google.com/file/d/1hyVeOGB7IsuVlKicjQGtJHzmt2OdyDKW/view [https://perma.cc/JXM2-NRA7].  Attendance at the program was "mandatory" for restaurants interested in participating in the outdoor dining program.  Doc. No. 21 ¶ 632.

do any of these factual allegations plausibly suggest the City relinquished or limited the discretionary legal authority it possessed to deny a license or to eliminate the outdoor-dining program entirely.

Fourth, Plaintiffs contend they have a property interest based on an "ethic that pervades our legal system."  Doc. No. 27 at 39.  Relying on a single state-court decision from almost forty years ago, Plaintiffs assert they have a protected property interest where the "government exerts power upon an individual in a matter of consequence has been related, on occasion, not strictly to the Constitution, but to an ethic that pervades our legal system."  Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 473 N.E.2d 1154, 1159 (Mass. App. Ct. 1985).  However, not only does Yerardi's concern an agency decision—not at issue here—but the court noted that, where an agency denies an individual relief, "it would do well to state its reasons at or near the time of decision."  473 N.E.2d at 1159.  Thus, Plaintiffs' own factual allegations render Yerardi's inapposite—Plaintiffs have pled at length the City's justifications for the fees and end of on-street dining in the North End.  In any event, Yerardi's concerns an "ethic" giving rise to a right, in certain circumstances, to an explanation of the reason(s) for governmental action taken against an individual license holder—it does not describe an ethic that creates substantive property rights.

Finally, Plaintiffs aver that they have a property interest in the goodwill of their businesses.  Doc. No. 27 at 40.  This argument also fails.  Plaintiffs neither cite to binding authority[17] recognizing a protected property interest of a business's goodwill, nor explain how the City's policies led to a loss of goodwill.

---

[17] Plaintiffs instead cite Soranno's Gasco, Inc. v. Morgan, which relied on California law and is not relevant in the instant case.  874 F.2d 1310 (9th Cir. 1989).

The Court need not go further as Plaintiffs fail to make the threshold showing that they were deprived of a protected property interest. The Motion to Dismiss Count III is ALLOWED.

## 2. *Substantive Due Process Claim*

To establish a Substantive Due Process claim, a plaintiff "must plausibly allege that the actions taken against [the plaintiff] were so egregious as to shock the conscience and that they deprived [the plaintiff] of a protected interest in life, liberty, or property." Gianfrancesco, 712 F.3d at 639. As previously explained, no protected property interest in on-street-dining licenses exists. Cf. Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either [E]qual [P]rotection or [S]ubstantive [D]ue [P]rocess purposes."). For that reason alone, the Substantive Due Process claim fails.

Even if Plaintiffs possessed a protected property interest, which they do not, the facts they allege fail to shock the conscience despite the benefit of the plaintiff-friendly Rule 12 standard. "In order to shock the conscience, conduct must at the very least be extreme and egregious, or, put another way, truly outrageous, uncivilized, and intolerable." Pagan, 448 F.3d at 32 (cleaned up). The First Circuit has held, "with a regularity bordering on the monotonous, that the [S]ubstantive [D]ue [P]rocess doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong." Id. at 33. "Any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking." Id.; cf. Harron, 660 F.3d at 536 ("[T]here are no truly horrific circumstances alleged here relating to the refusal to transfer or issue a liquor license for the tavern." (cleaned up)); Collins v. Nuzzo, 244 F.3d 246, 250 (1st Cir. 2001) ("[T]he denial of a land use permit, even if arbitrary, did not constitute a [S]ubstantive [D]ue [P]rocess violation unless it was a truly horrendous situation." (cleaned up)).

Here, at most, the City imposed fees for, and later prohibited, private restaurants in an especially dense neighborhood to operate on public streets, while allowing continued use of the public sidewalks.  That simply does not shock the conscience even when the City cut a different path in other neighborhoods.  Cf. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 836-37, 854-55 (1998) (finding officer's decision to engage in reckless high-speed chase after minor speeding violation, eventually causing death of sixteen-year-old motorcycle passenger, did not shock the conscience); Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 624 (1st Cir. 2000) (affirming dismissal where police officers' moving into owners' house without permission, refusing to leave, and subsequently harassing and threatening owners did not sufficiently shock the conscience); Clark v. Boscher, 514 F.3d 107, 113 (1st Cir. 2008) (affirming dismissal where town's denial of necessary permits to develop residential subdivisions did "not rise to the level of behavior that shocks the conscience").  Therefore, Plaintiffs' Substantive Due Process claim is unavailing and the Motion to Dismiss with respect to Count IV is ALLOWED.

E.  Declaratory Judgment Act

Count V of Plaintiffs' SAC alleges that the City's decisions, policies, and practices were arbitrary, capricious, and contrary to law.  Doc. No. 21 at 192.  "The Declaratory Judgment Act provides a procedure for resolving certain kinds of controversies, but it is not a source of substantive rights in itself."  Colonial Penn Grp., Inc. v. Colonial Deposit Co., 834 F.2d 229, 232 (1st Cir. 1987); see also Reiter v. Ill. Nat'l Cas. Co., 213 F.2d 946, 949 (7th Cir. 1954) (noting that Declaratory Judgment Act "granted authority to employ a new remedy in enforcing a cause of action for which there was previously a remedy[;] . . . it did not increase in anywise the jurisdiction of the United States District Court over the substantive rights of litigants or create new causes of action").  The federal Declaratory Judgment Act is not a means by which persons may seek general review of a city's decisions or policies.  See Mitchell v. Dakota Cnty. Soc.

Servs., 959 F.3d 887, 897 n.2 (8th Cir. 2020) ("The Declaratory Judgment Act does not provide a means for standing or relief.").  The only legal authority Plaintiffs cite for this Count, besides the Declaratory Judgment Act itself, is a state-court decision regarding an appeal of an administrative agency's decision.  Doc. No. 27 at 45.  Of course, the decisions at issue in this case are not decisions of an administrative agency but rather the Mayor, the executive officer of the City.  This Count fails to plausibly allege a claim able to stand on its own, let alone facts that would support one.  The Motion to Dismiss Count V is thus ALLOWED.

Count VI alleges that the impact and parking fees imposed on Plaintiffs for the outdoor-dining program constituted an unlawful tax.  Doc. No. 21 at 196.  Under Massachusetts law, a municipality is not authorized to collect taxes unless that power is expressly granted by the state legislature.  See Silva v. City of Attleboro, 908 N.E.2d 722, 725 (Mass. 2009).  However, a municipality may collect user fees without legislative authority.  Id.  Plaintiffs hold the "burden of proving the invalidity of the exaction."  Id.  To constitute a lawful fee, as opposed to an unlawful tax, courts consider whether: (1) "they are charged in exchange for a particular governmental service which benefits the party paying the fee"; (2) "they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge"; and (3) "the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses."  Emerson Coll. v. City of Bos., 462 N.E.2d 1098, 1105 (Mass. 1984).

Plaintiffs fail to plausibly allege that the impact and parking fees imposed in 2022 on restaurants in the North End were unlawful taxes.  The Court comes to this conclusion, taking the facts in the SAC as true, but not the legal conclusions drawn therefrom.  See Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.").

First, Plaintiffs themselves allege that the fees are charged in exchange for a benefit—

namely, a permit to authorize on-street dining that would otherwise be unlawful. These permits

were, as Plaintiffs allege, "central to their recovery and the revitalization of economic activity in

this struggling neighborhood" and "enable[ed] restaurants to recoup some of their losses." Doc.

No. 21 ¶¶ 3, 10. In short, Plaintiffs do not allege facts plausibly supporting the imposition of a

fee without a corresponding benefit.

Second, Plaintiffs paid the fee by choice. The SAC alleges that only those restaurants in

the North End "who choose to participate" in the outdoor dining program pay the fee. Id. ¶ 151.

The SAC further states: "Whether a restaurant decided to participate in outdoor dining was

purely a voluntary choice for each restaurant throughout the City. In fact, about [a] third of the

North End's restaurants did not participate in the outdoor dining program in 2020, 2021, and

2022." Id. ¶ 289 (emphasis added). That payment of the fee was a voluntary choice conflicts

with the fee constituting a tax. Faced with this challenge, Plaintiffs retort that the fees were

"highly coercive" because the restaurants participating in the program would have a "competitive

advantage" over those not participating. Doc. No. 21 ¶ 736. Maybe so, but the restaurants still

had a choice. Restaurants with liquor licenses certainly enjoy a competitive advantage over

those without such a license. Yet, the decision to apply for such a license is a choice, and the

requirement to pay for the license is a fee, not a tax. See Bertone v. Dep't of Pub. Utils., 583

N.E.2d 829, 836 (Mass. 1992) ("Fees are not taxes even though they must be paid in order that a

right may be enjoyed." (cleaned up)). Plaintiffs do not plead any facts that support an inference

that the City compelled the restaurants to apply to participate in the program and consequently

pay the associated fees if its applications were granted.  Furthermore, Plaintiffs allege that the

City offered hardship waivers, enabling qualifying restaurants to pay a reduced fee for

participation in outdoor dining.  See Doc. No. 21 ¶ 224.  This cuts against any inference of

coercion.  Thus, Plaintiffs fail to plausibly allege the fee was involuntary.

Finally, Plaintiffs also fail to make out the third requirement.  The impact fee the City

received paid for services that were related to the program, including rat baiting, power washing

of sidewalks, and painting of street lane lines.  Id. ¶ 150.  One of the fees did not even go to the

City; the parking fees were paid directly to garages to provide parking for residents who lost it as

a direct result of the outdoor-dining program.  Id. ¶ 146.  Plaintiffs counter that some of the funds

also benefited areas of the City other than the North End.  Id. ¶ 27.  Specifically, the City used

some of the collected funds to purchase an electric street sweeper with "[s]pecifications for north

end streets navigation," Doc. No. 21-6 at 2, that was deployed in the North End while adorned

with "a scene of St. Stephen's Church on Hanover Street," "a scene of the Old North Church and

the statue of Paul Revere," and "signs of cities and provinces in Italy, including 'Roma,'

'Milano,' 'Calabria,' 'Venezia,' and 'Torino.'"  Doc. No. 21 ¶ 247.  That the sweeper was also

used in other neighborhoods, id. ¶ 247, resulting in other areas receiving some benefit is

"inconsequential" because the Court's "inquiry does not involve an exact measuring or

quantifying of the comparative economic benefits of the limited group and the general public.

Instead, the inquiry is whether the limited group is receiving a benefit that is, in fact, sufficiently

specific and special to its members," Windsor Ct., LLC v. Lynnfield Water Dist., 18 N.E.3d

1138 (Mass. App. Ct. 2014) (unpublished table decision) (citing Denver St. LLC v. Town of

Saugus, 970 N.E.2d 273, 280 (Mass. 2012)).  See Am. Trucking Ass'ns v. Alviti, 944 F.3d 45,

54 (1st Cir. 2019) ("In any event, we do not think that the [charge] provide a general benefit

characteristic of a classic tax . . . . The key question is whether the assessment raises revenue for purposes that aren't especially beneficial or useful to the payers." (cleaned up)).  Moreover, because Plaintiffs do not allege any facts that the fees were "deposited in the City's general fund, just like tax revenues," they fail to make a showing that the fee was a tax under the third factor described in Emerson College.  SDCO St. Martin, Inc. v. City of Marlborough, 5 F. Supp. 3d 139, 144 (D. Mass. 2014).  For all of these reasons, the Motion to Dismiss pertaining to both Counts V and VI is ALLOWED.

IV.    CONCLUSION

For the foregoing reasons, the Court ALLOWS the City's Motion to Dismiss, Doc. No. 22.  The Clerk shall enter a judgment of dismissal with each side to bear its own fees and costs.

SO ORDERED.

  /s/ Leo T. Sorokin              
United States District Judge